## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------x
                                                                :
In re:                                                          :  Chapter 11
                                                                :
EHT US1, Inc., *et al.*,[1]                                     :  Case No. 21-10036 (CSS)
                                                                :
            Debtors.                                            :  (Joint Administration Requested)
----------------------------------------------------------------x

### DECLARATION OF ALAN TANTLEFF, CHIEF RESTRUCTURING OFFICER OF EAGLE HOSPITALITY GROUP, IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Alan Tantleff, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("CRO") of Eagle Hospitality Real Investment Trust ("EH-REIT") and its direct and indirect subsidiaries, (collectively, the "Eagle Hospitality Group"), certain of which are debtors and debtors in possession (the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases").[2]  I have served as the CRO to the Eagle Hospitality Group since April 13, 2020.  I am a Senior Managing Director and Leader of the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: EHT US1, Inc.(6703); 5151 Wiley Post Way, Salt Lake City, LLC (1455); ASAP Cayman Atlanta Hotel LLC (2088); ASAP Cayman Denver Tech LLC (7531); ASAP Cayman Salt Lake City Hotel LLC (7546); ASAP Salt Lake City Hotel, LLC (7146); Atlanta Hotel Holdings, LLC (6450); CI Hospitality Investment, LLC (7641); Eagle Hospitality Trust S1 Pte Ltd. (7669); Eagle Hospitality Trust S2 Pte Ltd. (7657); EHT Cayman Corp. Ltd. (7656); Sky Harbor Atlanta Northeast, LLC (6450); Sky Harbor Denver Holdco, LLC (6650); Sky Harbor Denver Tech Center, LLC (8303); UCCONT1, LLC (0463); UCF 1, LLC (6406); UCRDH, LLC (2279); UCHIDH, LLC (6497); Urban Commons 4th Street A, LLC (1768); Urban Commons Anaheim HI, LLC (3292); Urban Commons Bayshore A, LLC (2422); Urban Commons Cordova A, LLC (4152); Urban Commons Danbury A, LLC (4388); Urban Commons Highway 111 A, LLC (4497); Urban Commons Queensway, LLC (6882); Urban Commons Riverside Blvd., A, LLC (4661); and USHIL Holdco Member, LLC (4796).  The Debtors' mailing address is 3 Times Square, 9th Floor New York, NY 10036 c/o Alan Tantleff (solely for purposes of notices and communications).

[2]     In addition to serving as CRO, I serve as director and/or officer at all of the Debtors, with the exception of EH-REIT (which is not a Debtor).  In each of my respective roles, I am responsible to and report to officers of the REIT Trustee (as defined below), which acts as the ultimate decision-making authority over the Eagle Hospitality Group.

Hospitality, Gaming, and Leisure industry practice of FTI Consulting, Inc. ("FTI"), a leading global business advisory firm with over 50 offices worldwide and over 4,000 professionals, where I specialize in, among other things, workouts and financial restructurings of lodging and hospitality businesses. I have been assisted throughout my tenure at Eagle Hospitality Group by a team of FTI professionals.

2.     In my capacity as CRO, I am generally familiar with the Eagle Hospitality Group's day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

3.     On January 18, 2021 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"). I submit this declaration to assist the Court and parties in interest in understanding: (a) the Eagle Hospitality Group, its operations, and its capital structure; (b) the circumstances related to the commencement of the Debtors' Chapter 11 Cases under the Bankruptcy Code; and (c) the emergency relief requested by the Debtors pursuant to the pleadings filed contemporaneously with this declaration (collectively, the "First Day Motions").

4.     The First Day Motions seek relief necessary to avoid immediate and irreparable harm to the Debtors by allowing them to continue their operations and minimize disruptions to their business that could otherwise result from the commencement of the Chapter 11 Cases. Specifically, the First Day Motions seek relief allowing the Debtors to: (a) stabilize and maintain their business operations; (b) limit disruption to the Debtors' business by continuing the use of their prepetition cash management system and the payment of certain critical obligations; and (c)

2

establish certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, the chapter 11 process.

5.        Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Eagle Hospitality Group's leadership[3] and the Eagle Hospitality Group's advisors, my review of relevant documents and information concerning the Eagle Hospitality Group's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.  I am authorized to submit this Declaration on behalf of the Eagle Hospitality Group.

6.        To assist the Court in becoming familiar with the Eagle Hospitality Group and the initial relief sought to stabilize the Debtors' operations and facilitate their restructuring, this Declaration is organized into four sections.  Section I provides background information with respect to the Eagle Hospitality Group's history and business operations, as well as a summary of the Eagle Hospitality Group's prepetition capital structure.  Section II describes the circumstances leading to the commencement of the Chapter 11 Cases.  Section III discusses the First Day Motions.

## INTRODUCTION

7.        The Eagle Hospitality Group, consisting of EH-REIT and its direct and indirect subsidiaries, was established in May 2019 with the principal strategy of investing on a long-term basis in a diversified portfolio of income-producing real estate properties located in the United States—exclusively hotels.

---

[3]    As discussed below, during my tenure with the Eagle Hospitality Group, the Eagle Hospitality Group was led by the REIT Trustee (as defined below) which was, until December 30, 2020, acting at the direction of the special committee of the board of directors of the Former REIT Manager (as defined below), and it is currently led by the REIT Trustee.

8.        The parent of the Eagle Hospitality Group, non-Debtor EH-REIT, is a publicly-held, Singapore-based real estate investment trust ("REIT").  EH-REIT (which is not a Debtor at this time[4]) has no board of directors as it is a trust and not a body corporate, but currently acts at the direction of its trustee, DBS Trustee Limited (the "REIT Trustee").  Moreover, EH-REIT was, prior to December 30, 2020, managed by a manager entity, Eagle Hospitality REIT Management Pte. Ltd. (the "Former REIT Manager"), which (as discussed further below) is owned by third parties and is not a subsidiary of EH-REIT.[5]  EH-REIT is part of a stapled trust, Eagle Hospitality Trust ("EHT"), consisting of EH-REIT and Eagle Hospitality Business Trust ("EH-BT").  EH-BT, which (as discussed further below) is also owned by third parties and is not a subsidiary of EH-REIT (and thus not a Debtor in the Chapter 11 Cases), remains dormant as of the Petition Date, and thus for all intents and purposes it is the REIT Trustee that is authorized to act on behalf of EH-REIT and is the ultimate decision-making authority with respect to the Eagle Hospitality Group's affairs.

9.        Through direct and indirect wholly-owned subsidiaries of EH-REIT, the Eagle Hospitality Group owns a portfolio of eighteen full-service hotels (collectively, the "Hotels" or the "Properties"), all of which are located in the United States,[6] and each of which is owned by a separate LLC entity that is a member of the Eagle Hospitality Group (each, a "Propco").[7]  The

---

[4]    Should EH-REIT file a petition commencing its own chapter 11 case, it is expected that it will seek the joint administration of its cases with the Debtors' Chapter 11 Cases and to make other first day relief applicable to its case as well.  The REIT Trustee will be seeking direction from the General Division of the High Court of the Republic of Singapore to facilitate participation by EH-REIT as a debtor in the Chapter 11 Cases.

[5]    The Former REIT Manager was removed as manager on December 30, 2020, in connection with events described further below.  The Former REIT Manager is not a Debtor in the Chapter 11 Cases.

[6]    All but one of the Eagle Hospitality Group's Hotels are owned as freehold assets; the remaining Hotel, the Queen Mary Long Beach, is held through a long-term ground lease, as discussed more fully below.

[7]    The Propcos are 44 Inn America Woodbridge Associates, L.L.C.; 5151 Wiley Post Way, Salt Lake City, LLC; 6780 Southwest FWY, Houston, LLC; 14315 Midway Road Addison LLC; Sky Harbor Atlanta Northeast, LLC; Sky Harbor Denver Tech Center, LLC; UCCONT1, LLC; UCF 1, LLC; UCHIDH, LLC; UCRDH, LLC; Urban Commons 4th Street A, LLC; Urban Commons Anaheim HI, LLC; Urban Commons Bayshore A, LLC;

4

Eagle Hospitality Group's eighteen Propcos include fifteen entities (which own fifteen Hotels) that are Debtors in the Chapter 11 Cases (the "Debtor Propcos")[8] and three entities that are not Debtors in the Chapter 11 Cases (the "Non-Debtor Propcos")[9] (which own another three Hotels).[10]  A detailed organizational chart illustrating the Eagle Hospitality Group's entity structure is attached hereto as **Exhibit A**.

10.    The Hotels span the upper upscale, upscale, and upper midscale market segments. The Hotels are licensed (with one exception[11]) through franchise agreements (the "Franchise Agreements") with subsidiaries of premium and well-recognized hotel brands (collectively, the "Franchisors") and consist of 5,418 rooms located across eight states in primarily corporate, leisure, and airport locations.  As of the Petition Date, the Eagle Hospitality Group has approximately $509.9 million in principal amount of outstanding funded debt obligations across Debtor and Non-Debtor, of which approximately $448.3 million are outstanding funded debt obligations of the Debtors, the difference being the mortgage loans in respect of the Non-Debtor Propcos.

11.    On May 24, 2019, securities of EHT were issued in Singapore to the public through an initial public offering (the "IPO") on the Mainboard of the Singapore Exchange Securities Trading Limited.  These publicly traded securities are "stapled securities" comprising

---

Urban Commons Cordova A, LLC; Urban Commons Danbury A, LLC; Urban Commons Highway 111A, LLC; Urban Commons Riverside Blvd., A, LLC; and Urban Commons Queensway, LLC.

[8]    The Debtor Propcos are 5151 Wiley Post Way, Salt Lake City, LLC; Sky Harbor Atlanta Northeast, LLC; Sky Harbor Denver Tech Center, LLC; UCCONT1, LLC; UCF 1, LLC; UCHIDH, LLC; UCRDH, LLC; Urban Commons 4th Street A, LLC; Urban Commons Anaheim HI, LLC; Urban Commons Bayshore A, LLC; Urban Commons Cordova A, LLC; Urban Commons Danbury A, LLC; Urban Commons Highway 111A, LLC; Urban Commons Riverside Blvd., A, LLC; and Urban Commons Queensway, LLC.

[9]    The Non-Debtor Propcos are 14315 Midway Road Addison LLC; 6780 Southwest FWY, Houston, LLC; and 44 Inn America Woodbridge Associates, L.L.C.

[10]    References to "Propcos" herein refer generically to either Debtor Propcos or Non-Debtor Propcos.

[11]    The exception is the Queen Mary Long Beach, which is not branded through any franchise agreement.

1 unit of EH-REIT and 1 unit of EH-BT stapled together and treated as a single instrument.  The equity interests in the Former REIT Manager are controlled by Taylor Woods ("Woods") and Howard Wu ("Wu").  Woods and Wu also control the equity interests of the trustee-manager of EH-BT, Eagle Hospitality Business Trust Management Pte. Ltd. (the "BT Trustee-Manager").

12.     At the time of the IPO, largely through the offering prospectus dated May 16, 2019 (the "Prospectus"), the Eagle Hospitality Group touted the experience of its sponsor, Urban Commons, LLC ("Urban Commons").  Urban Commons' equity interests are also controlled by Woods and Wu.[12]  As is sometimes customary for a REIT structure, through a series of interrelated agreements, the Eagle Hospitality Group's Hotel portfolio was, until recently, leased to eighteen subsidiaries of Urban Commons (the "Master Lessees") under Master Lease agreements.  The Master Leases required that the Master Lessees pay rent to the Propcos while providing the Master Lessees the authority to enjoy the remaining profits from the Hotels and manage the day-to-day operations.  While the Master Leases were in effect, EH-REIT and its Propco subsidiaries had no income other than the lease payments that were supposed to be made by the Master Lessees.

13.     After entering into Master Leases to operate the Hotels, the Master Lessees in turn entered into or assumed rights and obligations under: (i) various hotel management agreements ("HMAs") with third-party hotel management companies (the "Hotel Managers") to manage the properties owned by the Eagle Hospitality Group; and (ii) franchise agreements with the Franchisors to brand the properties.  Under the Master Leases, the Master Lessees were generally responsible for paying rent to the Propcos as well as covering other Hotel operating expenses for

---

[12]     In addition, Urban Commons was the indirect owner of Debtor USHIL Holdco, and thus indirect owner of the twelve Debtor Propcos (and their twelve Hotels) prior to the IPO, in connection with which the equity interests in USHIL Holdco were transferred to the Eagle Hospitality Group.  Immediately after the IPO, Woods and Wu together held 15.2% of EHT's Stapled Securities, and held 13.69% as of December 31, 2019.

each of their respective leased Hotel properties, including the payment of fees to the Hotel Managers and Franchisors, while providing working capital to the Hotel Managers, if needed, to run the day-to-day operations.

14.     Beginning with the January 2020 rent, the Master Lessees failed to pay rent due to the Eagle Hospitality Group.  In addition, even prior to January 2020, the Master Lessees had begun to default on their payment obligations under various HMAs throughout the portfolio, and these defaults eventually resulted, by the end of May 2020, in the closure of all but three[13] of the Hotels by the Hotel Managers as well as the accrual of $52.9 million of unmet obligations to vendors, contractors, taxing authorities, and others, which in turn led to the commencement of litigation and the imposition of statutory liens against some of the Hotels.

15.     These defaults, in turn, led in March 2020 to the assertion of defaults and ultimately the acceleration of the Eagle Hospitality Group's largest credit facility in aggregate outstanding principal amount of $341 million (the "Prepetition Credit Facility"), held by a syndicate of lenders, including Deutsche Bank AG, DBS Bank Ltd., UBS AG, Bank of the West, and Bank of America, N.A. (the "Prepetition Lenders"), with Bank of America, N.A. serving as administrative agent (the "Administrative Agent").  As a result of such lender action, most of the cash accounts throughout the Eagle Hospitality Group's portfolio were frozen, and such accounts have only been accessible to date under the conditions of a series of forbearance agreements reached between Eagle Hospitality Group and the Prepetition Lenders.

16.     When it became clear that the Master Lessees would not cure the failure to pay rent, a special committee of directors of the Former REIT Manager (other than Woods and Wu) (the "Special Committee") was appointed pursuant to a resolution dated March 26, 2020.  The

---

[13]    As of the Petition Date, four Hotels are open, as the Hilton Atlanta Northeast opened on January 2, 2020.

Special Committee was initially comprised of all four of the Former REIT Manager's independent directors and the Former REIT Manager's Chief Executive Officer and executive director—five members in total (thus excluding Woods and Wu).[14]

17.     After its formation, the Special Committee worked closely with the REIT Trustee to protect the Eagle Hospitality Group's interests.  Among other things, the Special Committee and the REIT Trustee caused: (i) the hiring of independent legal counsel (Paul Hastings LLP),[15] restructuring advisors (FTI), and an investment banking firm (Moelis & Company LLC ("Moelis")) who immediately began to explore options, including through negotiations with the Prepetition Lenders, as well as with respect to out of court solutions and a potential restructuring or disposition of assets under chapter 11 of the Bankruptcy Code; (ii) the initiation of an investigation by the CRO and counsel into the prepetition activities of the Master Lessees and Urban Commons; and (iii) the termination of the Master Leases and the initiation of legal actions to obtain legal control over the Hotels.

18.     On September 21, 2020, the Eagle Hospitality Group served notices of termination with respect to each of the Master Leases upon the Master Lessees, which resulted in the automatic termination of the Master Leases pursuant to their terms ten days later, on October 1, 2020.[16]  Subsequently, the Eagle Hospitality Group began unlawful detainer actions against

---

[14]    From August 2020 to the removal of the Former REIT Manager on December 30, 2020, the Special Committee consisted of four members, as one of the independent directors was not re-appointed as a director by the shareholder of the Former REIT Manager (which is indirectly owned by Woods and Wu) in August 2020.

[15]    Paul Hastings LLP was hired in early April 2020.  Prior to that, the Eagle Hospitality Group, Urban Commons, Woods and Wu, and the Master Lessees were all being advised by the same U.S. counsel.

[16]    October 1, 2020, is the applicable termination date with respect to each of the Eagle Hospitality Group's Hotels with the exception of the Delta Woodbridge, for which the lease terminated on October 2, 2020.  Given that the Master Leases have terminated according to their terms, the Debtors intend to file adversary proceedings to seek rulings from this Court declaring, among other things, that (a) the Master Leases terminated according to their terms pre-petition, and (b) the continued legal control of any of the Debtors' Hotels by the Master Lessees would constitutes a violation of the automatic stay as an attempt to maintain control of assets of the Debtors' estates that is prohibited by 11 U.S.C. § 362(a)(3).

the Master Lessees in the applicable state courts with the goal of obtaining legal control of the Hotels.  As of the Petition Date, the Master Lessees have failed to contest any of these unlawful detainer actions and the Eagle Hospitality Group has obtained legal control of eleven of its eighteen Hotels.  Unlawful detainer actions with respect to the remaining seven Hotels were ongoing as of the Petition Date, although these pending actions are substantially complete and the Eagle Hospitality Group is in the last stages of obtaining legal control of such Hotels.

19.     The liquidity crisis arising from the Master Lessees' failure to make rent payments and the numerous claims in connection with the Master Lessees' unpaid property-related obligations have placed the Eagle Hospitality Group under intense pressure at a time when revenue from the Hotels is minimal.  Making matters worse, the Eagle Hospitality Group's attempt to engage a new manager that would recapitalize EH-REIT failed when the proposed new manager was rejected at the December 30, 2020 extraordinary general meeting ("EGM") of EHT's unitholders.  In this confluence of circumstances, the Eagle Hospitality Group determined that filing the Chapter 11 Cases was the only feasible option to protect the interests of its stakeholders and to maximize the value of its assets through an orderly sale process.[17]

20.     As part of the Chapter 11 Cases, the Eagle Hospitality Group has, among other things, appointed David Mack of Drivetrain LLC as an independent director (the "EHT US 1 Independent Director") of EHT US1, Inc. (the Eagle Hospitality Group entity that is the indirect owner of, and controls through its member-managed LLC subsidiaries, all the Propcos), including as related to EHT US1, Inc.'s role as the member, manager and/or direct or indirect controlling equity holder of its direct and indirect subsidiaries.

---

[17]    In addition, the Eagle Hospitality Group will also continue to explore other restructuring alternatives, such as an equity infusion.

21.     The Eagle Hospitality Group intends to use the "breathing space" afforded by the filing of the Chapter 11 Cases to execute a value-maximizing marketing process and sale of the Eagle Hospitality Group's business pursuant to section 363 of the Bankruptcy Code.  Further, the Eagle Hospitality Group is pleased to report that it has secured a $100 million DIP financing facility from one or more funds managed by, or other entities affiliated with, Monarch Alternative Capital LP (such funds or entities, collectively, the "DIP Lenders"), which would entail the grant of liens in previously unencumbered Hotels to the DIP Lenders.  A motion seeking approval of this DIP financing arrangement has been filed concurrently with this Declaration.

## GENERAL BACKGROUND

### A.     Debtors' Business and Overview

22.     The Eagle Hospitality Group was established in May 2019 and, through the Propcos, owns a portfolio of 18 full-service Hotels, comprised of nine upper upscale Hotels, five upscale Hotels, and four upper midscale Hotels located in eight states in the U.S. with a combined total of 5,418 rooms.

23.     The general features of the three types of Hotels in the Eagle Hospitality Group portfolio are as follows:

- Upper Upscale:  Typically offer a full range of on-property amenities and services, including full service, all-day restaurants, room service (in most cases), meeting facilities, lounges, recreational facilities, a fitness center, and a business center.  In some cases, the hotels feature concierges and spas, valet parking and luggage assistance.

- Upscale:  Offer an array of on-property amenities and services, including a food and beverage outlet, limited meeting facilities, recreational facilities (in some cases), a fitness center, and a business center.

- Upper Midscale:  Limited food and beverage options, selected on-property amenities to include a fitness center and selected business services.

10

24.     The chart below identifies the market segment, number of rooms, and operating status for each of the Eagle Hospitality Group's eighteen Hotels as of the Petition Date (Hotels owned by Debtor Propcos are **underlined and in bold**):

| Name of Hotel | Market Segment | Status | Number of Hotel Rooms |
|---|---|---|---|
| **Sheraton Pasadena (CA)** | Upper Upscale | Closed | 311 |
| **Holiday Inn Hotel & Suites Anaheim (CA)** | Upper Midscale | Closed | 255 |
| **Embassy Suites by Hilton Anaheim North (CA)** | Upper Upscale | Closed | 223 |
| **Holiday Inn Hotel & Suites San Mateo (CA)** | Upper Midscale | Closed | 219 |
| **Four Points by Sheraton San Jose Airport (CA)** | Upscale | Closed | 195 |
| **The Westin Sacramento (CA)** | Upper Upscale | Closed | 101 |
| **Embassy Suites by Hilton Palm Desert (CA)** | Upper Upscale | Closed | 198 |
| **The Queen Mary Long Beach (CA)** | Upscale | Closed | 346 |
| **Renaissance Denver Stapleton (CO)** | Upper Upscale | Open | 400 |
| **Holiday Inn Denver East – Stapleton (CO)** | Upper Midscale | Open | 298 |
| **Sheraton Denver Tech Center (CO)** | Upper Upscale | Closed | 263 |
| **Holiday Inn Resort Orlando Suites – Waterpark (FL)** | Upper Midscale | Closed | 777 |
| Crowne Plaza Dallas Near Galleria-Addison (TX) | Upscale | Closed | 428 |
| Hilton Houston Galleria Area (TX) | Upper Upscale | Closed | 292 |
| Delta Woodbridge (NJ) | Upper Upscale | Open | 311 |
| **Crowne Plaza Danbury (CT)** | Upscale | Closed | 242 |
| **Doubletree by Hilton Salt Lake City Airport (UT)** | Upscale | Closed | 288 |
| **Hilton Atlanta Northeast (GA)** | Upper Upscale | Open | 271 |
| **Total** | | | **5,418** |

25.     All but one of the Eagle Hospitality Group's Hotels are owned as freehold assets; the remaining Hotel, the Queen Mary Long Beach, is held through a long-term ground lease with the City of Long Beach, California, and the remaining term of that lease is approximately 62 years.  In addition, all of the Eagle Hospitality Group's Hotels, other than the Queen Mary Long Beach, are branded pursuant to Franchise Agreements with the Franchisors and operated under HMAs with third-party Hotel Managers.  The Queen Mary Long Beach is operated pursuant to a Caretaker Agreement (defined below) and subject to an HMA, but it is not branded by any Franchise Agreement.

26.     Until recently, the Eagle Hospitality Group leased each of the Hotels under Master Leases to one of eighteen non-Debtor lessees, *i.e.*, the Master Lessees.  The Master Lessees, who are not Debtors in the Chapter 11 Cases, are wholly owned by Woods and Wu through a series of holding companies.  Woods and Wu also wholly own the non-Debtor Former REIT Manager (which was removed as manager of EH-REIT on December 30, 2020 by the REIT Trustee at the direction of the Monetary Authority of Singapore ("MAS"), the Singapore regulatory authority).

27.     Among other things, under the Master Leases the Eagle Hospitality Group (through its Propcos) was to receive rental payments from the Master Lessees including a set amount of fixed rent and a variable rent component.  The variable rent component was typically calculated based upon operating metrics such as the projected gross operating revenue and/or gross operating profit for each Hotel property.  Each Master Lessee was to provide a security deposit, in cash or by letter of credit, to the Eagle Hospitality Group, which was originally

established as an amount equal to nine months of fixed rent and due shortly after the

commencement date under the Master Leases, for a total of $43.6 million.[18]

28.    In addition, under the Master Leases, the Master Lessees were responsible for all

operational expenses incurred at the property—including, but not limited to, insurance costs,

management fees, franchise fees, and repair and maintenance expenses—and were responsible

for upkeep and maintenance of the premises, based on annual budgets pre-approved by the

Propco.  The Propcos were generally responsible for certain costs associated with fee ownership

such as real estate taxes.

29.    The Master Lessees also entered into HMAs with the Hotel Managers whereby, in

exchange for payments to be made by the Master Lessees, the Hotel Managers were engaged to

operate the Hotels and provide certain necessary services, such as employment of personnel and

payment of personnel costs, utility costs, and general repair and maintenance expenses.  The

Hotel Managers would pay all property level expenses of the Hotels (including payroll and

utilities), contract with service providers, and purchase all goods and materials utilized in the

operation of the business.  To be clear, however, although the Hotel Managers were to make the

payments to vendors in connection with these expenses, the HMAs generally provided that

property level obligations were the ultimate responsibility of the Master Lessees, who were

required to provide the necessary "working capital" to fund operating expenses as and when

needed pursuant to the terms of the HMAs (e.g., in the event the Hotel does not generate

sufficient revenues from its operations to cover such expenses).

---

[18]    In December 2019, and again in February 2020, the Propcos (at the time influenced by Woods and Wu)
provided extensions of the time (initially until February 21, 2020, and then later until June 8, 2020) for the
posting of complete security deposit amounts.  Despite such extensions, the Master Lessees nevertheless failed
to post the entire security deposit amount required for each Hotel, except for the Crowne Plaza Dallas, Hilton
Houston Galleria, and Delta Woodbridge Hotels.

30.    The Master Lessees are also the counterparties to the Franchise Agreements with the Franchisors.  Pursuant to the Franchise Agreements, the Master Lessees were entitled to use the name and marks of the Franchisors' brands with respect to a Hotel, subject to certain terms and restrictions set forth in the Franchise Agreements, and in exchange the Master Lessees were obligated to pay certain specified fees to the Franchisors.  The Franchise Agreements also provided the Hotels with access to the Franchisors' reservation systems, thus allowing potential guests to search available rooms and/or make reservations.  Generally, under the Franchise Agreements, the Master Lessees were required to perform certain regular maintenance and periodic renovations to the Hotels and to participate in certain programs promulgated by the Franchisors related to marketing, reservations, or other functions of the Hotels in order to comply with the standards of the Franchisors' brands.

31.    Certain of the Propcos were also parties to ancillary agreements with Hotel Managers and Franchisors, as applicable, in connection with the ownership of certain of the Hotels and the Master Lessees' execution of HMAs and Franchise Agreements, respectively.  Pursuant to non-disturbance agreements ("NDAs") with respect to certain Hotels between Propcos, Master Lessees, and Hotel Managers, signatory Propcos may be obligated to (i) guarantee Master Lessees' obligations under the applicable HMA in the event the Master Lessee fails to do so and/or (ii) assume (or cause a replacement lessee entity to assume) the obligations under the applicable HMA upon termination of the Master Lease between the applicable Propco and Master Lessee.  Further, pursuant to owner agreements ("Owner Agreements")[19] between

---

[19]    For purposes of this declaration, NDAs refers to agreements between lessors, lessees, and hotel management companies, while Owner Agreements refers to agreements between lessors, lessees, and franchisors.  That being said, in the hotel industry (and in connection with certain of the Hotels discussed herein) there is not a hard definitional separation between these terms—for example, an agreements between lessors, lessees, and management companies may also be titled "Owner Agreements" instead of "Non-Disturbance Agreements."

certain Propcos, Master Lessees, and Franchisors with respect to certain Hotels, signatory Propcos may be required to cure outstanding obligations owed by Master Lessees to Franchisors in order to maintain franchise relationships.

### B.     Corporate History and Organizational Structure

32.     The ultimate parent entity of the Eagle Hospitality Group is non-Debtor EH-REIT, which is a real estate investment trust constituted by a trust deed dated April 11, 2019 entered into between the Former REIT Manager and the REIT Trustee.  Neither the Former REIT Manager nor the REIT Trustee are Debtors in the Chapter 11 Cases.

33.     EH-BT was also constituted by a trust deed dated April 11, 2019 in conjunction with the establishment of EH-REIT.  EH-BT is a Singapore-based business trust that is presently dormant, has no assets, and is not a Debtor in the Chapter 11 Cases.  EH-BT is managed by the BT Trustee-Manager, which is not a Debtor in the Chapter 11 Cases.  The units in EH-REIT and EH-BT were stapled together and issued as stapled securities (the "Stapled Securities") in a stapled trust, EHT, consisting of EH-REIT and EH-BT under the terms of a stapling deed dated April 11, 2019 entered into between the Former REIT Manager, the REIT Trustee, and the BT Trustee-Manager, and cannot be traded separately.

34.     As of September 30, 2020, the Eagle Hospitality Group's unaudited financial statements show consolidated assets totaling approximately $779 million, and consolidated liabilities totaling approximately $630 million.  Consolidated revenues for the 2019 fiscal year were approximately $51.6 million.

35.     The Eagle Hospitality Group consists of thirty-nine entities, twenty-seven of which are Debtors in the Chapter 11 Cases, organized under the laws of the United States, Singapore, and the Cayman Islands.  A detailed organizational chart illustrating the Eagle Hospitality Group's entity structure is attached hereto as **Exhibit A**.

C.       **Prepetition Capital Structure**

36.       On the Petition Date, the Eagle Hospitality Group was liable in connection with funded indebtedness in an aggregate outstanding principal amount of approximately $509.9 million consisting of: (i) the $341 million Prepetition Credit Facility secured, among things, by a pledge of the equity interests in fifteen Debtor Propcos, but <u>not</u> secured by mortgages on the Hotels owned by the Debtor Propcos; (ii) approximately $18.3 million of obligations incurred by Debtor USHIL Holdco Member, LLC ("<u>USHIL Holdco</u>") in connection with a secured interest rate swap agreement with Bank of the West, which shares in the collateral securing the Prepetition Credit Facility as described further below; (iii) approximately $61.6 million of loans secured by mortgages on the Hotels owned by the Non-Debtor Propcos; and (iv) an $89 million unsecured loan provided by Lodging USA Lendco, LLC ("<u>Lodging USA</u>") to Debtor EHT US1, Inc. ("<u>EHT US1</u>") as borrowed thereunder.[20]   A chart summarizing these obligations, along with further discussion regarding same, is set forth below.

| Funded Debt | Total Outstanding Amount[21] | Debtors' Outstanding Amount | Non-Debtors' Outstanding Amount |
|---|---|---|---|
| Prepetition Credit Facility | $341 million | $341 million | n/a |
| Swap Termination | $18.3 million | $18.3 million | n/a |
| Mortgage Loans | $61.6 million | n/a | $61.6 million |
| Lodging USA Loan | $89 million | $89 million | n/a |
| **Total** | **$509.9 million** | **$448.3 million** | **$61.6 million** |

---

[20]    In connection with the investigation of Woods and Wu, the Special Committee and REIT Trustee attempted to determine whether the Lodging USA loan is held directly or indirectly by Woods and/or Wu.  The registered agent, for notice purposes, of Lodging USA is Woods, and Wu has represented that he is an authorized signatory for this entity.  The principals of Lodging USA or their affiliates are the former owners of certain of the Hotels prior to the contribution of such Hotels into the Eagle Hospitality Group.

[21]    Amounts are approximate principal amount outstanding as of the Petition Date.

### 1.    Prepetition Credit Facility

37.    Certain members of the Eagle Hospitality Group are borrowers and guarantors under a credit facility with the Prepetition Lenders.  The Prepetition Credit Facility has an aggregate outstanding principal amount of approximately $341 million, consisting of term and revolving credit facilities.

38.    The borrowers under the Prepetition Credit Facility consist of Debtors USHIL Holdco, Atlanta Hotel Holdings, LLC, ASAP Salt Lake City Hotel, LLC, Sky Harbor Denver Holdco, LLC, Eagle Hospitality Trust S1 Pte Ltd., and Eagle Hospitality Trust S2 Pte Ltd., and non-Debtors EH-REIT and EH-BT (collectively, the "Prepetition Credit Facility Borrowers"), which entered into that certain Credit Agreement (the "Prepetition Credit Agreement"), dated as of May 16, 2019, with each lender from time to time party thereto and the Administrative Agent, for the Prepetition Credit Facility.  As of December 31, 2019, the Prepetition Credit Facility was fully drawn.

39.    The obligations due under the Prepetition Credit Facility are secured by a pledge of the Eagle Hospitality Group's wholly-owned equity interests in the fifteen Debtor Propcos, which are the direct owners of fifteen Hotels.  **The Prepetition Credit Facility is not secured by mortgages on any of the Hotels.**

40.    Payment of the obligations owing under the Prepetition Credit Facility is guaranteed by the Prepetition Credit Facility Borrowers, EHT US1, EHT Cayman Corp. Ltd., CI Hospitality Investment, LLC, ASAP Cayman Atlanta Hotel LLC, ASAP Cayman Salt Lake City Hotel LLC, ASAP Cayman Denver Tech LLC, and the Debtor Propcos (which own fifteen of the eighteen Hotels).  All of the obligors and guarantors under the Prepetition Credit Facility (with the exception of EH-REIT and EH-BT) are Debtors in the Chapter 11 Cases.

### 2. Secured Swap Agreement with Bank of the West

41.    USHIL Holdco and Bank of the West entered into that certain ISDA Master Agreement, dated as of May 22, 2019 (the "Master Agreement" and, together with the schedule thereto dated as of May 22, 2019 and each trade confirmation thereunder, the "Secured Swap Agreement"), pursuant to the terms of the Prepetition Credit Facility.  Under the Secured Swap Agreement, USHIL Holdco and Bank of the West entered into an interest rate hedging transaction for the purpose of mitigating interest rate risks associated with the loans under the Prepetition Credit Facility.  USHIL Holdco's obligations under the Secured Swap Agreement are secured by the same collateral that secures the obligations of the borrowers under the Prepetition Credit Facility, and such obligations are guaranteed by the same entities that guaranteed the Prepetition Credit Facility.  USHIL Holdco's right, title, and interest in the Secured Swap Agreement are also pledged as collateral to support the obligations of the borrowers under the Prepetition Credit Facility.

42.    On April 23, 2020, Bank of the West notified the Eagle Hospitality Group that the Transactions (as defined in the Master Agreement) entered into pursuant to the Secured Swap Agreement had been terminated on April 23, 2020.  Bank of the West asserted that USHIL Holdco owed $18,283,031.20 in connection with the terminated Transactions and other amounts owing under the Master Agreement.

### 3. Non-Debtor Mortgage Loans

43.    The Non-Debtor Propcos own three Hotels located in Houston, Texas (Hilton Houston Galleria); Dallas (Addison), Texas (Crowne Plaza Dallas Galleria); and Woodbridge, New Jersey (Delta Woodbridge) respectively.  Each Non-Debtor Propco is a stand-alone borrower in connection with a mortgage loan secured by such Non-Debtor Propco's respective

18

Hotel.[22]  Thus, these Mortgage Loans are effectively a separate silo of indebtedness from the

Prepetition Credit Facility.[23]

44.    The outstanding combined amount owed under the three mortgage loans (the

"Mortgage Loans") is approximately $61.6 million.  A chart summarizing the Mortgage Loans is

set forth below:

| Mortgaged Hotel | Current Mortgage Lender | Outstanding Amount[24] |
|---|---|---|
| Crowne Plaza Dallas Galleria | CMBS[25] | $12 million |
| Hilton Houston Galleria | CMBS | $14.9 million |
| Delta Woodbridge | Wells Fargo Bank, N.A. | $34.7 million |
| **Total** | | **$61.6 million** |

45.    As further detailed below, each of the Mortgage Loans is secured, on a stand-

alone basis, by: (a) a mortgage[26] over the underlying Property; (b) the cash reserve accounts

associated with such Property; and (c) the deposit accounts into which the security deposits and

rents attributed to such Property are deposited.  Obligations under each Mortgage Loan are

guaranteed by Woods, Wu, and EHT US1 on an unsecured basis pursuant to (i) a limited

recourse carve-out guaranty (also known as "bad boy" or "springing recourse" guarantee, and,

herein, a "Springing Recourse Guarantee") that could be triggered by, among other things, a

---

[22]  The Mortgage Loans are also secured by pledges of certain of the Non-Debtor Propcos' accounts.  Further, the Mortgage Loan with respect to the Crowne Plaza Dallas Hotel was secured by a cash collateralized letter of credit in an amount of $16,581,982 pursuant to a letter of credit agreement dated July 2, 2019.  Such letter of credit was drawn down in full and applied to then-outstanding balance of the applicable Mortgage Loan on September 5, 2020, thereby reducing the principal balance thereunder to approximately $12 million.

[23]  Defaults under the Prepetition Credit Facility do not result in cross-defaults under the terms of the agreements governing the Mortgage Loans.

[24]  Amounts are approximate principal amount outstanding as of the Petition Date.

[25]  "CMBS" refers to commercial mortgage backed securities.  Wilmington Trust, N.A. serves as trustee in connection with the CMBS mortgage loans secured by the Crowne Plaza Dallas and Hilton Houston Galleria.

[26]  As a technical matter, certain of the Mortgage Loans are secured by deeds of trust instead of mortgages, but in the interest of convenience this Declaration refers to deeds of trust and mortgages interchangeably as "mortgages."

bankruptcy the applicable Non-Debtor Propco) and (ii) an environmental indemnity (together with the Springing Recourse Guarantee, the "Mortgage Loan Guarantees").  In addition, EH-REIT is a guarantor with respect to the Mortgage Loan Guarantees applicable to the Houston Mortgage Loan (as defined below).  Pursuant to an indemnification agreement entered into in connection with the Mortgage Loans, EHT US1 has also agreed to indemnify Wu and Woods for all liabilities arising under the Springing Recourse Guarantee, except that Wu and Woods remain liable for any liabilities to the extent resulting from fraud, gross negligence, misappropriation of funds, intentional misrepresentation, willful misconduct or breach of applicable law by Wu, Woods, or their controlled affiliates.

(a)    **Woodbridge Mortgage Loan Agreement**

46.    Wells Fargo Bank, N.A. ("Wells Fargo"), as lender, and the Non-Debtor Propco 44 Inn America Woodbridge Associates, L.L.C. (the "Woodbridge Propco"), as borrower, are parties to that certain Loan Agreement, dated as of May 21, 2019 (the "Woodbridge Mortgage Loan Agreement").  The Woodbridge Mortgage Loan Agreement provides a mortgage loan in the original principal amount of $35 million secured by (a) a mortgage on the Delta Woodbridge Hotel located in Woodbridge, New Jersey, (b) the cash reserve accounts or letters of credit, the security deposit accounts, and the rent collection accounts associated with such Hotel, and (c) a pledge of the equity of Debtor Woodbridge Hotel Urban Renewal L.L.C. (which is 100% owned by Woodbridge Propco).  The Woodbridge Mortgage Loan Agreement matures on June 1, 2021. The payment obligations under the Renaissance Woodbridge Mortgage Loan Agreement are guaranteed by Woods, Wu, and EHT US1 pursuant to the Mortgage Loan Guarantees described above.  As of the Petition Date, $34.7 million remained outstanding under the Delta Woodbridge Mortgage Loan Agreement.

(b)    **Houston Mortgage Loan Agreement**

47.     Wells Fargo, as original lender, and the Non-Debtor Propco 6780 Southwest Fwy, Houston, LLC (the "Houston Propco"), as borrower, executed that certain Loan Agreement, dated as of October 24, 2017 (the "Houston Loan Agreement").  The Houston Mortgage Loan Agreement, which predates the formation of the Eagle Hospitality Group, provided a mortgage loan in the original principal amount of $15.6 million, secured by (a) a mortgage on the Hilton Houston Galleria Hotel, located in Houston, Texas, and (b) the cash reserve accounts or letters of credit, the security deposit accounts, and the rent collection accounts associated with such Hotel. The Houston Mortgage Loan Agreement matures on November 11, 2022.  The payment obligations due under the Houston Loan Agreement are guaranteed by Woods, Wu, EHT US1, and EH-REIT pursuant to the Mortgage Loan Guarantees described above.  As of the Petition Date, approximately $14.9 million remained outstanding under the Houston Mortgage Loan Agreement.

                    (c)     **Dallas Mortgage Loan Agreement**

48.     Deutsche Bank AG, New York Branch ("Deutsche Bank"), as original lender, and Non-Debtor Propco 14315 Midway Road Addison LLC (the "Dallas Propco"), as borrower, executed that certain Loan Agreement, dated as of December 20, 2017 (the "Dallas Mortgage Loan Agreement").  The Dallas Mortgage Loan Agreement, which predates the formation of the Eagle Hospitality Group, provides a mortgage loan in the original principal amount of $27,630,250 and is secured by (a) a mortgage on the Crowne Plaza Dallas Hotel and (b) the cash reserve accounts or letters of credit, the security deposit accounts, and the rent collection accounts associated with such Hotel.  The Dallas Mortgage Loan Agreement matures on January 6, 2028.  The payment obligations due under the Dallas Mortgage Loan Agreement are guaranteed by Woods, Wu, and EHT US1 pursuant to the Mortgage Loan Guarantees described

21

above.  As of the Petition Date, approximately $12 million remained outstanding under the

Dallas Mortgage Loan Agreement.[27]

### 4.        Unsecured Lodging USA Loan Agreement

49.        Lodging USA, as lender, and EHT US1, as borrower, are party to that certain loan

agreement dated as of May 16, 2019 (the "Lodging USA Loan Agreement"), in the original

principal amount of $89 million, which matures on August 25, 2024.  The obligations owing

under the Lodging USA Loan Agreement are unsecured.  Further, Lodging USA and the

Administrative Agent are party to that certain Subordination Agreement, dated as of May 24,

2019 (the "Lodging USA Subordination Agreement") whereby Lodging USA agreed to

subordinate the obligations owing under the Lodging USA Loan Agreement to the obligations

owing under the Prepetition Credit Facility.  Moreover, under the Lodging USA Subordination

Agreement, Lodging USA cannot exercise remedies until the obligations owing under the

Prepetition Credit Facility are paid in full.

50.        Lodging USA is an entity registered to Taylor Woods.[28]  The principals of

Lodging USA or their affiliates are the former owners of certain of the Hotels prior to the

contribution of such Hotels into the Eagle Hospitality Group.  As of the Petition Date,

approximately $89.3 million was purportedly outstanding under the Lodging USA Loan

Agreement.

---

[27]    The relatively low outstanding balance of the Dallas Mortgage Loan as of the Petition Date as compared to the
original principal amount is the result of the September 5, 2021 drawdown on a $16,581,982.00 collateralized
letter of credit securing such loan.

[28]    At the direction of the REIT Trustee, the CRO, with the assistance of counsel, is currently examining the role of
Woods and Wu in connection with Lodging USA as part of his investigation into Woods' and Wu's prepetition
transactions.

### D. Equity Ownership

51.     Equity interests in EHT are held as the Stapled Securities, which were publicly traded on the Singapore Exchange until March 19, 2020, when trading was halted and voluntarily suspended on March 24, 2020.  Approximately 15% of the EHT's equity interests were, immediately after the IPO, held by Wu and Woods collectively, with the remaining balance of approximately 85% owned by others.  As of December 31, 2019, Woods and Wu held approximately 13.69% of EHT's equity interests.[29]  The equity interests in each of the other members of the Eagle Hospitality Group are 100% owned, directly or indirectly, by EH-REIT.

### E. Cash Position

52.     As of the Petition Date, the Eagle Hospitality Group Debtors hold approximately $3.5 million in cash.  This amount includes approximately $511,000 held by the Debtor Propcos in security deposit accounts at the Administrative Agent (the "Debtor Security Deposit Accounts") and approximately$2.3 million held at an operating account maintained by Debtor USHIL Holdco.  The Administrative Agent has alleged that it holds a security interest with respect to the Debtor Security Deposit Accounts.  In addition, Debtor Eagle Hospitality Trust S2, Pte. Ltd. maintains a deposit account at DBS Bank (Hong Kong) Limited (the "DBS Hong Kong Account") historically used for the payment of dividends.  The funds (currently of *de minimis* amount) in the DBS Hong Kong Account are not encumbered by any security interest, though DBS Hong Kong has asserted a setoff right with respect to such account, which the Eagle Hospitality Group disputes as DBS Hong Kong (in contrast to DBS Singapore) is not a creditor of the Eagle Hospitality Group under the Prepetition Facility.

---

[29]    The Eagle Hospitality Group does not have a current estimate of the equity position of Woods and Wu in EH-REIT.

53.     Given the Debtors' dire liquidity situation, the Debtors intend to fund these Chapter 11 Cases pursuant to a DIP financing agreement reached with the DIP Lenders, which is the subject of a motion filed concurrently with this Declaration.

## II.     EVENTS LEADING TO CHAPTER 11 FILINGS

### A.     Conflicting Interests Between Propcos and Master Lessees

54.     As noted above, EH-REIT, parent entity of the Eagle Hospitality Group, was established as a REIT under Singapore law.  As part of this REIT structure, it was contemplated that the Propco entities, as lessors under Master Leases, would own Hotels and receive, as their sole source of revenue, rental income from the Master Lessees.  As was permitted under Singapore law, the Propcos were 100% indirectly owned by EH-REIT and, by extension, its unitholders.  By contrast, the Master Lessees were 100% indirectly owned by Woods and Wu.  As lessors and lessees, their interests were not aligned.

55.     Prior to April 2020, Woods and Wu were authorized signatories for both the Propcos and Master Lessees, and, in many instances, were the signatories on both sides of key agreements which Woods and/or Wu literally signed twice: first for the Propco, second for the Master Lessee.  During this period, Woods and Wu used their ability to assert control over the Propcos in their business dealings with the Woods/Wu-owned Master Lessees to benefit the Master Lessees (or themselves) at the expense of the Propcos and the Eagle Hospitality Group.

56.     Most notably, Woods and Wu put the interests of the Master Lessees (and thus, their own interests) ahead of the interests of the Eagle Hospitality Group by causing the Master Lessees to fail to pay rent and other amounts owed to the Propcos.  In addition, Woods and Wu caused the Master Lessees to fail to post the full amount of security deposits, meaning that the Propcos could not look to security deposits to mitigate the absence of lease payments as contemplated under the Master Leases.  These defaults under the Master Leases pushed the

24

Eagle Hospitality Group into a liquidity crisis, which predated the COVID-19 pandemic but was exacerbated by the pandemic as well as numerous failures by the Master Lessees to pay for operational expenses associated with the Hotels, leading the Debtors to seek chapter 11 protection.

### B.    Master Lessees' Failure to Pay Rent and Other Amounts

57.    As noted above, beginning with the January 2020 rent, and continuing through the Petition Date, the Master Lessees have failed to pay rent.  In addition, the Master Lessees have failed to make certain reserve contributions required under the Master Leases or restore security deposits for certain of the Hotel properties that were applied by the Propcos consistent with the terms of the Master Leases, and (irrespective of such application of security deposits) the Master Lessees have also failed to provide the entirety of the original security deposit amounts required to be paid under the Master Leases.  The Eagle Hospitality Group has repeatedly raised these defaults with Wu and Woods, as well as Urban Commons as owner of the Master Lessees.  But the Master Lessees have failed to cure such defaults.  The Master Lessees' unpaid rent, security deposit, and reserve contribution obligations total approximately $52.8 million, of which $51.8 relates to obligations owed to the Debtor Propcos.

### C.    Termination of Master Leases

58.    Despite giving the Master Lessees sufficient time to cure the defaults and after reviewing various compromise proposals from the Master Lessees (all of which were illusory and/or unworkable), and given the ongoing uncured defaults, on September 21, 2020, the Propcos served notices of termination with respect to each of the Master Leases upon the Master Lessees.  Further, the notices of termination raised numerous issues in addition to the failure to pay rent, including, without limitation, the Master Lessee's (i) failure to pay security deposit

amounts, (ii) defaults under applicable HMAs, and (iii) causing of numerous defaults and events of default under the Prepetition Credit Agreement.

59.     Under the Master Leases, the continuing failure of a Master Lessee to pay rent within five business days when due allows a Propco (*i.e.*, a Master Lessor) to terminate the applicable Master Lease upon ten days written notice.  Thus, the September 21, 2020 service of the notices of termination resulted in the automatic termination of the Master Leases pursuant to their terms ten days later, on October 1, 2020.[30]

### D.     Unlawful Detainer Actions

60.     Subsequently, the Eagle Hospitality Group began unlawful detainer actions (or similar actions) against the Master Lessees in the applicable state courts with the goal of obtaining legal control of the Hotels.  As of the Petition Date, the Master Lessees have failed to contest any of these unlawful detainer actions—in fact, none of the Master Lessees have appeared in court or filed any responses.  As of the Petition Date, the Eagle Hospitality Group has obtained legal control of eleven of its eighteen Hotels, and unlawful detainer actions with respect to the remaining seven Hotels were ongoing, though these pending actions are substantially complete and the Eagle Hospitality Group is in the last stages of obtaining legal control of such Hotels.

61.     In connection with these unlawful detainer actions, the Eagle Hospitality Group has obtained legal control of the following Hotels on the following dates Hotels owned (or, with respect to the Queen Mary Long Beach, leased under a long term ground lease) by the Debtor Propcos are **underlined and in bold**):

---

[30] October 1, 2020 is the applicable termination date with respect to each of the Eagle Hospitality Group's Hotels with the exception of the Delta Woodbridge, for which the lease terminated on October 2, 2020.

26

| Name of Hotel | Commencement of Action | Date of Legal Control |
|---|---|---|
| **Sheraton Pasadena (CA)** | October 16, 2020 | December 10, 2020 |
| **Holiday Inn Hotel & Suites San Mateo (CA)** | October 16, 2020 | December 15, 2020 |
| **Renaissance Denver Stapleton (CO)** | October 13, 2020 | November 10, 2020 |
| **Holiday Inn Denver East – Stapleton (CO)** | October 13, 2020 | November 17, 2020 |
| **Sheraton Denver Tech Center (CO)** | October 15, 2020 | November 25, 2020 |
| **Holiday Inn Resort Orlando Suites – Waterpark (FL)** | October 14, 2020 | December 15, 2020 |
| Crowne Plaza Dallas Near Galleria-Addison (TX) | October 28, 2020 | November 24, 2020 |
| Hilton Houston Galleria Area (TX) | October 19, 2020 | November 24, 2020 |
| **Crowne Plaza Danbury (CT)** | October 23, 2020 | December 15, 2020 |
| **Doubletree by Hilton Salt Lake City Airport (UT)** | October 13, 2020 | October 30, 2020 |
| **Hilton Atlanta Northeast (GA**) | October 28, 2020 | December 10, 2020 |

62.     The following chart sets forth the Hotels not yet under the legal control of the Eagle Hospitality Group as of the Petition Date for which unlawful detainer actions have commenced (Hotels owned by the Debtor Propcos are **underlined and in bold**):

| Name of Hotel | Commencement of Action | Status of Action |
|---|---|---|
| **Embassy Suites by Hilton Anaheim North (CA)** | October 20, 2020 | Execution of the writ of eviction pending. |
| **Embassy Suites by Hilton Palm Desert (CA)** | October 23, 2020 | Request for default judgment against Master Lessees pending |
| **Four Points San Jose (CA)** | October 21, 2020 | Execution of the writ of eviction in process |
| **The Queen Mary Long Beach (CA)** | October 16, 2020 | Request for default judgment pending |
| **Holiday Inn Anaheim (CA)** | October 16, 2020 | Application for writ of possession pending |
| **Westin Sacramento** (CA) | October 28, 2020 | Request for default judgment pending |
| Delta Woodbridge (NJ) | October 29, 2020 | Pending |

63.     Moreover, given that the Master Leases have terminated according to their terms, the Debtors intend to file adversary proceeding complaints (the "Declaratory Judgment Complaints") in connection with the six Hotels owed by Debtor Propcos listed in the preceding paragraph, above, seeking (I) rulings from this Court declaring that (a) the Master Leases have terminated and (b) the continued legal control of any of the Debtors' Hotels by the Master Lessees constitutes a violation of the automatic stay as an attempt to maintain control of assets of the Debtors' estates that is prohibited by 11 U.S.C. § 362(a)(3), and (II) turnover of estate property to the Debtors under 11 U.S.C. §542(a).  The Declaratory Judgment Complaints are a key piece of the Eagle Hospitality Group's chapter 11 strategy, which is aimed at executing a value-maximizing disposition of the Debtors' assets, send a clear signal to potential acquirers that the sale process will be free of interference.

**E.     Administrative Agent Notices of Defaults Under Prepetition Credit Facility**

64.     As a direct result of the non-payment of rent by the Master Lessees, on March 20 2020, the Administrative Agent issued a notice of default and acceleration to certain members of the Eagle Hospitality Group (the "Initial Notice of Default").  The Administrative Agent stated that the events of default included failure to comply with the provisions of the Prepetition Credit Agreement requiring the Eagle Hospitality Group to prepay a portion of the "Outstanding Amount" (as defined in the Prepetition Credit Facility)[31] when the Outstanding Amount exceeds the "Borrowing Base Amount" (as defined in the Prepetition Credit Agreement). [32]   More specifically, according to the Initial Notice of Default, the Master Lessees' failure to pay rent by

---

[31]   As defined in the Prepetition Credit Agreement, the Outstanding Amount was equal to the indebtedness outstanding under the Prepetition Credit Agreement plus applicable swap termination indebtedness at such time.

[32]   As defined in the Prepetition Credit Agreement, the Borrowing Base Amount was calculated for each Borrowing Base property in part to reflect the net operating income with respect to such property received by the Eagle Hospitality Group.  Thus, a complete lack of rental payments translated into a Borrowing Base Amount of zero dollars.

February 20, 2020 had caused the Borrowing Base Amount to be reduced to a level below the Outstanding Amount (thus requiring prepayment on February 21, 2020 equal to the excess of the Outstanding Amount over the Borrowing Base Amount) but no payment had been made. Further, the Administrative Agent stated that, based on the failure of any rent to be paid for 2020, the Borrowing Base Amount had been reduced to $0 (indicating that the Administrative Agent considered the entire Outstanding Amount to be immediately due and payable).

65.    Importantly, the Administrative Agent's Initial Notice of Default was a direct result of the Master Lessees' breach of their rent payment obligations.  The Master Lessees' failure to pay rent reduced the Borrowing Base Amount, thus triggering the prepayment obligation under the Prepetition Credit Agreement, and such failure to pay rent (along with the failure to post required security deposits) meant that it was impossible for the Eagle Hospitality Group to make any payments to the Administrative Agent in an attempt to comply with the Prepetition Credit Agreement.

66.    Pursuant to the Initial Notice of Default, the Administrative Agent accelerated the entire amount of the obligations outstanding under the Prepetition Credit Facility.  Importantly, this default under the Prepetition Credit Agreement and resulting acceleration caused by the Master Lessees' failure to pay rent is itself an event of default under the Master Leases which default is not subject to cure.

67.    Subsequently, the Administrative Agent issued additional notices of default under the Prepetition Credit Agreement, including on (i) April 2, 2020, when it sent a notice to the board of directors of the Former REIT Manager asserting that events of default had occurred based on the Master Lessees' failure to pay rent and the Eagle Hospitality Group's failure to pay principal due upon the reduction of the Borrowing Base Amount, and (ii) April 10, 2020, when

40000/0600-40014323v1

the Administrative Agent sent notices of default to the Master Lessees asserting that the Master Lessees' breaches of applicable HMAs, as well as certain other actions, constituted additional events of default under the Prepetition Credit Agreement.

68.    Following the Administrative Agent's issuance of the Initial Notice of Default, the Eagle Hospitality Group and its advisors engaged in negotiations with the Administrative Agent, which resulted in the execution of a forbearance agreement (the "Forbearance Agreement") effective on March 24, 2020 whereby (a) the Administrative Agent agreed not to exercise its remedies under the Prepetition Credit Agreement, including commencing a lawsuit, causing the collateral to be sold, or exercising control over the pledged equity of the Propcos, and (b) the Former REIT Manager agreed to suspend payment of a scheduled dividend of approximately $30 million to the stapled security holders of EHT.  Moreover, one of the Administrative Agent's conditions to entry into the Forbearance Agreement was that Eagle Hospitality Group agree to place a "hold" on the DBS Hong Kong Account of Debtor Eagle Hospitality Trust S2 Pte Ltd., which as of the execution of the Forbearance Agreement contained approximately $30.4 million of unencumbered cash.  Thus, the Eagle Hospitality Group's withdrawal of funds from the DBS Hong Kong Account has only occurred pursuant to agreement with the Administrative Agent while the Forbearance Agreement (and amendments thereto) is in effect.  The DBS Hong Kong Account was thus essentially frozen, and no funds could be withdrawn or transferred from the DBS Hong Kong Account absent the written consent of the Administrative Agent.   The Forbearance Agreement has been subject to multiple amendments and short-term extensions, the last such extension being scheduled to expire on January 22, 2021 at 11:59 p.m. (ET).  A few hours before the commencement of the Chapter 11 Cases (and after being advised that its offer to provide DIP financing would not be accepted given the receipt of a

superior offer from the DIP Lenders) the Administrative Agent sent a notice to the Eagle Hospitality Group advising it that any chapter 11 filing by the Debtors was not authorized and neither was any grant of a security interest or mortgage against the Hotels owned by the Debtors.

**F.    Mortgage Loan Notices of Default**

69.    Eagle Hospitality Group also received notices of default in connection with the certain of the Mortgage Loans alleging, among other things, that the respective Non-Debtor Propcos party to such Mortgage Loans had failed pay amounts due thereunder.  Moreover, a receivership action was commenced in December 2020 in connection with the Houston Mortgage Loan, which action remains pending and subject to mandatory mediation as of the Petition Date.  The Eagle Hospitality Group has decided to attempt to resolve open issues in connection with the Mortgage Loans outside of the chapter 11 process.

**G.    Relationships with Hotel Managers**

70.    Compounding the problems caused by the Master Lessees' failure to pay rent to the Eagle Hospitality Group pursuant to the Master Leases, the Eagle Hospitality Group also learned through the work performed by the CRO and counsel that numerous Master Lessees received notices of default under their respective HMAs as a result of, among other things, the Master Lessees' failure to provide and/or maintain sufficient working capital for basic Hotel operations and failure to pay management fees.  These issues led certain Hotel Managers to terminate HMAs and/or close Hotels, and the Debtors have continued to work through such issues over the last several months prior to the Petition Date.

**H.    Relationships with Franchisors**

71.    The behavior of the Master Lessees has also caused significant issues for the Franchisors who brand the Eagle Hospitality Group's Hotels.  In the months preceding the Petition Date, several of the Franchisors communicated with Eagle Hospitality Group regarding

the Master Lessees' defaults under the Master Leases and HMAs.  In addition, the CRO was

informed that the Master Lessees of each and every branded Hotel received notices of default

and termination from the relevant Franchisors a result of the Master Lessees' failure to cure

defaults for non-payment of fees and other amounts due and owing under the relevant Franchise

Agreement.

72.     The Eagle Hospitality Group continues to evaluate its options in connection with

maintaining relationships with Franchisors.  Among other things, the Eagle Hospitality Group

has been in communication with the Franchisors regarding the potential continuation of the

Franchise Agreements or the execution of new Franchise Agreements, as applicable, in

connection with the Hotels.

## I.     Impact of COVID-19 on Hotel Operations

73.     The Master Lessees' rent and other defaults began before the COVID-19

pandemic struck the U.S. and affected economic activity and travel.  In fact, certain Hotel

Managers indicated that the decision to close Hotels was based on the failure of the Master

Lessees' to fully fund operating expenses, not that business volumes necessitated closing the

Hotels.  However, the pandemic has exacerbated the challenges faced by Eagle Hospitality

Group.  For example, under more normal circumstances, the Eagle Hospitality Group might have

been able to pivot away from the Master Lessees and find replacement lessees who would have

been eager to operate the attractive portfolio of Hotels owned by the Eagle Hospitality Group.

Alternatively, had the Master Lessees either (1) posted the contractual security deposits in full or

(2) not left the Hotels in such financial disarray with Hotel Managers, Franchisors, government

authorities, vendors and/or other stakeholders, the Eagle Hospitality Group might have had more

"runway" to work through its problems.  Furthermore, with the lease structure in place, the Eagle

Hospitality Group has been unable (until recently) to reopen[33] any Hotels to secure even a modest level of revenues.  Unfortunately, the COVID-19 crisis and related disruptions to normal economic activity have made that strategy difficult to execute in the near term.

74.    Given the COVID-19 crisis, the Eagle Hospitality Group has been the victim of a classic "one-two punch."  First, the Eagle Hospitality Group was deprived of its stream of Hotel revenue (even before the onset of the COVID-19 crisis) by the failure of the Master Lessees to pay rent.  Second, the COVID-19 crisis made any hope of a quick lessee-replacement strategy or reopening of the Hotels that would permit the Eagle Hospitality Group to remain current on its debt obligations unrealistic.  Moreover, these factors were exacerbated by the Master Lessees' defaults in connection with HMAs and Franchise Agreements, as well as mounting unpaid operational obligations.

## J.    Problems Predate COVID-19

75.    The Master Lessees have asserted at times that failures to make Hotel-related payments have been caused by COVID-19, which undoubtedly has had a devastating impact on the hospitality industry.  It should be emphasized, however, that FTI has investigated these assertions and determined that the Master Lessees' pattern of disregard for their obligations began well before the full onset of COVID-19 in March 2020 and the beginning of the Master Lessees' rent defaults with respect to January 2020 rent, and in fact dates back to 2019, as demonstrated by the following examples:

- Non-payment of Marriott fees dating back to May 2019.
- Failure to pay property insurance dating back to November 2019.
- Failure to pay tourism and occupancy taxes at the Sheraton Pasadena dating back to May 2019.

---

[33]    As noted above, the first reopening of a previously closed Hotel occurred on January 2, 2020, with the reopening of the Hilton Atlanta Northeast.

- Failure to pay numerous contractors and architects, resulting in mechanic's liens dating to September 2019.
- Failure to make healthcare payments for employees of the Queen Mary Long Beach.
- Failure to pay the roofing contractor at the Holiday Inn Orlando in an amount of $750,000 in July 2019 resulting in the contractor "walking off the job" and filing a mechanic's lien.

**K.    Other Outstanding Claims Against Hotels**

76.    As part of a REIT structure, the Eagle Hospitality Group was designed to be removed from the everyday business of Hotel management, with the Master Lessees being responsible for working with Hotel Managers to pay employees, vendors, utilities, contractors, and local occupancy or sales taxes.  The expectation was that, consistent with the industry standard, the Master Lessees would provide funds to the Hotel Managers to pay such expenses, as contemplated under the various HMAs.

77.    Unfortunately, the Master Lessees have manifestly failed to live up to their responsibility to fund the Hotels' operations, with serious consequences going even beyond the closure of Hotels based on HMA defaults, as discussed above.  In particular, as part of their investigation into the conduct of the Master Lessees, the CRO has discovered numerous unpaid claims related to Hotel operations.   A chart summarizing the estimated property related claims that have been asserted against the Debtor Propcos and Non-Debtor Propcos as a result of the Master Lessees' defaults is set forth below:

| Propcos | Total Accounts Payable | Vendors and Contractors | Sales and Occupancy Taxes | Others |
|---|---|---|---|---|
| Debtors | $44.95 million | $29.68 million | $6.75 million | $8.52 million |
| Non-Debtors | $4.94 million | $3.51 million | $0.55 million | $0.87 million |
| **Total** | **$ 49.89 million** | **$33.20 million** | **$7.30 million** | **$9.40 million** |

78.     These unmet obligations have resulted in litigation across the portfolio of Hotels, the imposition of statutory liens against certain Hotels.  Statutory Lien amounts are summarized in the chart below:

| Propcos | Statutory Liens |
|---|---|
| Debtors | $2.79 million |
| Non-Debtors | $0.05 million |
| **Total** | **$2.84 million** |

79.     To be clear, the Eagle Hospitality Group disputes its liability in connection with many of these claims, which it believes are the responsibility of either the Master Lessees (and/or the directors and officers of the Master Lessees), including with respect to occupancy taxes which were collected but never remitted to the relevant taxing authorities) or the Hotel Managers.  Nevertheless, as the owner of the Hotels, the Eagle Hospitality Group has inevitably been targeted by claimants and forced to defend itself in numerous legal disputes, thus paying the price for others' failures.  Further, the Eagle Hospitality Group has come to understand that the Master Lessees and/or Hotel Managers may have entered into numerous contracts that failed to specifically identify the contracting party, instead naming only the Hotel itself (e.g., the "Crowne Plaza Danbury" or the "Westin Sacramento"), and thus leaving the Propcos, as the owners of the Hotels, at risk of liability.  Other agreements to which the Propcos were party were never assigned to the Master Lessees in connection with the Eagle Hospitality Group's IPO, despite representations and obligations to do so.  Adding to the difficulty is that many of these claims are likely to be duplicative, with one creditor potentially asserting the same claim against the applicable Propco, Master Lessee, and Hotel Manager (and, in some instances, Franchisor).  The Eagle Hospitality Group, denied rent by the Master Lessees and left to deal with the aftermath of the Master Lessees' failure to pay for the Hotels' operations, is now facing many of these claims.

40000/0600-40014323v1

### L.      Restructuring Initiatives

80.      Following the execution of the Forbearance Agreement with the Administrative Agent, the Eagle Hospitality Group, guided by the Special Committee and the REIT Trustee, actively explored strategic alternatives with respect to the obligations owing under the Prepetition Credit Facility and related issues involving the operation of the Eagle Hospitality Group's Hotels.

81.      The Eagle Hospitality Group has engaged in months of negotiations with the Administrative Agent concerning the use of cash contained in certain accounts, while simultaneously negotiating for sixteen extensions of the Forbearance Agreement (among other strategic options).  Further, since his appointment, the CRO has actively engaged with Hotel Managers, Franchisors, the City of Long Beach, and unpaid trade creditors and taxing authorities in an attempt to limit the damage caused by the Master Lessees' failure to perform their obligations.  The CRO leveraged his expertise in the hospitality industry to negotiate Caretaker Agreements, to preserve the value of closed Hotels, to work with Franchisors with respect to the continuation of valuable licensing arrangements, and to address the flood of claims from unpaid trade creditors.

### M.      Request for Proposal Process and Attempted Out-of-Court Solution

82.      In addition to their constant engagement with major creditors and counterparties to preserve as much as possible the value of the Eagle Hospitality Group's business, the Eagle Hospitality Group also sought a long-term solution to its liquidity and governance issues that would maximize value to stakeholders.  With this goal in mind, Moelis reviewed all available options to EHT, with the overriding objective that such strategic review be carried out in the best interests of EHT.

### 1. Selection of Proposed New Manager

83.     On July 23, 2020, the REIT Trustee instructed Moelis to commence a request for proposal ("RFP") process to seek proposals for EHT on an expedited basis.  The REIT Trustee then received several restructuring and recapitalization proposals from various parties, which included these proposals as part of their bids to be appointed replacement manager for EH-REIT. These proposals were received between July and October 2020 which were the subject of extensive discussions with, among others, the lenders under the Prepetition Credit Facility.  On December 1, 2020, the REIT Trustee announced, among other things, the selection of an affiliate of SC Capital Partners Pte. Ltd. as the proposed new manager (the "Proposed New Manager") of EH-REIT, subject to stapled security holders' approval at the EGM that was to be held on December 30, 2020.

84.     Among other things, the Proposed New Manager represented that, upon approval of its selection, it would move to reduce EHT's aggregate leverage through a combination of portfolio rebalancing (which would have included divestment of select Hotels, the raising of valuations through rigorous asset management initiatives (subject to market conditions), and the recapitalization of EHT's balance sheet through new equity issuances).

### 2. Direction to Remove Former REIT Manager

85.     On October 26, 2020, MAS issued a notice that it intended to direct the REIT Trustee to remove the Former REIT Manager as manager of EH-REIT due to various breaches of Singapore's Securities and Futures Act (Chapter 289 of Singapore) ("SFA"), and MAS' concerns over the Former REIT Manager's ability to comply with rules and regulations.  The notice further stated that before such a direction is made, the Former REIT Manager may give MAS, by close of business on 9 November 2020, a written statement, accompanied by any relevant documents, as to why MAS should not direct the REIT Trustee to remove the Former REIT

37

Manager as manager of EH-REIT and appoint a new manager for EH-REIT, failing which MAS would proceed on the basis that the Former REIT Manager had no comments.  In response to the notice of intention, the shareholder of the Former REIT Manager, Mandarin West Holdings, LLC (which is indirectly owned by Woods and Wu) provided written submissions to MAS.  On November 30, 2020, MAS issued a directive requiring that the REIT Trustee to remove the Former REIT Manager as manager by no later than December 30, 2020.  Thus, the REIT Trustee contemplated that, subject to the outcome of the stapled security holders' vote, the Former REIT Manager would be replaced by the Proposed New Manager upon the conclusion of the EGM on December 30, 2020 and that the Former REIT Manager would be removed as the manager of EH-REIT with effect as of December 30, 2020.

### 3.      New Hotel Valuations

86.      On November 6, 2020, the Eagle Hospitality Group announced updated Hotel valuations obtained from Colliers International Consultancy & Valuation (Singapore) Pte Ltd ("Colliers"). According to these valuations, as of August 31, 2020 the aggregate value of the Eagle Hospitality Group's Hotels was $726,900,000 ($645,900,000 with respect to the Debtor Propcos' Hotels) on an "as is" basis and $899,600,000 ($776,400,000 with respect to the Debtor Propcos' Hotels) on a "stabilised basis." As discussed in the Eagle Hospitality Group's public disclosures, "[u]nder the stabilised basis, the Properties are valued as if they were operating at a fully stabilised level as of the date of [Colliers'] inspection, post-COVID-19. It should be noted that stabilisation does not imply a return to pre-COVID-19 levels but that the Property is

achieving its fair market share and has reached its mature level of operation in a recovered market."[34]

### 4.  Negotiation of Potential Bridge Loan with Prepetition Lenders

87.     In the lead up to the EGM, the Eagle Hospitality Group engaged in discussions with the Prepetition Lenders regarding the provision of financing designed to support the Eagle Hospitality Group upon the contemplated appointment of the New Proposed Manager.  Such liquidity was of critical importance given that, at the time of the EGM, fifteen of the eighteen Eagle Hospitality Group Hotels remained closed and provided no revenue to the Eagle Hospitality Group.  Discussions between the parties lead to the formulation of a proposed bridge facility (the "Proposed Bridge Facility") under which the Prepetition Lenders would, upon the appointment of the New Proposed Manager, provide the Eagle Hospitality Group with a credit facility of up to $125 million secured by collateral including first priority liens on the Hotels owned by the Debtor Propcos whose equity had been pledged under the Prepetition Credit Facility.  Further terms of the Proposed Bridge Facility were disclosed by the Eagle Hospitality Group in its Singapore public filings,[35] including certain fees, milestones, equity capital raising requirements, and a restriction on distributions.  Importantly, the Proposed Bridge Facility was tied to the appointment of the New Proposed Manager—among the conditions were the approval of the various EGM resolutions for the appointment of the New Proposed Manager.

### 5.  EGM Circular and Resolutions

88.     In anticipation of the EGM to be held on December 30, 2020, the Eagle Hospitality Group issued a number of Singapore public filings designed to provide ample

---

[34]   *See* Circular, Letter to Stapled Security Holders ¶ 1.2.7, n.1, Eagle Hospitality Trust (Dec. 8, 2020), https://investor.eagleht.com/newsroom/20201208_234237_LIW_3AMENV723O0SUKOX.3.pdf. 27.

[35]   *Id.* ¶ 1.4.

40000/0600-40014323v1

information to stapled security holders in advance of the EGM votes.  One of these key filings

was the Circular dated December 8, 2020 (the "Circular").  The Circular, which totaled 194

pages in length, contained detailed information regarding, among other things, the recent history

of the Eagle Hospitality Group and its financial difficulties, the terms of the Proposed Bridge

Facility, the background and qualifications of the New Proposed Manager and its personnel, the

Colliers' Hotel valuations, and explanations regarding the voting process.

89.     Critically, the Circular discussed the five resolutions to be voted on at the EGM

(the "Resolutions").  The first four of these Resolutions reflected terms of the New Proposed

Manager's RFP process proposal that were accepted by the REIT Trustee.  More specifically:

Resolution 1 was to approve the appointment of the New Proposed Manager as new manager of

EH-REIT; Resolution 2 was to approve a fee structure to compensate the New Proposed

Manager; Resolution 3 was to approve the appointment of an affiliate of the New Proposed

Manager as new trustee-manager of EH-BT; and Resolution 4 was to approve the issuance of

140,000,000 new stapled securities that would then be used to pay the New Proposed Manager's

fees during fiscal years 2021-2022 in lieu of payment in cash.  Resolutions 1 through 4 were

interconditional—each of these Resolutions was subject to and contingent on passage of each of

the others.

90.     Next, Resolution 5 was to be voted on in the event that any one of Resolutions 1-4

failed to pass.  Resolution 5 was to approve the voluntary termination (liquidation) of EH-REIT

and EH-BT.  The Circular explained that this option reflected the financial distress of the Eagle

Hospitality Group given its lack of revenues or liquidity and, in the absence of the approval of a

new manager under Resolutions 1-4, the elimination of the liquidity lifelines presented by the

Bridge Loan (which was conditioned on passage of Resolutions 1-4).

91.     Finally, the Circular also discussed the consequences of a failure to approve any

of the Resolutions.  Among other things, the Circular explained that pursuant to the MAS

directive, the Former REIT Manager would be removed from its manager role effective upon the

conclusion of the EGM held on December 30, 2020 and (if Resolutions 1-4 were not carried)

would not be replaced, and that in light of its financial condition EHT would lack the resources

or time to identify an alternative new manager candidate.  The Circular thus warned that after a

failure of all the Resolutions "the [REIT Trustee] will likely be compelled to consider seeking

insolvency protection under Chapter 11 of the United States Bankruptcy Code to facilitate a

reorganisation of EH-REIT or an orderly winding down of EH-REIT."[36]  The Circular also

warned that there was no certainty or assurance that a chapter 11 reorganization would be

successful or that stapled security holders would receive any value in a chapter 11 wind-down.

In addition, other Singapore public filings from the Eagle Hospitality Group warned stapled

security holders regarding the likelihood of a chapter 11 filing should the Resolutions not pass.[37]

### 6.    Failure to Pass Resolutions

92.     Despite the Circular's clear and unequivocal warnings regarding the

consequences of failing to pass the Resolutions, at the EGM the number of security holders

voting in favor of the Resolutions was insufficient to secure the passage of any of the

---

[36]   *Id.* ¶ 4.

[37]   *See* Proposal Q&A, at 11, Eagle Hospitality Trust (Dec. 2020),
      https://investor.eagleht.com/newsroom/20201209_095255_LIW_TC2NXEFR80YO20QO.2.pdf ("In the event
      that Resolution 5 is also not passed, the EH-REIT Trustee will likely be compelled to consider seeking
      insolvency protection under Chapter 11 . . . .").  *See also* Proposal Presentation, *Proposal to Stabilise and
      Recapitalise EHT Under New Management*, at 18 (same), Eagle Hospitality (Dec. 2020), https://investor
      .eagleht.com/newsroom/20201209_095255_LIW_TC2NXEFR80YO20QO.1.pdf.  Further, the announcement
      on December 30, 2020 on the results of the EGM stated that: "Given the present circumstance and challenges,
      EHT does not have sufficient resources as a going concern. The EH-REIT Trustee will consider the available
      options for EHT with its advisers, under the current circumstances and provide updates to Stapled
      Securityholders in due course."  Results of Extraordinary General Meeting Held on 30 Dec. 2020, at 4, Eagle
      Hospitality Trust, https://investor.eagleht.com/newsroom/20201230_143751_LIW_KYJ0AQ79IR36BSG6.1.
      pdf.

40000/0600-40014323v1

Resolutions under the applicable voting rules.  While each of Resolutions 1 through 4 obtained majorities of the votes cast, in each case of approximately 56% in favor, a bare majority was only sufficient with respect to the passage of Resolutions 1, 3, and 4.  Resolution 2, regarding the New Proposed Manager's fee structure, required a 75% voting threshold and thus did not pass with only 56% in support. [38]  As Resolutions 1-4 were inter-conditional and Resolution 2 was not passed, none of the Resolutions could be carried.  Finally, Resolution 5 failed as well with a vote of over 88% against.

93.     As predicted in the Circular, the failure to pass the resolutions resulted in the removal of the Former REIT Manager on December 30, 2020, and the Eagle Hospitality Group entered a liquidity crisis, with available cash inadequate to pay December expenses.  Further, failure to pass Resolutions 1-4 meant that the hope of a Bridge Loan financing the Eagle Hospitality Group until conditions improved was no longer feasible.  Essentially, the failure to appoint the Proposed New Manager and access the Bridge Loan eliminated the Eagle Hospitality Group's last viable out of court restructuring option.

### N.     Need for Chapter 11 Protection

94.     As discussed above, the diligent efforts of the Eagle Hospitality Group and its advisors to reach an out of court solution to Eagle Hospitality Group's financial plight were ultimately unsuccessful.  At the same time, the various trade creditors and taxing authorities that were left unpaid by the Master Lessees, including creditors seeking payment for maintenance and repairs on Hotels, continued to pursue remedies such as the imposition of statutory liens in pursuit of payment for their services.  Given this scenario, and the fact that the Eagle Hospitality

---

[38]     Resolution 2 was required to be passed by an "Extraordinary Resolution" pursuant to Clause 28.2 of the EH-REIT Trust Deed.  Circular, Letter to Stapled Security Holders ¶ 2.6(b).  Under the EH-REIT Trust Deed, an Extraordinary Resolution requires a 75% majority of votes cast for passage.  EH-REIT Trust Deed, Schedule 1, ¶ 22.

40000/0600-40014323v1

Group did not have sufficient liquidity to continue operating without financing, the Eagle Hospitality Group commenced the Chapter 11 Cases on the Petition Date in order to execute a value maximizing disposition of Eagle Hospitality Group's assets for the benefit of all stakeholders.

95.     Moreover, as part of the Chapter 11 Cases, the Eagle Hospitality Group retained the EHT US 1 Independent Director as a new independent director of EHT US1 (the Eagle Hospitality Group entity that is the indirect owner of, and controls through its member-managed LLC subsidiaries, all the Propcos), including as related to EHT US1, Inc.'s role as the member, manager and/or direct or indirect controlling equity holder of its direct and indirect subsidiaries.

### O.     Chapter 11 Strategy

96.     The Eagle Hospitality Group aims to use the "breathing spell" provided by the filing of the Chapter 11 Cases to execute a value-maximizing sale of its Hotels for the benefit of all stakeholders (while not foreclosing any other value maximizing strategies).   In addition, the Debtors intend to use available bankruptcy tools to review, challenge, and avoid certain prepetition transactions for the benefit of their estates and creditors.  Chapter 11 will also allow the Debtors to implement an orderly claims reconciliation process in order to properly address the numerous claims of employees, vendors, and taxing authorities.

### P.     Corporate Governance and Investigations into Past Transactions

97.     In addition to tackling Eagle Hospitality Group's operational and liquidity challenges, the Special Committee and REIT Trustee have effectuated major salutary changes to the Eagle Hospitality Group's corporate governance.  The Master Lessees' defaults under the Master Leases, described above, made it clear to the other directors of the Former REIT Manager (apart from Woods and Wu) that strong action needed to be taken to protect the Eagle Hospitality Group and its stakeholders.  As a result, the Special Committee was appointed pursuant to a

resolution dated March 26, 2020.  The Special Committee was subsequently reduced to four members upon the departure of one of the independent directors in August 2020, and ultimately, ceased to manage the affairs of EH-REIT upon the removal of the Former REIT Manager on 30 December 2020, as discussed above.

98.      As part of its efforts to disentangle the conflicts of interest related to the role of Woods and Wu, the Special Committee retained separate counsel to represent the Eagle Hospitality Group, a key decision given that previously the Woods/Wu-owned entities and the Eagle Hospitality Group entities had all been represented by the same counsel.  The Special Committee and the REIT Trustee then acted to remove Woods and Wu from director and/or officer positions in the various members of the Eagle Hospitality Group, including by replacing Woods and Wu as authorized signatories on certain of the bank accounts owned by the Propcos. Subsequently, Woods and Wu were also removed from their positions as registered agents for and officers of the Propcos and resigned their positions on the board of directors of the Former REIT Manager.

99.      In addition, the Special Committee and REIT Trustee directed the CRO and counsel to investigate past transactions between the Eagle Hospitality Group and the Master Lessees (controlled by Woods and Wu) to determine the degree to which Woods and Wu may have improperly used their past influence over the Eagle Hospitality Group to benefit the Master Lessees at the Eagle Hospitality Group's expense, as well as to identify other irregularities that occurred during Woods' and Wu's tenure.  This investigation remains ongoing by the CRO at the direction of the REIT Trustee.

1.      **Discovery of Damaging NDAs**

100.      The clearest examples of troubling conduct uncovered by the CRO's investigation occurred in October and December 2019 and February 2020, when, Woods and Wu (on behalf of

both the applicable Propcos and Master Lessees) entered into (i) five separate NDAs with Hotel Manager Crestline Hotels & Resorts, LLC (together with its affiliates, "Crestline") in connection with one Hotel in Dallas (the "Dallas NDA"), one Hotel in Atlanta (the "Atlanta NDA"), and three Hotels in Denver (the "Denver NDAs") and (ii) an NDA with Hotel Manager Highgate Hotels L.P. (together with its affiliates, as applicable, "Highgate") in connection with the one Hotel in Woodbridge, New Jersey (the "Woodbridge NDA" and, together with the Dallas NDA, Atlanta NDA, and Denver NDAs, the "Damaging NDAs").  Pursuant to these Damaging NDAs, the Propcos guaranteed all of the Master Lessees' obligations under related HMAs, including the payment of all fees, charges and reimbursable expenses, the payment of all third party payables, as well as the repayment of approximately $6.1 million of key money[39] paid (or to be paid) by (i) Crestline to the Master Lessees as an incentive to enter into the HMAs for the Hotels in Dallas (the "Dallas HMA") and Denver (the "Denver HMAs"), as applicable, and (ii) by Highgate to the Master Lessees as an incentive to enter into the HMA for the Hotel in Woodbridge (the "Woodbridge HMA").

101.    In the Damaging NDAs, Woods and Wu used their position as sole director(s) and/or sole officer(s) of certain members of the Eagle Hospitality Group to benefit the Master Lessees (in which they own 100% of the equity), including by obtaining cash in the form of key money for the Master Lessees.  The Propcos were left "holding the bag"—burdened with onerous guarantee obligations (including with respect to the key money obligations) and no evidence has been uncovered that the Propcos received any consideration in exchange for assuming these burdens.  Indeed, it is estimated that as of the Petition Date there are

---

[39]    As discussed above, key money is a financial incentive customary in the hospitality industry in which a hotel management company will pay a lump sum to a hotel owner (here, the Master Lessee) in exchange for entry into a HMA.  Key money is then typically amortized over the course of the agreement's term, with outstanding unamortized amounts payable in the event of termination for specified reasons.

approximately $11.8 million of unmet Master Lessee obligations under the Crestline HMAs that Crestline has asserted are guaranteed by the Propcos under the Dallas NDA, Atlanta NDA, and Denver NDAs, $9.8 million of which has been asserted against the applicable Debtor Propcos (owners of the Hotels in Atlanta and Denver).   Similarly, it is estimated that as of the Petition Date there are approximately $3.3 million of unmet Master Lessee obligations under the Highgate HMA that Highgate has asserted under the Woodbridge NDA.

102.     The timing of the Damaging NDAs is also noteworthy.  Four of the Damaging NDAs (those executed in connection with the Hotels in Denver and Atlanta) were executed on February 14, 2020, after the Master Lessees had already begun defaulting on their obligations to pay rent to the Propcos.[40]  Further, the Denver NDAs were signed in connection with HMAs that provided for the payment of approximately $4 million of key money to the Master Lessees (repayment of which was guaranteed by the Debtor Propcos under the Denver NDAs subject to certain conditions therein).  Thus, Woods and Wu used the Denver NDAs to saddle these Debtor Propcos with guarantee liability and obtain millions of dollars of cash which they then kept for themselves and their entities, at precisely the moment when they should have been paying overdue rent.  These Debtor Propcos thus suffered a double blow: denied much-needed rent just as they were being saddled with new obligations (to help obtain cash for the Master Lessees at the same time the Master Lessees were failing to post required security deposits and failing to make payments necessary for the proper functioning and upkeep of the Hotels).

103.     Making matters worse, the Dallas and Denver HMAs (executed by the Master Lessees on October 19, 2020 and February 14, 2020, respectively, the same dates the Propcos guaranteed all the Master Lessees' liabilities thereunder pursuant to the Dallas and Denver

---

[40]    Rent was due on February 5, 2020.

NDAs) contained key money terms that made the liabilities faced by these Propcos even more severe.  In typical HMAs, key money that is paid by the management company almost always begins to amortize commencing on the effective date of the HMA (or, in the alternative, upon commencement of management operations) and continues to amortize in equal installments each year over the term of the HMA.  The Dallas and Denver HMAs are highly unusual because the key money under each HMA does not begin to amortize until 2030 (with respect to the Dallas HMA) and 2031 (with respect to the Denver HMAs).  Thus, not only were the Propcos burdened with millions of dollars of liabilities on account of key money owed to Crestline, that liability would not be reduced over time, but would remain payable in full for the next eleven years should termination of or, in some instances, default under, the applicable HMA occur prior to such time.  As of the Petition Date, a total of $6.1 million of key money was owed in connection with the Damaging NDAs, $3.9 million of which was owed by Debtor Propcos.

### 2. Queen Mary Issues

104.    One of the Eagle Hospitality Group's most valuable Hotels is the Queen Mary Long Beach (the "Queen Mary"), a repurposed ocean liner leased by Debtor Propco Urban Commons Queensway LLC (the "Queen Mary Debtor Propco") under long-term ground leases from the City of Long Beach (collectively, the "Queen Mary Ground Lease") and sublet to a Master Lessee the ("Queen Mary Master Lessee") under one of the Master Leases (the "Queen Mary Master Sublease").  The Queen Mary Master Sublease provides, among other things, that the Queen Mary Master Lessee is responsible for payment of rent to the City of Long Beach under the Queen Mary Ground Lease, in addition to being responsible for other amounts, such as property and occupancy taxes, and responsible for complying with certain audit requests made by the City of Long Beach.  However, should the Queen Mary Master Lessee default on

47

obligations under the Queen Mary Ground Lease, the Queen Mary Propco would remain liable to the City of Long Beach.

105.    In addition to all the other issues already discussed herein, the CRO's investigation has revealed a number of irregularities arising from Woods' and Wu's control over the Queen Mary Long Beach.

106.    For example, the CRO discovered that in May 2020 Woods had submitted an unauthorized loan application (which was granted) for a loan in an amount of $2,347,500 on behalf of the Queen Mary Propco under the United States Paycheck Protection Program ("PPP") under the CARES ACT in order to obtain funds for the Queen Mary Master Lessee, thus exposing the Queen Mary Propco to liability with respect to such loan.  While Woods has represented that this occurred as a result of an administrative error that would be corrected by the transfer of the loan to the Queen Mary Master Lessee, it has still not been resolved.  Counsel's investigation indicates that these funds went to a Wells Fargo bank account that is not under the control of the Debtor Propco—the Eagle Hospitality Group has never seen this money.  This incident matches a pattern of behavior in which Woods and Wu have used Propcos to benefit Urban Commons Master Lessees in a way that leaves the Propcos with liability that they should never have incurred.

107.    Compounding the PPP issues discussed above is the fact that in 2019 and 2020 the Queen Mary Master Lessee defaulted on certain of its obligations under the Queen Mary Ground Lease, thus putting the Queen Mary Propco at risk of liability thereunder.  These defaults included failures to pay certain occupancy taxes and rent as well as the failure to supply the City of Long Beach with certain financial documentation requested as part of an audit initiated in 2019.

### 3.     Investigation Remains Ongoing

108.    The CRO, with the assistance of counsel, will continue to investigate the past transactions undertaken by Woods and Wu and intend to pursue all potential avenues in order to protect the interests of the Eagle Hospitality Group and its stakeholders.  The CRO will also continue to investigate the full magnitude of the Master Lessees' failures to pay operating expenses and the claims of trade creditors and taxing authorities arising therefrom, as discussed above.

### Q.     Singapore Regulatory Matters

109.    Given EHT's stapled securities are publicly listed on the Singapore exchange, the Eagle Hospitality Group is subject to significant oversight by the Singapore Exchange Securities Trading Limited ("SGX").  Among other things, SGX enforces rigorous disclosure requirements, comparable to the disclosure requirements for publicly traded companies in the United States.  Furthermore, EH-REIT, being a real estate investment trust, is a collective investment scheme under the SFA.  As such, EH-REIT (as well as the REIT Trustee and the Former REIT Manager in their capacities as the trustee and manager of EH-REIT) are subject to the regulatory framework of the SFA and the regulations and guidance promulgated thereunder, where applicable, which are administered by MAS.

110.    Accordingly, in the months leading up to the Petition Date, the Eagle Hospitality Group, in compliance with its obligations under the listing rules of the SGX, has issued numerous Singapore public reports related to its financial situation, including financial statements and reports, as well as updates regarding, among other matters, the default notices under the Prepetition Credit Facility, the retention of the CRO and other advisors, the Master Lessees' defaults under the Master Leases and HMAs, the CRO's investigation into the activities of Woods and Wu, the discovery of the Damaging NDAs, and the progress of the RFP process.

In addition, MAS and SGX have issued a number of inquiries and/or directive to the Former REIT Manager and the REIT Trustee with respect to the foregoing.

111.    Among other things, on June 5, 2020, MAS and the Commercial Affairs Department of the Singapore Police Force announced the commencement of a joint investigation into the then current and former directors of as well as officers responsible for managing EH-REIT and EH-BT in connection with suspected breaches of public disclosures required under Singapore's securities laws (the "MAS Investigation").  Members of the Special Committee attended interviews with MAS to assist in the MAS Investigation.  In addition, the Eagle Hospitality Group understands that as part of the ongoing MAS Investigation, on October 1, 2020, all of then current and former Singapore-based directors of the Former REIT Manager and the BT-Trustee-Manager were arrested and released on bail on reasonable suspicion that certain provisions of the SFA may have been breached.  The Eagle Hospitality Group cannot confirm at this time additional details with respect to the MAS Investigation, which it understands remains ongoing.  As discussed above, on November 30, 2020, MAS issued a directive requiring that the REIT Trustee remove the Former REIT Manager as manager within one month from November 30, 2020, and consequently the Former REIT Manager was removed on December 30, 2020.

112.    EH-REIT has, to date, accepted all directives from MAS and SGX and has proactively taken steps to abide by such directives.  Further, the REIT Trustee has remained in close communication with MAS and SGX personnel, have provided additional information, responses to inquiries, and public disclosures upon request, and have cooperated fully in connection with the MAS Investigation.

### III.    RELIEF SOUGHT IN FIRST DAY MOTIONS

113.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize their business

operations, facilitate the efficient administration of the Chapter 11 Cases, and facilitate a smooth transition into bankruptcy.  I have reviewed each of the First Day Motions, and the facts stated therein are true and correct to the best of my belief.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of the Chapter 11 Cases.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims (*i.e.*, the First Day Motions seeking relief related to the insurance policies and programs) the relief requested is essential to the Debtors' restructuring efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.  The success of the Chapter 11 Cases depends upon the Debtors' ability to maintain their operations and maximize estate value.  The relief requested in the First Day Motions is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful restructuring.

114.    Accordingly, on behalf of the Debtors respectfully submit that the First Day Motions should be approved.

*[Remainder of page intentionally left blank.]*

40000/0600-40014323v1

115.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this day of January 19, 2021

/s/ Alan Tantleff
Alan Tantleff
Chief Restructuring Officer for the
Debtors