# EXHIBIT A

11/15/2016 03:07 PM          R $231.00          D $0.00
City & County of Denver                          EAS
Electronically Recorded

# AMENDED AND RESTATED

# RECIPROCAL EASEMENT AGREEMENT

### Dated as of November 10, 2016

## TABLE OF CONTENTS

RECITALS .................................................................................................................................1

1.    Access Easements. ............................................................................................................2

2.    Utility Easements .............................................................................................................3

3.    Parking Easements. ..........................................................................................................3

4.    Provisions Regarding Parking...........................................................................................4

5.    Drainage Easements .........................................................................................................6

6.    Easement for Lateral and Subjacent Support....................................................................6

7.    Easements for Incidental Encroachments .........................................................................6

8.    No Further Grants of Easements.......................................................................................7

9.    Further Assurances...........................................................................................................7

10.   Intentionally Deleted........................................................................................................7

11.   Maintenance and Operation of Joint Use Areas. ..............................................................7

12.   Electric Services...............................................................................................................8

13.   Reimbursement for Joint Use Area Expenses and Electric Services. ................................9

14.   Maintenance of Individual Parcels..................................................................................12

15.   Insurance and Indemnification........................................................................................12

16.   Restrictions on Use ........................................................................................................15

17.   Casualty and Eminent Domain. ......................................................................................16

18.   Remedies in the Event of Default. ..................................................................................17

19.   Agreement Runs with the Land; Successors and Assigns ...............................................19

20.   Fees and Expenses .........................................................................................................19

21.   Counterparts...................................................................................................................19

22.   Severability ....................................................................................................................19

23.   Section Headings ...........................................................................................................19

24.   Binding Effect................................................................................................................19

25.   Choice of Law ...............................................................................................................19

26.   No Third Party Beneficiary.............................................................................................19

27.   Notices ..........................................................................................................................19

28.   No Joint Venture ............................................................................................................21

29.   Approvals.......................................................................................................................21

30.   Estoppel Certificates ......................................................................................................21

31.   Reservation of Rights.....................................................................................................21

32.     Right of Each Party to Post Their Parcel to Give Notice of Non-Liability for Mechanic's and Materialman's Liens .................................................................................22

33.     AS IS-WHERE IS CONDITION OF EASEMENTS ........................................................22

34.     No Public Dedication ........................................................................................................22

35.     Agreement Superior to Liens ............................................................................................22

36.     Amendment .......................................................................................................................22

37.     Entire Agreement ..............................................................................................................22


EXHIBIT A, Hotel Real Property ...............................................................................................A-1
EXHIBIT A-1, Hotel Site ...........................................................................................................A1-1
EXHIBIT A-2, Intentionally Blank ............................................................................................A2-1
EXHIBIT B, Office Building Real Property ................................................................................B-1
EXHIBIT B-1, Office Building Site ............................................................................................B1-1
EXHIBIT B-2, Parking Garage Level P-1 ..................................................................................B2-1
EXHIBIT B-3, Parking Garage Level P-2 ..................................................................................B3-1
EXHIBIT C, Exterior Joint Use Areas .......................................................................................C-1
EXHIBIT D-1, Interior Joint Use Areas Ground Level .............................................................D1-1
EXHIBIT D-2, Interior Joint Use Areas First Level Parking ....................................................D2-1
EXHIBIT D-3, Interior Joint Use Areas Second Level Parking .................................................D3-1
EXHIBIT E, Surface Parking Lot ...............................................................................................E-1
EXHIBIT F-1, Parking Space Outline First Level Garage ........................................................F1-1
EXHIBIT F-2, Parking Space Outline Second Level Garage .....................................................F2-1
EXHIBIT F-3, Surface Parking Lot Parking Space Outline ......................................................F3-1
EXHIBIT F-4, Surface Parking Lot Common Maintenance Area ..............................................F4-1

## AMENDED AND RESTATED RECIPROCAL EASEMENT AGREEMENT

THIS AMENDED AND RESTATED RECIPROCAL EASEMENT AGREEMENT (this "**Agreement**"), is made effective as of November 10 , 2016 (the "**Effective Date**"), by and between UCHIDH, LLC, a Delaware limited liability company ("**Hotel Owner**"), and HOLUALOA STAPLETON OFFICE, LLC, an Arizona limited liability company ("**Office Owner**") (The parties hereto are referred to individually as a "**Party**" and collectively as the "**Parties**").

## RECITALS

A.    Hotel Owner's predecessor-in-title, Cypress Hotels Limited Partnership, a Delaware limited partnership, and Office Owner's predecessor-in-title, Cypress Stapleton Office Limited Partnership, a Delaware limited partnership, entered into that certain Reciprocal Easement Agreement effective as of October 31, 2000, and recorded on December 12, 2000, with the Denver County Clerk and Recorder at Reception No. 2000180766, as amended by that certain First Amendment to Reciprocal Easement Agreement effective as of June 1, 2006, and recorded on June 1, 2006, with the Denver County Clerk and Recorder at Reception No. 2006085809 (collectively, the "**Original REA**").  Hotel Owner and Office Owner desire to amend, restate, and fully replace the Original REA with this Agreement to, among other things, modify certain responsibilities for maintenance and utilities, and remove provisions concerning the now demolished fitness center, which may in the future be replaced with a conference center.

B.    Hotel Owner is the owner of that certain real property located in the City and County of Denver, State of Colorado, as more particularly described by this reference (the "**Hotel Real Property**"), together with the improvements located thereon including, without limitation, an 11-story hotel building containing approximately 142,846 square feet of area as more fully depicted on **Exhibit A-1** attached hereto and incorporated herein by this reference (the "**Hotel**") and a space which was formerly built out as a fitness center and may in the future be configured as a conference center (the "**Conference Center**") located in the breezeway area between the Hotel and the Office Building (as defined below) (the Hotel Real Property, the Hotel, the Conference Center, and any other improvements located on the Hotel Real Property are hereinafter collectively referred to as the "**Hotel Property**").

C.    Office Owner is the owner of that certain real property located in the City and County of Denver, State of Colorado, and adjacent to the Hotel Property, as more particularly described on **Exhibit B** attached hereto and incorporated by this reference (the "**Office Building Real Property**"), together with the improvements located thereon including, without limitation, a 10-story office building containing approximately 131,820 square feet of area as more fully depicted on **Exhibit B-1** attached hereto and incorporated herein by this reference (the "**Office Building**"); and a subterranean parking garage located under the Office Building containing approximately 142,215 square feet of area as more fully depicted on **Exhibit B-2** and **Exhibit B-3** attached hereto and incorporated herein by this reference (collectively, the "**Parking Garage**") (the Office Building Real Property, the Office Building, the Parking Garage and any other improvements located on the Office Building Real Property are hereinafter collectively referred to as the "**Office Property**"). The Hotel Property and the Office Property are hereinafter sometimes collectively referred to as the "**Development**." The term "**Parcel**" is sometimes used

herein to refer to that portion of the Development owned by a particular Party (i.e., Hotel Owner's "Parcel" is the Hotel Property and Office Owner's "Parcel" is the Office Property).

        D.      The Office Property and the Hotel Property share certain services and areas, including without limitation, common curb cuts; common landscaped areas; common roadways; common aisles; common parking areas; common loading areas; common sidewalks; a breezeway which connects the Hotel and the Office on the ground level, thereby allowing internal pedestrian travel between the Office and the Hotel, all as more fully depicted on **Exhibit C** attached hereto and incorporated herein by this reference depicting all such exterior joint use areas (the "**Exterior Joint Use Areas**") and **Exhibit D-1** (the "**Interior Joint Use Areas Ground Level**"), **Exhibit D-2** (the "**Interior Joint Use Areas First Level Parking**"), and **Exhibit D-3** (the "**Interior Joint Use Areas Second Level Parking**") attached hereto and incorporated herein by this reference depicting all such interior joint use areas (the Interior Joint Use Areas Ground Level, the Interior Joint Use Areas First Level Parking and the Interior Joint Use Areas Second Level Parking are hereinafter collectively referred to as the "**Interior Joint Use Areas**") (the Exterior Joint Use Areas and the Interior Joint Use Areas being collectively referred to herein as the "**Joint Use Areas**"), as well as shared arrangements for certain functions in connection with utilities and other services, all as more particularly described in this Agreement.

        D.      Hotel Owner and Office Owner recognize that for the most favorable operation of the Hotel Property and the Office Property as a unified and coordinated Development, it is desirable that they agree and cooperate with respect to the operation and maintenance of their respective Parcels and in connection therewith, they desire to burden their respective Parcels with certain easements appurtenant to the other's Parcel and to obtain the benefit of certain easements appurtenant over the other's Parcel, all on the terms and conditions set forth in this Agreement.

        NOW, THEREFORE, in consideration of the foregoing Recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Hotel Owner and Office Owner, intending to be legally bound, hereby agree as follows:

    1.      Access Easements.

    a.      Exterior Joint Use Areas. Each Party hereby grants and conveys to the other Party, its successors and assigns, a nonexclusive perpetual easement and right of use appurtenant to and for the benefit of the grantee's Parcel, to and from adjacent public roads in and over that portion of the Exterior Joint Use Areas located on the grantor's Parcel, for the purpose of pedestrian and vehicular ingress, egress, passage, delivery and installation, construction, repair or maintenance of utilities servicing the grantee's Parcel. The easement granted hereby shall be for the benefit of, but not restricted solely to, the Parties and each Party may grant the benefit of such easement to other occupants of its Parcel for the duration of such occupancy and to its agents, licensees, concessionaires, customers, employees, business invitees, tenants or other occupants; but the same is not intended nor shall it be construed as creating any rights in or for the benefit of the general public.

b.    <u>Interior Joint Use Areas</u>. Each Party hereby grants and conveys to the other Party, its successors and assigns, a nonexclusive perpetual easement and right of use appurtenant to and for the benefit of the grantee's Parcel, in and over that portion of the Interior Joint Use Areas located on the grantor's Parcel, for the purpose of pedestrian ingress, egress and access. The easement granted hereby shall be for the benefit of, but not restricted solely to, the Parties and each Party may grant the benefit of such easement to other occupants of its Parcel for the duration of such occupancy and to its agents, licensees, concessionaires, customers, employees, business invitees, tenants or other occupants, but the same is not intended nor shall it be construed as creating any rights in or for the benefit of the general public.

2.    <u>Utility Easements</u>. Each Party hereby grants to the other Party, its successors and assigns, a perpetual nonexclusive easement and right of use appurtenant to and for the benefit of the grantee's Parcel in, to, over, under and across the Exterior Joint Use Areas of the grantor's Parcel for the installation, operation, maintenance, repair, relocation and removal of sewers, water and gas mains, electric power lines, telephone and telecommunication lines, cable and satellite lines and facilities, and other utility lines ("**<u>Utility Lines</u>**") to serve the grantee's Parcel, including without limitation the right to install and maintain manholes, meters, pipelines, valves, hydrants, sprinkler controls, conduits, sewage facilities and all related facilities in a manner which does not interfere with any Joint Use Area use or operation or any other use or operation of the grantor's Parcel. All easements for the Utility Lines shall be subject, as to location, to the prior written approval of the Party whose Parcel is to be burdened thereby, which approval shall not be unreasonably withheld or delayed. The grantee shall repair and maintain the Utility Lines, but such repair and maintenance or installation shall be performed, except in the case of emergency, only after ten days' written notice to the grantor. The grantee shall, at its cost and expense, repair any damage to any improvements on the grantor's Parcel caused by such repair and maintenance and in all events such repair and maintenance shall be performed in a manner so as to cause a minimum amount of interference with the grantor's Parcel and the operation of the Development. The grantor may, at its expense, relocate any Utility Lines after 30 days' written notice to the grantee. Except: (a) with respect to any utility lines or poles currently existing at the Development as of the date of this Agreement; (b) as may be necessary during periods of construction, repair or temporary service, or (c) unless required to be above ground by the utility providing such service or by any applicable law, ordinance, rule, regulation or other governmental requirement, all Utility Lines shall be underground.

3.    <u>Parking Easements</u>.

a.    <u>Grant of Parking Easements—Surface Parking Lot</u>. Subject to the provisions of **<u>Section 4</u>** of this Agreement, each Party hereby grants and conveys to the other Party, its successors and assigns, a nonexclusive perpetual easement and right of use appurtenant to and for the benefit of the grantee's Parcel, in and over the surface parking lot identified on the site plan of the Development attached hereto as **<u>Exhibit E</u>** and incorporated herein by this reference (the "**<u>Surface Parking Lot</u>**") for the purpose of parking. The easement granted hereby shall be for the benefit of, but not restricted solely to, the Parties and each Party may grant the benefit of such easement to other occupants of its Parcel for the duration of such occupancy and to its agents, licensees, concessionaires, customers, employees, business invitees, tenants or other occupants; but the same is not intended nor shall it be construed as creating any rights in or for the benefit of the general public.

Subject to the foregoing and subject to a taking of any portion of the Surface Parking Lot by the exercise of the right of eminent domain, no Party shall materially alter the location, quality or quantity of parking in its portion of the Surface Parking Lot, without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

b.     <u>Grant of Parking Easements—Parking Garage</u>. Subject to the provisions of **Section 4** of this Agreement, Office Owner hereby grants and conveys to Hotel Owner, its successors and assigns, a nonexclusive perpetual easement and right of use appurtenant to and for the benefit of the Hotel Property, in, through and over the Parking Garage for the purpose of parking. The easement granted hereby shall be for the benefit of, but not restricted solely to, Hotel Owner and Hotel Owner may grant the benefit of such easement to other occupants of its Parcel for the duration of such occupancy and to its agents, licensees, concessionaires, customers, employees, business invitees, tenants or other occupants; but the same is not intended nor shall it be construed as creating any rights in or for the benefit of the general public. Subject to the foregoing and subject to a taking of any portion of the Parking Garage by the exercise of the right of eminent domain, Office Owner shall not materially alter the location, quality or quantity of parking in the Parking Garage, without the prior written consent of Hotel Owner, which consent shall not be unreasonably withheld or delayed.

c.     <u>Common Parking Areas</u>. The Surface Parking Lot, together with the Parking Garage, are hereinafter collectively referred to as the "**Common Parking Areas**."

4.     <u>Provisions Regarding Parking</u>.

a.     <u>Division of Parking Spaces</u>. Notwithstanding the generality of **Section 3** of this Agreement, the number of parking spaces contained in the Common Parking Areas shall be allocated between the Parties as follows (subject to adjustment and/or reconfiguration upon mutual agreement of the Parties):

i.     <u>Weekday Parking Areas and Restrictions</u>.

(1)     <u>Office Owner Exclusive Use</u>. From 7:00 a.m. until 6:00 p.m. each Monday through Friday, but excepting holidays recognized by Office Owner at the Office Building ("**Office Hours**"), the following parking spaces shall be reserved for the exclusive use of Office Owner and the Office Property guests, tenants, licensees, invitees, visitors, customers, employees and contractors: (A) 137 parking spaces located on Level P-1 of the Parking Garage, as more fully depicted on **Exhibit F-1** attached hereto and incorporated by this reference (the "**Parking Space Outline First Level Garage**") and as identified thereon as "Office Building Only 7:00 a.m. to 6:00 p.m. Weekdays"; (B) 211 parking spaces located on Level P-2 of the Parking Garage, as more fully depicted on **Exhibit F-2** attached hereto and incorporated by this reference (the "**Parking Space Outline Second Level Garage**") and as identified thereon either as "Office Building Exclusive" or "Office Building Only 7:00 a.m. to 6:00 p.m. Weekdays"; and (C) 52 parking spaces located on the Surface Parking Lot, as more fully depicted on **Exhibit F-3** attached hereto and incorporated by this reference (the "**Surface**

**Parking Lot Parking Space Outline**") and as identified thereon as "Office Building Exclusive Parking."

(2)      Hotel Owner Exclusive Use. During Office Hours, the following parking spaces shall be reserved for the exclusive use of Hotel Owner and the Hotel Property guests, tenants, licensees, invitees, visitors, customers, employees and contractors: (A) 60 parking spaces located on Level P-1 of the Parking Garage, as more fully depicted on **Exhibit F-1** attached hereto and incorporated by this reference (the Parking Space Outline First Level Garage) and as identified thereon as "Hotel Exclusive Parking;" and (B) 86 parking spaces located on the Surface Parking Lot, as more fully depicted on **Exhibit F-3** attached hereto and incorporated by this reference (the Surface Parking Lot Parking Space Outline) and as identified thereon as "Hotel Exclusive Parking."

(3)      Two-Hour Parking Restriction. During Office Hours, 59 parking spaces located on the Surface Parking Lot, as more fully depicted on **Exhibit F-3** attached hereto and incorporated by this reference (the Surface Parking Lot Parking Space Outline) and as identified thereon as "2-Hour Parking" shall be subject to a two-hour parking restriction.

ii.      Weeknight and Weekend Parking Areas and Restrictions. At all times other than Office Hours, the following parking spaces shall be reserved for the exclusive use of Office Owner and the Office Property guests, tenants, licensees, invitees, visitors, customers, employees and contractors: (1) 52 parking spaces located on the Surface Parking Lot, as more fully depicted on **Exhibit F-3** attached hereto and incorporated by this reference (the Surface Parking Lot Parking Space Outline) and as identified thereon as "Office Building Exclusive Parking;" and (2) 176 parking spaces located on Level P-2 of the Parking Garage, as more fully depicted on **Exhibit F-2** attached hereto and incorporated by this reference (the Parking Space Outline Second Level Garage) and as identified thereon as "Office Building Exclusive;" and all other parking spaces in the Common Parking Areas shall be reserved for the exclusive use of Hotel Owner and the Hotel Property guests, tenants, licensees, invitees, visitors, customers, employees and contractors during such times.

b.      Enforcement of Parking Provisions. Office Owner shall be responsible for enforcement of all parking restrictions contained herein as pertain to the Common Parking Areas, and is entitled to take any commercially reasonable steps to enforce such parking restrictions and to cure violations thereof including, without limitation, imposing fines on the owners of vehicles violating such parking restrictions and/or having vehicles violating such parking restrictions towed at their owners' expense; provided, however, that prior to towing any vehicles, Office Owner shall give Hotel Owner three days' prior written notice of its intent to begin towing violating vehicles (the "**Tow Notice**"), and after such Tow Notice is given and such three days have elapsed, for a period of 60 days (each 60 day period being hereinafter referred to as a "**Tow Period**"), Office Owner will be permitted to tow any vehicles in violation of the parking restrictions; provided, further, that, with respect to those parking spaces located in the Parking Garage and reserved for the exclusive use of Office Owner during Office Hours and Hotel Owner at all other times, Office Owner shall take no action to enforce the parking restrictions with respect

to the use of such parking spaces by Hotel Owner and the Hotel Property guests, tenants, licensees, invitees, visitors, customers, employees and contractors during the Office Hours occurring between 7:00 a.m. and 9:00 a.m. and between 4:00 p.m and 6:00 p.m. other than placing warnings or other violation notices on violating vehicles. After a Tow Period shall have elapsed, Office Owner must give an additional Tow Notice to Hotel Owner prior to towing any vehicles, which Tow Notice will be valid for an additional Tow Period. Notwithstanding the foregoing, in the event that Hotel Owner discovers any violations of the parking restrictions occurring in any of the Common Parking Areas which are designated as "Hotel Exclusive Parking," then in addition to any other rights it may have, Hotel Owner shall be entitled, but not obligated, to have any such vehicles violating such parking restrictions towed at their owners' expense; provided, however, that Hotel Owner shall be required to give Office Owner a Tow Notice in the same manner as set forth above in this subsection, and any such Tow Notice shall only be valid for a Tow Period in the same manner as set forth above. The Parties shall reasonably cooperate with each other to ensure the parking restriction enforcement is in compliance with all applicable laws, rules, regulations and ordinances.

5. _Drainage Easements_. Each Party hereby grants and conveys to the other, its successors and assigns a nonexclusive easement and right of use appurtenant to and for the benefit of the grantee's Parcel in, to, over, under and across those portions of the grantor's Parcel upon which storm water runoff from the grantee's Parcel currently drains as of the date of this Agreement, for the purposes of permitting drainage of storm water runoff from the grantee's Parcel. Notwithstanding the generality of the foregoing, the Parties acknowledge and agree that, to the best of their knowledge, as of the date hereof there is no drainage of storm water runoff from their respective Parcels in, to, over, under or across any portions of the other Party's Parcel.

6. _Easement for Lateral and Subjacent Support_. Each Party hereby grants, sells and conveys to the other Party a nonexclusive easement appurtenant to each Party's Parcel and easements granted herein for the purpose of furnishing connection, lateral and subjacent support or attachment including, without limitation, walls, slabs and structural systems of an improvement to any improvement owned by the other Party.

7. _Easements for Incidental Encroachments_. The Parties hereby grant to the other a perpetual easement under and over an area directly adjoining the property line between their respective Parcels for incidental encroachments for, among other things, footings for the support of foundations or for overhangs for roof projections, signs or similar projections provided that no such encroachment shall, at the time such encroachment shall first occur, interfere in any way with the actual use of either Party's Parcel or either Party's prior use of the easements granted pursuant to this Agreement, and (except for the Encroachment Area described in **Section 7(a)** below), the encroachment shall not exceed three feet.

a. _Parking Garage Encroachment Easement_. The Parking Garage located under the Office Building encroaches, below ground, across the south property line of the Office Property and into approximately the north fifteen (15) feet of the Hotel Property (the "Encroachment Area"). Hotel Owner hereby grants a perpetual easement to Office Owner to allow the Parking Garage to continue to exist in its current physical location and state within the Encroachment Area. Office Owner shall have the right to operate, maintain, and repair the Parking Garage, but shall in no event expand the Parking Garage onto or

under the Hotel Property beyond its existing dimensions within the Encroachment Area, replace the Parking Garage or take any action that could adversely affect or fail to take any action necessary to avoid an adverse effect upon the structural integrity of the Parking Garage and all elements thereof, including, but not limited to, failure to take any action within the Parking Garage necessary to maintain the structural integrity of the Hotel Property. Nothing in this **Section 7(a)** shall be construed to grant an easement to Office Owner to use or occupy the surface of the Hotel Property or to otherwise interfere with the current or future use, operation or development of the Hotel Property by Hotel Owner and its successors and assigns. The responsibility for the performance of and payment for maintenance and repairs to the Parking Garage, including that portion of the Parking Garage located within the Encroachment Area, shall be as otherwise provided herein.

8.      No Further Grants of Easements. No Party shall grant an easement or easements of any type set forth in this Agreement or otherwise to any person for the benefit of property not within the Development, or otherwise so burden the easements granted herein; provided, however, that the foregoing shall not prohibit the granting or dedicating of utility easements by a Party on its Parcel to governmental or quasi-governmental authorities or to utilities so long as the rights granted under such utility easements do not materially adversely affect the other Parcel.

9.      Further Assurances. Each of the Parties hereto hereby agrees for itself and its successors and assigns that it will execute such documents in recordable form as may be necessary to effectuate the provisions of this Agreement including, but without limiting the generality of the foregoing, any documents granting easements, licenses, and similar rights to utility companies and governmental bodies or agencies thereof.

10.     Intentionally Deleted.

11.     Maintenance and Operation of Joint Use Areas.

a.      Exterior Landscaping and Ordinary Maintenance. Except as provided in subsections (b) and (c) below, each Party shall be responsible for maintenance and repair of that portion of the Exterior Joint Use Area located on its respective Parcel as provided in **Section 14** of this Agreement.

b.      Parking Garage. Subject to reimbursement from Hotel Owner as provided in **Section 13** of this Agreement, Office Owner shall be responsible for keeping the Parking Garage including without limitation all curb cuts, entrances and exits to the same, in good repair and in a safe, sound and functional condition, free from refuse, rubbish and dirt, smooth, free from cracks and potholes, and in conformity with all governmental regulations, such responsibility to include, without limitation, cleaning, general maintenance, re-paving, re-striping and replacing markings on the surface of the Parking Garage and driveways from time to time so as to provide for the orderly parking of automobiles, and repair or replacement of adequate exit and entrance and other traffic control signs to direct traffic in and out of the Parking Garage. Office Owner shall also be responsible for maintaining the structural integrity of the Parking Garage and all elements thereof, including, but not limited to, as necessary to maintain the structural integrity of the Hotel Property and the Office Property. The Parties agree that the costs and expenses

incurred by Office Owner in connection with the maintenance and repair responsibilities outlined above will be borne as follows: Office Owner will be responsible for payment of 67% of such costs and expenses related to the Parking Garage and Hotel Owner will reimburse Office Owner for 33% of such costs and expenses related to the Parking Garage, all in the manner set forth in **Section 13** of this Agreement.

    c.     Surface Parking Lot. Except as provided in this subsection (c), each Party shall be responsible for maintenance and repair of that portion of the Surface Parking Lot located on its respective Parcel as provided in **Section 14** of this Agreement, including without limitation, keeping that portion of the Surface Parking Lot located on its respective Parcel, including without limitation all curb cuts, entrances and exits to the same, in good repair and in a safe, sound, functional condition, smooth, free from cracks and potholes, and in conformity with all governmental regulations, such responsibility to include, without limitation, general maintenance, snow removal, general cleaning, repaving, re-striping and replacing markings on the surface of the portion of the Surface Parking Lot and driveways located on its respective Parcel from time to time so as to provide for the orderly parking of automobiles, and repair and replacement of adequate exit and entrance and other traffic control signs to direct traffic in and out of the Surface Parking Lot. Notwithstanding the foregoing obligation of each Party to maintain the portion of the Surface Parking Lot located on its respective Parcel as provided in this subsection (c), Hotel Owner shall reimburse Office Owner as provided in **Section 13** of this Agreement for 50 % of the costs and expenses incurred by Office Owner for its maintenance and repair of that portion of the Surface Parking Lot located on the Office Property which is depicted on **Exhibit F-4** attached hereto and incorporated herein by this reference (the "**Surface Parking Lot Common Maintenance Area**").

    d.     Interior Joint Use Areas. Each Party shall be responsible for the maintenance and repair of the Interior Joint Use Areas on its respective Parcel as provided in **Section 14** of this Agreement.

    12.     Electric Services. Subject to reimbursement from Office Owner as set forth in **Section 13** of this Agreement, Hotel Owner shall coordinate electrical service to the Development through the applicable public utility provider of electrical services, or if more than one provider is available, with such provider as determined by Hotel Owner in its sole and absolute discretion. The Parties acknowledge that there currently is one electrical meter serving the Hotel (the "**Hotel Electrical Meter**") and one electrical sub-meter serving the Office Building (the "**Office Electrical Sub-Meter**"). The Parties also acknowledge that the Conference Center electric service is currently provided through electrical lines running from the Office Property to the Hotel Property. Within 30 days from the recordation of this Agreement, Hotel Owner, at its sole cost and expense, shall cause the electric usage provided to the Conference Center from the Office Property to be measured either (a) through the Hotel Electrical Meter or (b) through an additional sub-meter to be installed by Hotel Owner (the "**Conference Center Electrical Sub-Meter**") that will monitor the electrical usage provided to the Conference Center from the Office Property (collectively, the "**Hotel Electrical Meter Work**"). If Hotel Owner causes such electric usage to be measured through the Hotel Electrical Meter, then Hotel Owner shall sever all electrical lines running from the Office Property to the Hotel Property. The allocation between the Hotel Electrical Meter, the Office Electrical Sub-Meter, and, if applicable, the Conference Center Electrical Sub-Meter will be based on actual

usage without mark up. Notwithstanding the foregoing, if Hotel Owner fails to complete the Hotel Electrical Meter Work within 30 days from the recordation of this Agreement, Hotel Owner will be responsible for payment of twelve percent of all electricity billed through the Office Electrical Sub-Meter until such time as it completes the Hotel Electrical Meter Work. The Parties agree that Hotel Owner will retain the Hotel Electrical Meter, the Office Electrical Sub-Meter, and, if applicable, the Conference Center Electrical Sub-Meter in its own name. Hotel Owner will be responsible for payment of all electricity billed through and all other costs and expenses associated with the Hotel Electrical Meter and, if applicable, the Conference Center Electrical Sub-Meter; and Office Owner will be responsible for payment of all electricity billed through and all other costs and expenses associated with the Office Electrical Sub-Meter (less the amounts, if any, billed through the Conference Center Electrical Sub-Meter) and will reimburse Hotel Owner for such electricity and related costs and expenses, all in the manner set forth in **Section 13** of this Agreement. At any time, upon no less than 30 days' advance written notice to Hotel Owner, Office Owner may, at its sole cost and expense, convert the Office Electrical Sub-Meter to a separate electrical meter, provided that any such conversion shall be done in a good and workmanlike manner and in compliance with all applicable laws, in which case this **Section 12** and **Section 13(b)** shall have no further force and effect.

13.    Reimbursement for Joint Use Area Expenses and Electric Services.

a.    Joint Use Areas Reimbursement. All costs and expenses related to Joint Use Areas which are subject to reimbursement pursuant to **Section 11** of this Agreement shall be paid as follows:

i.    Estimate of Costs. No later than January 1 of each calendar year, the Party responsible for any maintenance or repair of the Exterior Joint Use Areas or Common Parking Areas for which reimbursement pursuant to this **Section 13** is required as provided in **Section 11**, shall provide the other Party with a good faith estimate of the expenses related to such maintenance and repair for such calendar year (the "**Cost Estimate**"), which Cost Estimate shall be itemized and shall also disclose whether or not the Party is planning to engage third party contractors for any such maintenance or repair and if so, whether or not any of such third parties are affiliated with the Party providing the Cost Estimate. In any event, to the extent that any Party providing a Cost Estimate documents the proposed use of in-house providers or providers otherwise affiliated with such Party, the cost for such providers shall be generally consistent with rates charged by unaffiliated third parties for similar goods and services. The Party receiving the Cost Estimate shall have 30 days in which to either approve or disapprove the Cost Estimate for the calendar year. A Party's failure to disapprove the Cost Estimate within this 30-day time frame shall be deemed an approval of the Cost Estimate. In the event that a Party disapproves a Cost Estimate, it shall give the other Party a written notice outlining its disapproval of the Cost Estimate, including details of the exact nature of the disapproval (the "**Disapproval Notice**"). In the event that either Party gives a Disapproval Notice, the Parties agree to negotiate in good faith toward a resolution of the dispute. In the event that the Parties are unable to reach an agreement concerning the Cost Estimate within 30 days after the date of the Disapproval Notice, the Parties agree to submit to binding arbitration concerning the disputed Cost Estimate (hereinafter referred to as an "**Irreconcilable Dispute**") on the terms outlined in subsection (ii) below.

ii.   Arbitration. Any Irreconcilable Dispute shall be submitted to arbitration in the state of, and pursuant to the laws of, Colorado under the following procedure:

(1)   The Irreconcilable Dispute shall be submitted to binding arbitration before a single neutral arbitrator (the "**Arbitrator**"). The Arbitrator shall be a member of Judicial Arbiter Group ("**JAG**"), an organization consisting of retired and/or former judges. The Parties shall use good faith efforts to mutually agree upon the Arbitrator using a list of available JAG members (the "**List**"). If the Parties cannot agree on the Arbitrator within 15 days after being provided with the List, then JAG shall choose the Arbitrator. In the event that JAG no longer exists at the time that any Irreconcilable Dispute is submitted to arbitration, the Parties agree that the Party not disputing the Cost Estimate may designate any other organization in the Denver, Colorado area consisting primarily of retired and/or former judges, and the Arbitrator shall be chosen in the same manner as provided for the appointment of an Arbitrator from JAG as provided above, provided that the Arbitrator must be a retired and/or former judge. If no similar organization exists, the Arbitrator shall in any event be a retired or former judge having once served on a court in the State of Colorado, which Arbitrator shall be chosen in the same manner as provided for the appointment of an Arbitrator from JAG as provided in this subsection, except that in the event that the Parties cannot agree on the Arbitrator within 15 days, then the Party disputing the Cost Estimate shall petition the Chief Judge of the District Court of the City and County of Denver, Colorado, to appoint the Arbitrator.

(2)   The Arbitrator shall determine the procedures for the conduct of the arbitration (for such purpose the Arbitrator may, at his discretion, utilize the procedures of any organization acceptable to the Arbitrator, such as the American Arbitration Association), except that such procedures shall not be inconsistent with the following: (A) the arbitrator shall hold at least one hearing in connection with any Irreconcilable Dispute, but no more than one hearing unless the Arbitrator believes that additional hearing(s) are reasonably necessary; (B) both Parties shall be entitled to present written evidence and witnesses at the hearing(s); (C) the Arbitrator shall be entitled to examine witnesses and the parties; (D) there shall be no cross-examination of witnesses or parties; (E) there shall be no pre-hearing discovery, either oral or written; (F) the rules of evidence shall not apply to the hearing(s); and (G) the Arbitrator shall have the authority to order the parties to mediate the Irreconcilable Dispute, and notwithstanding the fact that the Arbitrator is acting as the ultimate trier of fact in connection with the Irreconcilable Dispute, he or she may also act as a mediator in an attempt to resolve the Irreconcilable Dispute.

(3)   Each Party shall pay one-half of any fees required to be paid to the Arbitrator. The substantially prevailing Party, if any (as determined by the Arbitrator) shall be awarded all arbitration fees and attorneys' fees.

(4)   The award of the Arbitrator shall be final and binding and may be enforced by the District Court or any other Court having jurisdiction in the City and County of Denver, Colorado.

    iii.    <u>Payment of Costs and Expenses</u>. Once the Parties agree on the Cost Estimate for a particular calendar year, the Party responsible for maintenance and repair shall make arrangements for such maintenance or repair with such contractors as such Party deems appropriate in its sole and absolute discretion, and shall make payments directly to any such providers before the same is due, and such Party shall then submit an invoice to the other Party for its proportionate share of payment according to the allocations set forth in **Section 11** without any additional mark-up by the Party paying the contractor directly, which invoice shall include a copy of the invoice directly from the contractor to document the amounts owed to the particular contractor. In the event that the Party does not engage a contractor for any aspect of maintenance or repair, it shall bill the other Party for such maintenance and repair no less often than quarterly, and shall outline the services and costs in the same manner as they were outlined in the Cost Estimate. The other Party shall then have 15 days after the date of receipt of such invoice to make payment to the other Party to reimburse it for such payment. Provided that the Party's proportionate share is correctly calculated, and subject to the provisions of subsection (iv) below, the amount to be reimbursed to the other Party for any particular payment shall not be subject to dispute. In no event shall any Party's dispute with the other Party or any third party provider of services concerning the amount it may owe such particular provider entitle it to withhold payment to or otherwise offset any amounts owing to the other Party as reimbursement as provided in this **Section 13**. If the Party responsible for payment directly to any third-party provider does not make payment when due, and any late fees, interest, or other charges are assessed by the third-party provider based on such failure to pay, such fees and costs shall not be prorated, and the Party failing to make the payment when due shall be solely responsible for the payment of any such fees and costs.

    iv.    <u>Expenses in Excess of Cost Estimate</u>. Within 120 days after the end of each calendar year, or as soon thereafter as practicable, the Party that had previously submitted a Cost Estimate to the other Party shall provide the other Party with a statement showing the actual costs and expenses incurred in the preceding calendar year, along with an accounting of what amounts are still subject to reimbursement by the other Party (the "**Reconciliation**"). In the event that the Reconciliation shows maintenance and repair costs which are less than the Cost Estimate or which, in the aggregate, exceed the Cost Estimate by no more than ten percent, then the costs and expenses outlined in the Reconciliation shall not be subject to dispute. In the event that the Reconciliation exceeds the Cost Estimate by more than ten percent and the party receiving the Reconciliation believes that the actual cost and expenses incurred were unreasonable, then the Party receiving the Reconciliation shall have 30 days in which to either approve or disapprove the Reconciliation for the calendar year. A Party's failure to disapprove the Reconciliation within this 30-day time frame shall be deemed an approval of the Reconciliation. In the event that a Party disapproves a Reconciliation, it shall give the other Party a written notice outlining its disapproval of the Reconciliation in the same manner as set forth for giving a Disapproval Notice (the "**Reconciliation Disapproval Notice**"). In the event that either Party gives a Reconciliation Disapproval Notice, the Parties agree to negotiate in good faith toward a resolution of the dispute. In the event that the Parties are unable to reach an agreement concerning the Reconciliation within 30 days after the date of the Reconciliation Disapproval Notice, the Parties agree to submit

to binding arbitration concerning the disputed Reconciliation on the terms outlined in subsection (ii) above, and such disputed item will be deemed an "**Irreconcilable Dispute**" for purposes of the arbitration.

b.    Electric Reimbursement. The electric service subject to reimbursement pursuant to **Section 12** of this Agreement shall be paid as follows:

   i.    Payments Directly to Provider. Hotel Owner shall make all payments directly to the electricity provider before the same is due, and Hotel Owner shall then submit an invoice to Office Owner for its share of payment according to its actual usage as evidenced by the Office Electrical Sub-Meter without any additional mark-up, which invoice shall include a copy of the invoice directly from the electricity provider to document the amounts owed. The Office Owner shall then have 15 days after the date of receipt of such invoice to make payment to the Hotel Owner to reimburse it for such payment. Provided that the Office Owner's share is as shown on the Office Electrical Sub-Meter, the amount to be reimbursed to the Hotel Owner shall not be subject to dispute. In no event shall the Office Owner's dispute with the electricity provider concerning the amount it may owe entitle it to offset any amounts owing to the Hotel Owner as reimbursement. If the Hotel Owner does not make payment when due, and any late fees, interest, or other charges are assessed, such fees and costs shall not be prorated, and the Hotel Owner shall be solely responsible for the payment of any such fees and costs.

   ii.    Payments for Other Incidental Costs. Any other costs or expenses made by the Hotel Owner which are subject to reimbursement pursuant to **Section 12** of this Agreement including, without limitation, costs and expenses associated with maintenance or repair of the shared meters, sub-meters, shall be estimated and paid in the same manner as provided for Exterior Joint Use Areas maintenance and repair as provided in subsection (a) above.

14.    Maintenance of Individual Parcels. Except as otherwise expressly set forth herein, each Party shall, during the term of this Agreement, maintain, or cause to be maintained, at its sole cost and expense, its respective buildings, including building signs and Parcels, in a safe, clean, tenantable, sightly and first class condition and in good order and repair. Each Party shall require its tenants and subtenants to comply with the requirements of this Agreement with reference to sanitation, handling of trash and debris, loading and unloading of trucks and other vehicles, safety and security against fire and theft, vandalism, personal injury and other hazards, including a prohibition against unsightly window advertising, unsightly or unsanitary accumulation of trash or other similar misuse of walkways, landscaping and loading areas.

15.    Insurance and Indemnification.

a.    Each Party shall, with respect to the Joint Use Areas on its Parcel, maintain or cause to be maintained in full force and effect Commercial General Liability Insurance with a financially responsible insurance company or companies licensed in the State of Colorado, with a minimum Best's rating of A-; such insurance to provide for a limit of not less than Two Million Dollars ($2,000,000.00) for bodily injury or death to any one person, for a limit of not less than Two Million Dollars ($2,000,000.00) for bodily injury

or death to any number of persons arising out of any one occurrence, and for a limit of not less than Five Hundred Thousand ($500,000.00) for any property damage. An "umbrella policy" may be provided and utilized to cover the insurance requirements hereunder, provided any such umbrella policy otherwise complies with the provisions of this Agreement. Additionally, the insurance to be maintained under this **Section 15(a)** shall include the following minimum requirements:

      i.     shall provide coverage on an occurrence basis;

      ii.     shall provide that the policy may not be canceled without at least 30 days prior written notice by the insurer to the other Party;

      iii.     shall include the other Party as an additional insured;

      iv.     shall provide for severability of interests;

      v.     shall provide that an act or omission of the insured or additional insured which would void or otherwise reduce coverage, shall not reduce or void the coverage as to the additional insured or the insured, respectively.

Such insurance shall specifically extend to the contractual obligation of the insured Party arising out of the indemnification obligations set forth in this Agreement. Each Party ("**Indemnitor**") shall indemnify, defend and hold harmless the other Party, its members, partners, shareholders, managers, directors, officers, employees, agents and other representatives (collectively, "**Indemnitee**") from and against all claims, costs, expenses and liability (including reasonable attorney's fees and costs of suit incurred in connection with all claims) including any action or proceedings brought thereon, arising from or as a result of the injury to or death of any person, loss of use, economic injury or damage to the property of any person or entity which shall occur on the Indemnitor's Parcel, except for claims caused by the negligence or willful act or omission of such Indemnitee, its tenants, licensees, concessionaires, agents, servants, or employees, or the agents, servants, or employees of any tenant, licensee or concessionaire thereof. The minimum limits set forth above shall automatically increase every five years based on the Consumer Price Index - All Urban Consumers, Denver-Boulder Metropolitan Area, all items (1982-1984=100) published by the Bureau of Labor Statistics ("**BLS**"). Such index is referred to herein as the "Denver CPI". The minimum limits of insurance shall be adjusted on January 1, 2021, and every fifth anniversary date thereafter, by multiplying the initial minimum limits by a fraction, the denominator of which shall be the average Denver CPI for 2015 and the numerator which shall be the average Denver CPI for the five year period immediately preceding the year for which adjustment is being calculated. Should the BLS change the base period of 1982-1984 to another base period for purposes of the Denver CPI, then the average Denver CPI for 2015 shall be converted to the new base period and the new base period used for adjustments to the minimum limits of insurance thereafter. Should the BLS cease publication of the Denver CPI, then the adjustments called for herein shall be based upon the Consumer Price index published by the BLS that most closely corresponds to the Denver CPI. Notwithstanding the foregoing, in no event shall the minimum levels of insurance required pursuant to this Agreement be decreased from the minimum limits set forth herein.

b.    Each Party will carry or cause to be carried "Special Causes of Loss Form" property insurance with a financially responsible insurance company or companies licensed in the State of Colorado, with a minimum Best's rating of A-, in an amount at least equal to the replacement cost (exclusive of the cost of excavation, pavement, foundations, and footings) of the buildings and improvements on such Party's Parcel, such coverage extending at least to the following perils: loss or damage by fire, windstorm, cyclone, tornado, hail, explosion, riot, riot attending a strike, civil commotion, malicious mischief, vandalism, aircraft, vehicle, smoke damage, and sprinkler leakage.

Each Party (the "**Releasing Party**") hereby releases and waives for itself and on behalf of its insurer, any other Party (the "**Released Party**") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Development, which loss or damage is of the type actually covered by "Special Causes of Loss Form" property insurance, irrespective of any negligence on the part of the Released Party which may have contributed to or caused such loss. Each Party shall obtain a similar waiver from each tenant, subtenant or occupant of its Parcel as to the other Parties, it being the intent of the Parties that such tenants, subtenants and occupants shall each look to its own insurance company in the event of a casualty. Each Party agrees to use its best efforts to obtain, if needed, appropriate endorsements to its policies of insurance with respect to the foregoing release provided, however, that failure to obtain such endorsements shall not affect the release hereinabove given.

In the event there is no waiver of subrogation by and between all Parties, each Indemnitor covenants and agrees to indemnify, defend and hold harmless Indemnitee from and against all claims asserted by or through any Party or the Indemnitor's Parcel for any loss or damage to the property of such Party located upon the respective Indemnitor's Parcel, which loss or damage is of the type actually covered by "Special Causes of Loss Form" property insurance, irrespective of any negligence on the part of the Indemnitee which may have contributed to or caused such loss.

c.    Each Party with respect to the portions of its Parcel not part of the Joint Use Area shall maintain or cause to be maintained in full force and effect Commercial General Liability Insurance, including Personal Injury Liability Insurance and Contractual Liability Insurance with a financially responsible insurance company or companies licensed in the State of Colorado, with a minimum Best's rating of A-; such insurance to provide for a limit of not less than Two Million Dollars ($2,000,000.00) for bodily injury or death to any one person, for a limit of not less than Two Million Dollars ($2,000,000.00) for bodily injury or death to any number of persons arising out of any one occurrence, and for a limit of not less than Five Hundred Thousand Dollars ($500,000.00) for any property damage. Additionally, such insurance shall include the following minimum requirements:

    i.    shall provide coverage on an occurrence basis;

    ii.    shall provide that the policy may not be canceled without at least 30 days prior written notice by the insurer to the other Party;

iii.    shall include the other Party as an additional insured;

iv.    shall provide for severability of interests; and

v.    shall provide that an act or omission of one of the insured or additional insured which would void or otherwise reduce coverage shall not void or reduce the coverage as to the other additional insured or the insured, respectively.

Such insurance shall specifically extend to the contractual obligation of the insured Party arising out of the indemnification obligations set forth in the next sentence. Each Party ("**Indemnitor**") covenants and agrees to indemnify, defend and hold harmless the other Party, its members, partners, shareholders, managers, directors, officers, employees, agents and other representatives (collectively, "**Indemnitee**") from and against all claims, costs, expenses and liability (including reasonable attorney's fees and cost of suit incurred in connection with all claims) including any action or proceedings brought thereon, arising from or as a result of the injury to or death of any person, or damage to the property of any person or entity which shall occur on the Parcel owned by each Indemnitor, except for claims caused by the negligence or willful act or omission of such Indemnitee, its tenants, licensees, concessionaires, agents, servants, or employees, or the agents, servants, or employees of any tenant, licensee or concessionaire thereof. The minimum limits set forth above shall be increased every five years based on the Denver CPI in the same manner as set forth in subsection (a). Notwithstanding the foregoing, in no event shall the minimum levels of insurance required pursuant to this Agreement be decreased from the minimum limits set forth herein.

d.    The insurance described above may be carried under (i) an individual policy covering this location, (ii) a blanket policy or policies which includes other liabilities, properties and locations of such Party, (iii) a plan of self-insurance, provided that the Party so self-insuring, or its guarantor, or a Party's assignee if such Party shall guarantee said assignee's insurance obligations, has and maintains $100,000,000.00 or more of current net worth as evidenced by a certificate of such Party's or guarantor's chief financial officer or the annual report of such Party, or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by a Party in compliance with this Section, such Party shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed $50,000.00 unless such Party qualifies for self-insurance pursuant to (iii) above. Each Party agrees to furnish to the other Party requesting the same, certificates of insurance or other evidence that the insurance required to be carried by such requesting Party is in full force and effect and a Party electing to self insure shall so advise the other Party in writing.

16.    <u>Restrictions on Use</u>. Office Owner will not permit the Office Property to be used primarily for a hotel, motel, inn, or any other overnight lodging. Hotel Owner will not permit the Hotel Property to be used primarily for commercial office space. Neither Party will lease or sublease or permit the use of any portion of the Development, or any future expansion thereof, to any tenant or occupant whose business creates strong, unusual or offensive odors, fumes, dust or vapors; is a public or private nuisance; emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness; creates unusual fire, explosive or other

hazards; or is for one of the following uses: (a) massage parlors or strip joints; (b) second hand stores, pawn shops, odd lots, closeout or liquidation stores; (c) game rooms and/or arcades (except as an ancillary use within any improvements upon any Parcel); (d) "adult" bookstores, novelty shops, theatres, amusement shops or any facility selling, renting or displaying material of a pornographic nature; (e) tattoo parlors; (f) auction house or flea market; (g) palm reading and fortune telling establishments; (h) cocktail lounge or bar (except as an ancillary use within the Hotel Property); (i) disco or nightclub; (j) blood bank; (k) the outdoor housing or raising of animals; (l) funeral home, hospice or cemetery; (m) on-site dry cleaning operation; and/or (n) half-way house, drug clinic (in or out patient), student housing or dormitory, homeless shelter, or public housing project.

17.    Casualty and Eminent Domain.

a.    Damage or Destruction to Building. If any portion of the building located on the Parcel of any Party is damaged or destroyed by fire or any other cause, the owner of any such portion of the building shall either: (i) promptly cause the repair, restoration, or rebuilding of the building so damaged or destroyed, as provided in this Agreement, or (ii) promptly cause the razing of any damaged portion, the filling of any excavations, the grading of the site, and performance of any other work necessary to put such portion of the Development in a clean, sightly, and safe condition.

b.    Damage or Destruction of Joint Use Areas. In the event any Joint Use Area improvements of the Development are damaged or destroyed by any cause, whether insured or uninsured, the owner of the Parcel to which such damage has occurred shall promptly, as soon as practicable, cause and diligently pursue to completion, the repair, restoration or rebuilding of the improvements so damaged or destroyed so that the restored portions of the Joint Use Areas shall comply with the applicable requirements of this Agreement.

c.    Condemnation. In the event the whole or any part of the Development shall be taken by right of eminent domain or any similar authority of law, the entire award for the value of the land and improvements so taken shall belong to the owner of the property so taken, as its interest may appear, and no other owner of land in the Development shall claim any portion of such award by virtue of any interest created by this Agreement; provided, however, any such other owner may file a collateral claim with the condemning authority over and above the value of the land and improvements being so taken to the extent of any damage suffered by such owner resulting from the severance of the area so taken so long as such collateral claim does not reduce the claim of any Party. In the event of a partial taking, the owner of the portion of the Development so condemned shall either: (i) raze and pave for parking; or (ii) restore the remaining portion of the Development owned by such Party as nearly as possible to the condition existing just prior to such condemnation, without contribution from the other Party and any condemnation award necessary therefore, to the extent paid and received, shall be held in trust and applied for such purpose.

18.     <u>Remedies in the Event of Default.</u>

a.     If any Party to this Agreement shall default in the performance of its obligations ("**<u>Defaulting Party</u>**"), then the other Party ("**<u>Nondefaulting Party</u>**") shall, in addition to all other remedies it may have at law or in equity, after 30 days' prior written notice to the Defaulting Party, have the right (but not the obligation) to cure such obligation on behalf of such Defaulting Party and be reimbursed by such Defaulting Party for the cost thereof, together with interest thereon from the date incurred until paid in full at the rate of the lesser of that permitted by law or two percent in excess of the prime or base lending rate charged by Citibank, N.A. or its successor for commercial loans to its most preferred commercial customers, plus reasonable collection fees. Any such claim for reimbursement, together with interest as aforesaid and reasonable collection fees, shall be secured by a lien therefor and shall attach to: (i) any insurance proceeds paid to and received by the Defaulting Party or payable to the Defaulting Party; (ii) the portion of the Development, and improvements thereon, owned by the Defaulting Party, including without limitation any rents derived therefrom (the "**<u>Defaulted Parcel</u>**"); and (iii) any condemnation award paid to and received by the Defaulting Party or payable to the Defaulting Party, effective upon recording of a notice thereof in the Office of the Clerk and Recorder of Denver County, Colorado. Any such lien may be foreclosed in the same manner as a mortgage or deed of trust. The foregoing right to cure shall not be exercised if within the 30 days notice period: (y) the Defaulting Party cures the default, or (z) if the default is curable, but cannot reasonably be cured within that period, the Defaulting Party (or its mortgagee) begins to cure such default within such time period and diligently pursues such action to completion. The 30 day notice period shall not be required if, using reasonable judgment, the Nondefaulting Party deems that an emergency exists which requires immediate attention. In the event of such an emergency, the Nondefaulting Party shall give whatever notice to the Defaulting Party as is feasible under the circumstances. Each Party hereby grants and conveys to the other, its successor and assigns a nonexclusive easement and right of use appurtenant to and for the benefit of the grantee's Parcel in, to, over, under and across the grantee's Parcel for the purposes of curing any event of default as provided in this **<u>Section 18(a)</u>**.

b.     In the event of a breach, or attempted or threatened breach, of any obligation of this Agreement, the other Party shall be entitled forthwith, upon prior written notice to the Defaulting Party unless an emergency exists in which case no notice shall be required, to obtain an injunction to specifically enforce the performance of such obligation, the Parties hereby acknowledging the inadequacy of legal remedies and the irreparable harm which would be caused by any such breach, and/or to relief by all other available legal and equitable remedies from the consequences of such breach. Any action or document made in violation of this Agreement shall be void and may be set aside upon the petition of the other Party. All costs and expenses of any such proceeding shall be assessed against the Defaulting Party and shall constitute a lien against the land, and improvements thereon, or the interests therein, until paid, in the manner provided in subsection (a).

c.     No delay or omission of any Party in the exercise of any right accruing upon any default of the other Party shall impair any such right or be construed to be a waiver thereof, and every such right may be exercised at any time during the continuance of such

default. A waiver by any Party of a breach of, or a default in, any of the terms and conditions of this Agreement by the other Party shall not be construed to be a waiver of any subsequent breach of or default in the same or any other provision of this Agreement. Except as otherwise specifically provided in this Agreement, no remedy provided in this Agreement shall be exclusive but each shall be cumulative with all other remedies provided in this Agreement and at law or in equity.

d.      It is expressly agreed that no breach of the provisions of this Agreement shall entitle any Party to cancel, rescind or otherwise terminate this Agreement; but such limitation shall not affect, in any manner, any other rights or remedies which any Party may have hereunder by reason of any breach of the provisions of this Agreement. No breach of the provisions of this Agreement shall affect or render invalid the lien of any mortgage or deed of trust made in good faith and for value covering any part of the Development and any improvements thereon. If **Section 18(a)** would authorize a Party to enforce any lien with respect to a Defaulted Parcel (which lien shall in all cases be subordinate to the lien of any mortgage or deed of trust encumbering the Defaulted Parcel), and provided the holder of the mortgage or deed of trust ("**Mortgagee**") encumbering the Defaulted Parcel shall have previously provided to such Party a written notice specifying the name and address of the Mortgagee, then prior to commencing the enforcement of the lien, such Party shall send to the Mortgagee, in the manner specified in **Section 27** hereof for the giving of notices, a copy of each demand for payment provided to the Defaulting Party, addressed to the Mortgagee at the address last furnished to such Party. The Mortgagee shall have the right, at any time or from time to time after receipt of such Party's demand for payment, to cure the Defaulting Party's failure to make payment by paying the sum of money which is the subject of the demand for payment, together with all interest accruing, provided such cure shall be completed by the Mortgagee within the cure period established by this Agreement for such default. The provisions of this Agreement shall be binding upon and effective against any owner of the Development, or any portion thereof, whose title is acquired by foreclosure or trustee's sale or any grantee by deed in lieu of foreclosure or trustee's sale. In no event shall any Mortgagee, the successors, assigns or transferees of a Mortgagee in its capacity as mortgagee, mortgagee in possession, or owner of all or any part of a Parcel, be liable for any obligation hereunder of any previous owner of the same Parcel arising prior to the time such Mortgagee, or its successors, assigns or transferees, takes actual possession or becomes the owner of such Parcel. A Mortgagee shall have no liability or obligation under this Agreement except for matters arising during the period of time in which it is an owner or a mortgagee in actual possession of a Parcel.

e.      In the event any Party shall be delayed or hindered in or prevented from the performance of any act required to be performed by such party by reason of acts of God, strikes, lockouts, unavailability of materials, failure of power, prohibitive governmental laws or regulations, riots, insurrections, the act or failure to act of the other Party, adverse weather conditions preventing the performance of work as certified to by an architect, war or other reason beyond such Party's control (excluding the inability to pay money or to secure financing), then the time for performance of such act shall be extended for a period equivalent to the period of such delay; upon the condition that the Party excused has taken all reasonable steps under the circumstances to mitigate the effects of the force

majeure situation. Lack of funds or financial inability to perform shall not be deemed to be a cause beyond the control of such party.

19.     Agreement Runs with the Land; Successors and Assigns. The rights granted and obligations imposed by this Agreement shall run with the Hotel Property and the Office Property and shall be binding upon and inure to the benefit of Hotel Owner and Office Owner and their respective successors, assigns and legal representatives. Upon a sale of a Party's Parcel, the Party transferring its interest shall be released from liability for any claims accruing after the date of such transfer.

20.     Fees and Expenses. In the event of any litigation arising from any controversy, claim or dispute between Hotel Owner and Office Owner affecting or relating to the subject matter or performance of the rights, duties and obligations under this Agreement, the prevailing party shall be entitled to recover from the nonprevailing party all of the prevailing party's reasonable costs and expenses including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest. Only those disputes which are expressly made subject to arbitration in this Agreement shall be subject to arbitration.

21.     Counterparts. This Agreement may be executed in multiple counterparts, and all such executed counterparts shall constitute the same Agreement.

22.     Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

23.     Section Headings. Section headings contained herein are for convenience only and shall not be considered in interpreting or construing this Agreement.

24.     Binding Effect. This Agreement shall not be binding upon any party hereto unless and until both Hotel Owner and Office Owner have executed this Agreement.

25.     Choice of Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado, without regard to any conflicts of laws provisions.

26.     No Third Party Beneficiary. This Agreement is for the benefit only of Hotel Owner and Office Owner and their respective successors, assigns and legal representatives and is not for the benefit of any third party, and accordingly, no third party shall have the right to enforce this Agreement.

27.     Notices. All communications required or permitted under this Agreement shall be in writing and any communication or delivery hereunder shall be deemed to have been duly made if actually delivered, or transmitted by (a) confirmed facsimile or e-mail transmission, (b) within one business day after deposit with a nationally recognized overnight delivery service, or (c) within three business days after mailing if mailed by registered or certified mail, postage prepaid, addressed as set forth below. Notice given by facsimile or e-mail transmission shall be followed by notice given by an alternate means of permitted notice. Any Party may, by written notice so delivered to the other, change the address to which delivery shall thereafter be made.

a.   Notices to Hotel Owner:

UCHIDH, LLC
3334 E. Coast Highway, Suite 350
Corona del Mar, California 92625
Attn: Howard Wu & Taylor Woods
Facsimile:   (949) 435-2380
E-mail:      hwu410@gmail.com
E-mail:      taylorwoods23@gmail.com


and

Sherry Meyerhoff Hanson & Crance LLP
610 Newport Center Drive, Suite 120
Newport Beach, California 92660
Attn: Andrew P. Hanson
Facsimile: (949) 719-1212
E-mail: ahanson@calawyers.com

b.   Notices to Office Owner:

Holualoa Stapleton Office, LLC
c/o Holualoa Arizona, Inc.
3573 East Sunrise, Suite 225
Attn: Stan Shafer
Facsimile: (480) 829-3137
E-mail:Stan@Holualoa.com

and

Holualoa Arizona, Inc.
75-5706 Hanama Place, Suite 104
Kailua-Kona, Hawaii 96740
Attn: Lynn Taube, Vice President
Facsimile: (808) 329-6335
E-mail: taube@holualoa.com

and

Lewis Roca Rothgerber LLP
One South Church, Suite 700
Tucson, Arizona 85701-1611
Attn: Andrew D. Schorr, Esq.
Facsimile: (520) 879-4718
E-mail: aschorr@LRRLaw.com

28.    No Joint Venture. Nothing in this Agreement shall be construed to make the Parties hereto partners or joint venturers or render any of the Parties liable for the debts or obligations of the other.

29.    Approvals. Unless otherwise herein provided, whenever approval is required, such approval shall not be unreasonably withheld or delayed. Unless provision is made for a specific time period, approval shall be given or withheld within 30 days of the receipt of the request for approval. If a disapproval is not given within the required time period, the requested Party shall be deemed to have given its approval provided any such request for approval indicates that failure to respond within the required time period shall constitute an approval of the item which is the subject of the request. If a Party shall disapprove, the reasons therefor shall be stated in reasonable detail. Except with respect to an approval given by lapse of time, all approvals and disapprovals shall be in writing. The "right to approve" herein reserved by any Party shall be assignable by each, but only by a Party in total to a Party who owns a Parcel within the Parcel; each successor assignee may also assign such "right to approve" on the same condition. If the holder of the "right to approve" transfers its entire ownership interest prior to assigning such "right to approve," then the transferee Party shall immediately become vested with such "right to approve."

30.    Estoppel Certificates. Any Party may, at any time and from time to time, in connection with the sale or transfer of its Parcel, or in connection with the financing or refinancing of its Parcel by bona fide mortgage, deed of trust or sale--leaseback made in good faith and for value, deliver a written notice to the other Party requesting such Party to execute a certificate certifying that the Party making such request is not in default in the performance of its obligations under this Agreement, or, if in default, describing therein the nature and amount of any default and that no condition exists, which with the passage of time provided under this Agreement would constitute a default, or if so, describing therein the nature and amount of any default which would arise within such time period. A Party shall execute and return such certificate within 15 days following its receipt therefor. Failure by a Party to so execute and return such certificate within the specified period shall be deemed an admission on such Party's part that the Party requesting the certificate is current and not in default in the performance of such Party's obligations under this Agreement. The Parties acknowledge that such certificate may be relied upon by transferees, mortgagees, deed of trust beneficiaries and leaseback-lessors.

31.    Reservation of Rights. Each Party hereto hereby reserves unto itself the nonexclusive right to use and enjoy any of the easement areas burdening such Party's respective Parcel pursuant to this Agreement in any manner whatsoever, provided that such use and enjoyment does not unreasonably and materially interfere with the other Party's use and enjoyment of the easements benefitting its Parcel nor deny the other Parcel access to and from public streets. Such reserved rights of a Party shall include, without limitation: (a) the right to maintain and repair the easement areas in, on or under such Party's Parcel; (b) the right to relocate and/or reconfigure the improvements and/or easement areas in, on or under such party's Parcel; (c) the right to close temporarily the easement areas in, on or under such Party's Parcel in order (and only to the extent necessary) to accomplish the purposes set forth in clauses (a) and (b) above, to repair any improvements located on the Party's parcel and/or to avoid public dedication; and (d) the right to establish from time to time reasonable rules and regulations governing the use of its Parcel.

32.     Right of Each Party to Post Their Parcel to Give Notice of Non-Liability for Mechanic's and Materialman's Liens. Either Party may place a notice of non-responsibility for mechanics' liens pursuant to C.R.S. § 38-22-105(2) or any successor statute, upon any portion of such Party's Parcel upon which the other Party has contracted for construction, maintenance or repairs of the easements granted to it under this Agreement. Any such contracting party shall remove, bond over or insure over any such mechanics' lien filed due to its nonpayment of any obligation hereunder, within 30 days after the filing of such lien.

33.     AS IS-WHERE IS CONDITION OF EASEMENTS. EACH OF THE PARTIES ACCEPTS THE EASEMENTS GRANTED HEREIN IN THEIR "AS-IS, WHERE-IS" CONDITION.

34.     No Public Dedication. Nothing contained in this Agreement will be deemed to be a dedication of any portion of the easements granted herein to the general public or for the general public or for any public purpose whatsoever; it being the intent of the Parties that the easements granted herein are and shall continue to be private unless and until the owner of any such easement or easements, at its sole option and election, completes the dedication of such easements to an eligible governmental or quasi-governmental entity, in accordance with all applicable laws, rules, regulations and ordinances.

35.     Agreement Superior to Liens. This Agreement and the rights, privileges and easements of each party hereto with respect to the other Party and all of the real property subject to this Agreement (other than the right to place a lien on a Defaulted Parcel) shall in all events be superior and senior to any and all liens placed upon any real property subject to this Agreement, including without limitation, the lien of any mortgage or deed of trust. Any variation, modification or amendment of or to this Agreement, whenever made, shall be deemed superior and senior to any and all liens, including without limitation, the lien of any mortgage or deed of trust, the same as if such variation, modification or amendment had been executed concurrently with this Agreement.

36.     Amendment. No variations or modification of, or amendment to, the terms of this Agreement shall be binding upon the Parties unless reduced to writing and signed by the Parties hereto and consented to in writing by any holder of a valid mortgage or deed of trust lien upon any interest of a Party hereunder.

37.     Entire Agreement. This Agreement, including the Exhibits hereto, contains the entire agreement between Hotel Owner and Office Owner pertaining to the matters addressed herein and fully supersedes any and all prior agreements and understandings between the Parties pertaining to such matters.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed effective as of the day and year first above written, which execution may appear on separate pages.

**OFFICE OWNER**:

HOLUALOA STAPLETON OFFICE, LLC,
an Arizona limited liability company

By:     Holualoa Arizona, Inc.,
        an Arizona corporation
Its:    Manager

By:_____
        Richard B. Kauffman
Its:    Chief Financial Officer

**HOTEL OWNER**:

UCHIDH, LLC,
a Delaware limited liability company

By:_____
        Taylor Woods
Its:    President

STATE OF ARIZONA      )
                                 )
County of Pima         )

      On October ___12th___, 2015 before me, ___JESSICA LEE DUKE___ personally appeared **Richard B. Kauffman** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

      Witness my hand and official seal.



JESSICA LEE DUKE
Notary Public - Arizona
Pima County
My Comm. Expires Aug 10, 2016

_____
Notary Public

[SEAL]

STATE OF CALIFORNIA    )
                               )
County of Orange        )

      On October _____, 2015 before me, _____ personally appeared **Taylor Woods** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

      Witness my hand and official seal.

_____
                Notary Public

[SEAL]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed effective as of the day and year first above written, which execution may appear on separate pages.

**OFFICE OWNER:**

HOLUALOA STAPLETON OFFICE, LLC,
an Arizona limited liability company

By:     Holualoa Arizona, Inc.,
         an Arizona corporation
Its:     Manager


By:_____
        Richard B. Kauffman
Its:     Chief Financial Officer

**HOTEL OWNER:**

UCHIDH, LLC,
a Delaware limited liability company


By:_____
        Taylor Woods
Its:     President

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    )

COUNTY OF ORANGE                    )

On _October 9_, 2015, before me, _D. Secard_, Notary Public, personally appeared _Taylor Woods_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature

(Seal)

D. SECARD
Commission # 2119522
Notary Public - California
Orange County
My Comm. Expires Aug 10, 2019

## EXHIBIT A

**Hotel Real Property Legal Description**

Lot 11, except the North 10.2 feet thereof, and Lots 12 through 37, inclusive, and Lot 38, except the North 10.2 feet thereof, Block 9, **ELMWOOD PLACE**. **Together with** the alley in said Block 9, adjacent to said lots, vacated by Ordinance No. 319, Series of 1973, recorded June 15, 1973, in Book 713 at Page 509, City and County of Denver, State of Colorado.

# EXHIBIT A1

## HOTEL SITE



**35TH AVENUE**

Hotel

**POPLAR STREET**

**QUEBEC STREET**

**33RD AVENUE**

**NORTH**

EXHIBIT A-2

[Intentionally Blank]

EXHIBIT B

**Office Building Property Legal Description**

Lots 1 through 10, inclusive, and the North 10.2 feet of Lot 11, and the North 10.2 feet of Lot 38, and Lots 39 through 48, inclusive, Block 9, **ELMWOOD PLACE, Together with** the alley in said Block 9, adjacent to said lots, vacated by Ordinance No. 319, Series of 1973, recorded June 15, 1973, in Book 713 at Page 509, City and County of Denver, State of Colorado.

# EXHIBIT B1

## OFFICE BUILDING SITE



# EXHIBIT B2

## PARKING GARAGE LEVEL P-1

### 35TH AVENUE



POPLAR STREET

QUEBEC STREET

Garage
P-1

### 33RD AVENUE

NORTH

# EXHIBIT B3

## PARKING GARAGE LEVEL P-2

### 35TH AVENUE



NORTH

# EXHIBIT C

## EXTERIOR JOINT USE AREAS







# EXHIBIT D1
## INTERIOR JOINT USE AREA GROUND LEVEL

# EXHIBIT D2

## INTERIOR JOINT USE AREAS FIRST LEVEL PARKING

### 35TH AVENUE



Interior
Joint
Use



POPLAR STREET

QUEBEC STREET

### 33RD AVENUE



NORTH

# EXHIBIT D3

## INTERIOR JOINT USE AREAS SECOND LEVEL PARKING

### 35TH AVENUE



**33RD AVENUE**

NORTH



**EXHIBIT E**

**SURFACE PARKING LOT**

# EXHIBIT F1

## PARKING SPACE OUTLINE FIRST LEVEL GARAGE

### 35TH AVENUE



137 Spaces at P-1 marked "Office Building Only 7:00am to 6:00pm Weekdays" Hotel other times

60 Spaces at P-1 Hotel Exclusive Parking

**POPLAR STREET**

**QUEBEC STREET**

**33RD AVENUE**

**NORTH**

# EXHIBIT F2

## PARKING SPACE OUTLINE SECOND LEVEL GARAGE

### 35TH AVENUE



**33RD AVENUE**

# EXHIBIT F3

## SURFACE PARKING LOT SPACE OUTLINE



52 Spaces at surface:
Office Building
exclusive parking

86 Spaces at surface:
Hotel
exclusive parking

59 Spaces at surface:
2-hour parking

NORTH

# EXHIBIT F4

## SURFACE PARKING LOT COMMON MAINTENANCE AREA

