## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | Case No. 21-10036 (CSS) |
| EHT US1, Inc., et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ———————————————— | ) | |

### OPINION[1]

**Richards, Layton & Finger, P.A**.
Mark D. Collins
Brendan J. Schlauch
Megan E. Kenney
One Rodney Square
 920 North King Street
Wilmington, DE 19801
- and –
**Morgan, Lewis & Bockius LLP**
P. Sabin Willett (Argued)
One Federal Street
Boston, MA 02110-1726

Jennifer Feldsher
101 Park Avenue
New York, NY 10178

David M. Riley
2049 Century Park East
Los Angeles, CA 90067

Counsel to Bank of America, N.A

**Cole Schotz, P.C.**
Seth Van Aalten
G. David Dean
Justin R. Alberto
500 Delaware Avenue
Wilmington, DE  19801
-and-
**Paul Hastings LLP**
Luc A. Despins (Argued)
G. Alexander Bongartz
200 Park Avenue
New York, NY  10166

Counsel to Debtors and Debtors
in Possession

Dated: June 1, 2021

Sontchi, C.J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

Before the Court is a motion filed by the Debtors' largest creditor to dismiss the Chapter 11 petitions of three non-U.S. Debtors in these jointly administered Chapter 11 cases.   The core issue is whether a Singapore REIT [2] organized under Singapore's Securities and Futures Act is a "business trust" that is eligible to be a "debtor" under the Bankruptcy Code.   Declining to follow several cases holding that whether an entity is a business trust is a question of federal law, the Court embraces the bedrock principle of *Butner v. United States* that bankruptcy judges should not unsettle non-bankruptcy rights in the absence of a clear directive from Congress.   Thus, the Court must look to the law of Singapore, which governs the existence and operation of the REIT, to determine whether the REIT is a business trust.   Having done so, the Court holds that the REIT is a business trust and, thus, is an eligible debtor under the Bankruptcy Code.   In addition, the Court holds that the cases of the REIT and its two Singapore affiliates were filed in good faith.   Finally, the Court declines to abstain from this matter.   Thus, the Court will deny the motion.

---

[2] A "REIT" is a common acronym, which stands for "real estate investment trust."

### A. Findings of Fact[3]

#### a. The Movant

Bank of America, N.A., as Administrative Agent (the "Agent") for a group of lenders (the "Prepetition Lenders") under that certain credit agreement, dated as of May 16, 2019, and as amended (the "Credit Agreement") has moved to dismiss the bankruptcy cases of three debtors: (i) Eagle Hospitality Real Estate Trust (Case No. 21-10120) (the "EH-REIT"), (ii) Eagle Hospitality Trust S1 Pte. Ltd. (Case No. 21-10037) ("EHT-S1"), and (iii) Eagle Hospitality Trust S2 Pte. Ltd. (Case No. 21-10038) ("EHT-S2," and collectively with EH-REIT and EHT-S1, the "Parent Debtors").[4]

In March 2020, the Agent issued a notice of default and acceleration of the Credit Agreement under which a principal amount of $341 million had been borrowed. To date, the debt remains unpaid.[5]

---

[3] The Court conducted an evidentiary hearing on April 7, 2021. At the hearing, Joint Exhibits 1-12 and 14-18 were admitted into evidence. The Court took the admission of Exhibit 13 under advisement. The Agent's relevance objection is overruled, and Exhibit 13 is admitted. In addition, the Debtors proffered the testimony of Alan Tantleff, the Debtors' Chief Restructuring Officer. Mr. Tantleff also submitted live testimony. After the hearing, the Court requested the presentation of expert evidence as to Singapore law. That evidence was submitted at a continued evidentiary hearing on May 28, 2021. At the May 28th hearing, Agent's Hearing Exhibits 1-3 and Debtors' Hearing Exhibits 1-2 were admitted into evidence, which included the declarations of the parties' experts, Professor Hans Tjio and Professor Loi Chit Fai Kelry. Both Professor Tjio and Professor Loi submitted live testimony on cross-examination.

[4] D.I. 210 (the "Motion") and supporting memorandum of law (D.I. 212). The Agent also filed the Declaration of T, Charlie Liu in support of the Motion (D.I. 211) (the "Liu Declaration"). The Debtors filed an opposition to the Motion (D.I. 505) (the "Opposition") as well as additional Exhibits (D.I. 538). Thereafter, the Agent responded with a reply (D.I. 544).

[5] Parties to the Credit Agreement and to interrelated pledges, guarantees, and other agreements, the Agent and the Prepetition Lenders hold claims against the U.S. debtors, EH-S1 and EHS2 (collectively, the "Singapore SPVs"), the REIT Trustee (identified *infra*), and other parties.

### b. The EH-REIT

The Parent Debtors represent the ultimate parent (EH-REIT) and intermediate holding companies (EHT-S1 and EHT-S2) of an integrated business enterprise formed to own hotels and earn profits from these hotels in order to provide returns to the equity holders (also known as the "Unitholders"). EH-REIT is part of a stapled trust, Eagle Hospitality Trust ("EHT"), consisting of EH-REIT and non-Debtor Eagle Hospitality Business Trust ("EH-BT"). The equity units in EH-REIT and EH-BT were stapled together and issued as stapled securities (the "Stapled Securities").

EH-BT is not a business under the law of the Republic of Singapore, but it is a species of trust *authorized* to manage or operate a business, as a business trust regulated by Singapore's Business Trusts Act.[6] EH-BT was established to safeguard against the possibility that no appropriate third party lessees could be found for any of EH-REIT's hotel properties and is, therefore, the "master lessee of last resort," as EH-REIT (or its subsidiaries) could not lease the hotels to themselves. EH-BT has never been activated and EH-BT is currently dormant and has *de minimus* assets and no operations.

The equity units in the EH-REIT are a "collective investment scheme," authorized under Singapore's Securities and Futures Act ("SFA"), Chapter 289,[7] pursuant to which a trustee acts for the benefit of unit holders, by means of a Singapore trust deed (the "Trust Deed"). The original parties to the Trust Deed were a Singapore corporation,

---

[6] Business Trusts Act, Chapter 31A (2005), available at *https://sso.agc.gov.sg/Act/BTA2004*.

[7] Securities and Futures Act (2006), available at https://sso.agc.gov.sg/Act/SFA2001. Under the SFA, a "real estate investment trust" means a collective investment scheme – (a) that is authorized under [the SFA; (b) that is a trust; (c) that invests primarily in real estate and real estate-related assets . . . (c) all or any units of which are listed . . . on an approved exchange.

Eagle Hospitality REIT Management Pte. Ltd. (the "REIT Manager"), and a Singapore banking affiliate, DBS Trustee Limited (the "REIT Trustee").  The Trust Deed makes clear that acts taken by the REIT Trustee in its capacity as trustee of EH-REIT bind EH-REIT, and not DBST.  In other words, acts superficially or nominally taken "by" the REIT Trustee (in its capacity as trustee) are, in truth, acts of EH-REIT.  For example, the Trust Deed:

(i)     Defines "Liabilities" as including "all the liabilities of the Trust whether incurred directly by the Trustee or indirectly through [EH-REIT's subsidiaries];"[8]

(ii)    References the payment of taxes "payable by the Trustee" with respect to goods used "for the purpose of any business carried on or to be carried on by the Trust;"

(iii)   Provides that "Investments or assets of the Trust which are held in any Special Purpose Vehicle or Treasury Company shall be deemed to be held or (as the case may be) made directly by the Trustee for the Trust;" and

(iv)    Requires the Trustee, upon the liquidation of EH-REIT, to "repay any borrowing and all amounts owing under any money raising or financing arrangement effected by the Trust. . . ."

---

[8] Such payments are to be made only from EH-REIT's assets.  *See* Joint Exh. 4 (Deed of Trust Constituting Eagle Hospitality Real Estate Investment Trust by and between Eagle Hospitality REIT Management Pte. Ltd. and DBS Trustee Ltd. dated April 11, 2019), hereinafter the "Trust Deed" § 18.13.4 ("Any liability incurred and any indemnity to be given by the Trustee shall be limited to the Deposited Property of the Trust over which the Trustee has recourse PROVIDED THAT the Trustee had acted without fraud, gross negligence, wilful default, breach of this Deed or breach of trust.").  Further, the Trust Deed requires that loan agreements entered into by the REIT Trustee be "subject to a provision that the Trustee's liability is limited to the extent of" the value of EH-REIT's assets."  Trust Deed § 10.12.6.

The Trust Deed includes sections devoted to discussing business activities such as, among other things, (i) lending, borrowing, or raising money,[9] (ii) permitted and restricted investments,[10] (iii) the exercise of voting rights in subsidiaries,[11] and (iv) distributions to unitholders.[12]  Furthermore, the Trust Deed contemplates the acquisition of additional properties as part of EH-REIT's growth strategy.[13]  The investment mechanism includes:

> (i) participants in the scheme have no day-to-day control over management of the property;
>
> (ii) either or both
>
>> a. the property is managed as a whole by or on behalf of a manager, or
>>
>> b. the participants' contributions are pooled and profits/income from which payments are to be made are pooled; and
>
> (iii) the purpose or effect of the scheme is to enable participants to participate in or receive profits/income from the property.[14]

---

[9] Trust Deed at § 10.12.

[10] Trust Deed at §§ 10.2 and 10.3.

[11] Trust Deed at § 13.

[12] Trust Deed at § 11.1.

[13] Trust Deed at §§ 3 and 13 (defining "Real Estate Related Assets" as "listed or unlisted debt securities and listed shares of or issued by property companies or corporations, mortgage-backed securities, listed or unlisted units in business trusts, collective investment schemes or unit trusts or interests in other property funds and assets incidental to the ownership of Real Estate, including, without limitation, furniture, carpets, furnishings, machinery and plant and equipment installed or used or to be installed or used in or in association with any Real Estate or any building thereon").

[14] *Id.* Singapore Authority, Offers of Collective Investment Schemes. Available at https://www.the Singapore Authority.gov.sg/regulation/capital-markets/offers-of-collective-investment schemes (last updated April 29, 2020).

Until December 30, 2020, property held in trust by the REIT Trustee for EH-REIT beneficiaries was managed by the REIT Manager.[15]  The REIT Manager was removed by the REIT Trustee, effective December 30, 2020, pursuant to a directive of the Monetary Authority of Singapore ("MAS").[16]

The EH-REIT has no directors, officers or employees, and no operations of their own. They are property arrangements.[17]  In this case, until the MAS ordered its removal, the EH-REIT was managed by the REIT Manager, an external entity that had directors, officers and employees of its own.

The EH-REIT was "established with the principal investment strategy of investing on a long-term basis, directly or indirectly, in a diversified portfolio of income-producing real estate which is used primarily for hospitality and/or hospitality-related purposes, as well as real estate-related assets in connection with the foregoing, with an initial focus on the US."[18]  The REIT Manager was to collect and pay to the REIT Trustee all moneys received from the subsidiaries.[19]  The REIT Trustee would then make distribution to unitholders at the direction of the manager.[20]

---

[15]  *See* Joint Exh. 11 (Declaration of Alan Tantleff, Chief Restructuring Officer of Eagle Hospitality Group, in Support of Debtors' Chapter 11 Petitions and First Day Motions (D.I. 13)) ("Tantleff Declaration") ¶ 51.

[16]  *Id.* at ¶ 26.

[17]  *See* SFA, Ch. 289, Part XIII, § 286(2).

[18]  Joint Exh. 5 (Eagle Hospitality Trust Offering Prospectus dated May 16, 2019, publicly available on the investor page for the Eagle Hospitality Trust at https://investor.eagleht.com/misc/prospectus-final.pdf) (the "Prospectus") at 1.

[19]  Trust Deed at § 11.2.

[20]  Trust Deed at § 11.3.

The Trust Deed requires that the EH-REIT's assets and activity comply with the MAS's Code on Collective Investment Schemes and its associated Property Fund Appendix, which require that the scheme's revenue be primarily passive. "A property fund should not derive more than 10% of its revenue from sources other than: a) rental payments from the tenants of the real estate held by the property fund; or b) interest, dividends, and other similar payments . . . "[21]

Under the original design, the most senior governance of operations in the group would rest with the REIT Manager.[22]  Its board of directors would be comprised of industry veterans and experts in finance, hospitality and real estate.[23]  The REIT Manager was removed after the MAS raised concerns as to its ability to comply with its rules and regulations.[24]  Although the Trust Deed requires the appointment of a replacement manager when a previous manager has been removed,[25] the REIT Trustee has given no notice of such an appointment.

### c.  Unitholders

The units or shares in the EH-REIT were issued exclusively to non-U.S. investors.

> "Nothing in this Prospectus constitutes an offer for securities
> for sale in the United States or any other jurisdiction where it
> is unlawful to do so.  The Stapled Securities have not been and

---

[21]  *See* Singapore Authority, Code on Collective Investment Schemes ("CIS Code"), Appendix 6 – Investment: Property Funds § 7.2.

[22]  *See* Trust Deed at § 19.1.

[23]  *See* Singapore Authority, Guidelines to All Holders of a Capital Markets Services License for Real Estate Investment Trust Management, Guideline No. SFA04-G07 (January 1, 2016). Available at https://www.mas.gov.sg/regulation/guidelines/guideline-sfa04-g07-for-reit-managers (last updated January 1, 2016).

[24]  Tantleff Decl. at ¶ 111.

[25]  Trust Deed at § 24.3.

will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act") and, subject to certain exceptions, may not be offered or sold within the United States (as defined in Regulation S under the Securities Act ("Regulation S"). The Stapled Securities are being offered and sold outside the United States in reliance on Regulation S."[26]

The Unitholders are not liable for the obligations of EH-REIT.[27]

### d. Singapore SPVs

The Agent asserts that non-U.S. equity investors pooled resources in order to invest, indirectly, in two Singapore special purpose vehicles ("SPVs" or "Singapore SPVs"): (i) one SPV indirectly holds the interests in the Debtors, and (ii) the other was set up to fund capital to a subsidiary that provided a loan to a holding company for the Debtors. Each of the Singapore SPVs is a non-operating limited company organized under the laws of Singapore.

Each of the Singapore SPVs, EHT-S1 and EHT-S2, is a non-operating limited company organized under the laws of Singapore.[28] EHT-S2 owns a Cayman Islands subsidiary ("Cayman Corp. 1") (and EHT-S1 owns shares in Cayman Corp. 1) that lends to, the top-level U.S. holding company Debtor, known as EHT US1, Inc. ("EHT US1"). Passive rental income generated, through leases, from the Debtors' real estate properties, would be expected to flow upstream as dividends from Debtors owning hotels, through

---

[26] *See* Prospectus at 1.

[27] Trust Deed at § 4.3.4 (A Unitholder "shall not be liable to the Manager or the Trustee to make any further payments to the Trust after it has fully paid the consideration to acquire its Units and no further liability shall be imposed on such Holder in respect of its Units.").

[28] Liu Decl., Exh. B (Eagle Hospitality Trust 2019 Annual Report, publicly available on the investor page for the Eagle Hospitality Trust at https://investor.eagleht.com/misc/ar2019.pdf) (the "Annual Report") at 3.

several layers of holding companies to EHT US1, then through the Singapore SPVs (in part in the form of interest payments paid by EHT US1 to Cayman Corp. 1, and then distributed by it to EHT-S2), and ultimately to the REIT Trustee.



### e. Business Activities

Concurrently with its formation, EH-REIT created the subsidiaries and corporate structure that would become the Eagle Hospitality Group and would own and lease the hotels. This involved "a series of assignments and intercompany loans and fund transfers," pursuant to which (i) EH-REIT, acting through the REIT Trustee, acquired the stock of the entities that owned the hotels prior to the formation of EH-REIT and the Eagle Hospitality Group, and (ii) transferred the ultimate beneficial interests therein to EHT US1, Inc., "a newly incorporated U.S. Corporation wholly owned by EH-REIT through [EHT-S1], a newly incorporated Singapore company wholly owned by EH-REIT."[29]

---

[29] Prospectus at 35.

Since then, and exercising its authority under the Trust Deed, EH-REIT—through the REIT Trustee in its capacity as trustee of EH-REIT—has directed the operations and management of its subsidiary entities in order to administer the Eagle Hospitality Group and generate profit for Unitholders.  In this respect EH-REIT has served the same function as the parent company of any multi-entity international business enterprise.

In connection with these business activities EH-REIT also incurred significant obligations.  For example, EH-REIT is the guarantor of the mortgage loan entered into in connection with the Eagle Hospitality Group's Houston Hilton Galleria Hotel (the "Houston Guaranty").[30]  Importantly, the Houston Guaranty provides that it "is made" by, (among others) EH-REIT "with [the REIT Trustee] signing on its behalf in its capacity as trustee thereof."[31]  In other words, and like the Trust Deed, the Houston Guaranty recognizes the basic, but fundamental, concept that actions superficially or nominally taken "by" the REIT Trustee are, in truth, actions taken by EH-REIT. EH-REIT also contracted to obtain insurance policies, certain of which are pledged as security in connection with an insurance financing agreement entered into by EH-REIT.[32]

---

[30]  The Houston Guaranty includes (i) the Guaranty of Recourse Obligations dated October 24, 2017, as amended by the Consent Agreement dated May 24, 2019, pursuant to which EH-REIT, among others, became a named guarantor of the obligations and liabilities discussed therein and (ii) the May 24, 2019 Payment and Completion Guaranty entered into by EH-REIT and pursuant to which EH-REIT guaranteed the performance and payment of certain specified renovations.  Joint Exh. 6, hereinafter the "Houston Guaranty."

[31]  Houston Guaranty preamble to Payment and Completion Guaranty.

[32]  *See* D.I. 439 at Schedule D for EH-REIT.

Furthermore, EH-REIT is an obligor under the prepetition credit agreement with the Agent, and it was anticipated that it would also be one of the obligors under the DIP financing proposal that the Agent prepared and delivered to the Debtors.

### f. Credit Agreement

A number of the Debtors, including the Parent Debtors, are parties to that certain credit agreement, dated as of May 2019, with a syndicate of lenders, with the Agent acting as administrative agent (as defined *supra,* the "Credit Agreement"). The Credit Agreement was executed by, among others, each of the Parent Debtors. The introductory paragraph of the Credit Agreement identifies which of the Eagle Hospitality Group entities are parties thereto and defines "SG Borrower" as EHT-S1, EHT-S2, and Parent. Parent, in turn, is defined as the hospitality stapled group comprising EH-REIT and EH-BT.

Under the Credit Agreement, the activities of EHT-S1 and EHT-S2 were limited to holding the interests in the subsidiaries below them. They were prohibited from becoming operating entities.[33] The Credit Agreement describes them as "structuring subsidiaries," and their principal purpose was to enable the U.S. sourced-dividends paid by the EH-REIT to its non-U.S. unitholders to be sheltered from withholding tax.[34]

---

[33] *See* Joint Exh. 8 (Credit Agreement, dated May 16, 2019, by and between USHIL Holdco Member, LLC; Atlanta Hotel Holdings, LLC; ASAP Salt Lake City Hotel, LLC; Sky Harbor Denver Holdco, LLC; DBS Trustee Ltd. in its capacity as Trustee of Eagle Hospitality Real Estate Investment Trust; Eagle Hospitality Business Trust Management Pte. Ltd., in its capacity as Trustee-Manager of Eagle Hospitality Business Trust; Eagle Hospitality Trust S1 Pte. Ltd.; Eagle Hospitality Trust S2 Pte. Ltd.; Bank of America, N.A.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; and Bank of the West) (the "Credit Agreement") at 41, 131-35.

[34] *Id.*

Revenue derived from the U.S. operations paid up the chain by EHT US1 would consist principally of interest on the loan made by Cayman Corp. 1 to EHT US1, which Cayman Corp. 1 would distribute to EH S-2, to be, in turn, distributed to the REIT Trustee, and by it to the scheme's unitholders. This architecture was tax driven: designed to exempt unitholder distributions from U.S. withholding under the "Portfolio Interest Exemption" provided by sections 871 and 881 of the U.S. Internal Revenue Code.[35]

However, the Credit Agreement also includes provisions concerning EH-REIT's ability to enter into agreements and commence insolvency proceedings:

(i)     Defines EH-REIT as the trust itself, exclusive of the REIT Trustee. Section 1.01 of the Credit Agreement defines EH-REIT to mean "the trust of which the REIT Trustee is the trustee . . . ."

(ii)    Identifies EH-REIT as an "Individual Borrower." EH-REIT is included in the definition of "individual borrower" under section 11.03 of the Credit Agreement.[36]

_____

[35] The IRC exemptions apply so long as the recipient unitholder directly or indirectly does not own 10% or more of the outstanding stapled securities issued by the REIT and the Eagle Business Trust. The Prospectus explains:

> Non-U.S. Stapled Securityholders should comply with the Portfolio Interest Exemption Limit, that is, they should not directly or indirectly own 10% or more of the outstanding Stapled Securities, in order for them to be able to claim the Portfolio Interest Exemption. This is necessary to ensure that the interest paid to Cayman Corp 1 by US Corp pursuant to intercompany loans from Cayman Corp 1 to US Corp qualifies for favourable tax treatment under the Portfolio Interest Exemption.

*See* Prospectus at 102.

[36] *See* Credit Agreement at § 11.03(a) (" . . . the term "Individual Borrower" means each of . . . EH-REIT, EH-BT, EH-S1, and EHTS2, each in its individual capacity as a Borrower and as a First Borrower hereunder . . . ."

(iii)     Anticipates that EH-REIT May Be a Chapter 11 Debtor. The Credit Agreement contemplates that EH-REIT may later file for chapter 11 bankruptcy protection.[37]

(i)     Acknowledges and requires EH-REIT's ownership and control of subsidiaries. The definition of "Change of Control" in the Credit Agreement provides that a Change of Control occurs if, among other things "EH-REIT ceas[es] to own and control, directly or indirectly, 100% of each Borrower (other than EH-BT or the BT Trustee-Manager), each Guarantor or each Structuring Subsidiary."[38]

The Credit Agreement also replicates the Trust Deed's identity between EH-REIT itself and the REIT Trustee, in its capacity as trustee of EH-REIT. Accordingly, the Credit Agreement provides that "[u]nless the context otherwise requires, all references in this Agreement to EH-REIT shall include, without limitation, a reference to the REIT Trustee in its capacity as the trustee of EH-REIT."

Importantly, however, the Credit Agreement recognizes that the REIT Trustee's role under the Credit Agreement creates no direct obligations on it (or on EH-BT), which role is limited to EH-BT's "capacity as trustee of EH-REIT and not in its personal capacity," and that, therefore, "[a]ny obligation, matter, act, action or thing required to be done, performed, or undertaken or any covenant, representation, warranty or undertaking given by the REIT Trustee under this Agreement shall only be in connection

---

[37] *See* Credit Agreement, § 1.01 (defining "Debtor Relief Laws" to specifically include chapter 11 reorganization "of the Parent (or REIT Trustee or BT Trustee-Manager)").

[38] Credit Agreement §2.06(c).

with the matters relating to EH-REIT and shall not extend to the obligations of DBST in respect of any other trust or real estate investment trust of which it is trustee."[39]

The Credit Agreement recognized two key realities of the operation of EH-REIT: (1) that actions superficially or nominally taken "by" the REIT Trustee (in its capacity as trustee) are, in truth, acts of EH-REIT for purposes of EH-REIT's operations—i.e., EH-REIT's ownership of property, incurrence of liabilities, and entry into agreements; and (2) the fact that EH-BT outside its trustee role is essentially a different entity that, as part of its business, assumes the capacity of trustee with respect to other trusts.

### g. Singapore High Court Order

On January 20, 2021, the REIT Trustee, in its capacity as trustee for EH-REIT, filed the Singapore Application with the High Court of the Republic of Singapore (the "Singapore High Court"). The Singapore Application explained that, for a number of reasons detailed therein, the Former REIT Manager had been removed from its role. Further, despite the best efforts of the REIT Trustee and the professionals it engaged, the unitholders in EH-REIT narrowly defeated a series of resolutions that would have resulted in the infusion of capital into EH-REIT and the installation of a new manager to replace the Former REIT Manager.

As explained in the Singapore Application, this meant that the EH-REIT was left without a Manager and "left a lacuna in the trust management structure" caused by the fact that while "the EH-REIT Trust Deed empowers the REIT Trustee to exercise broad

---

[39]  Credit Agreement § 11.10(a).

powers in relation to EH-REIT on the Manager's recommendation, it is silent as to whether the REIT Trustee can exercise these powers in the absence of such recommendation."[40]

The REIT Trustee (through the Singapore Application) requested an order from the Singapore High Court clarifying that the REIT Trustee could, even without any manager entity in place, take all actions that (i) the Trust Deed contemplated would be undertaken on the "recommendation, request, direction or instructions of the" Former REIT Manager without the need of any such recommendation and (ii) the REIT Trustee "may deem necessary for the management and administration of the EH-REIT and its business."[41]

Specifically, the Singapore Application was explicit that the actions the REIT Trustee intended to, and sought confirmation from the Singapore High Court that it could, take included the powers to take immediate action on behalf of EH-REIT to join the Chapter 11 Cases in the United States.[42] The REIT Trustee explained that this was necessary because (i) the EH-REIT itself remains exposed to claims from creditors[43] and there was an imminent risk of enforcement actions being taken against EH-REIT and (ii) it is critical that EH-REIT itself has access to the DIP Facility, to enable EH-REIT to meet

---

[40] Joint Exh. 1, hereinafter the "Singapore Application" at ¶¶ 6 and 7.

[41] Singapore Application ¶ 12.1(b).

[42] Singapore Application at ¶ 19 and ¶ 22.

[43] Singapore Application ¶ 32.

critical expenses necessary for its continued operation, and to protect the value of the Hotels.[44]

On January 22, 2021, Vinodh Coomarswamy, J. of the Singapore High Court entered an Order (the "Singapore High Court Order") granting the relief requested in the Singapore Application and allowing the REIT Trustee to take any action it deems "necessary for the management and administration of [EH-REIT] and its business."[45]  As applicable to the REIT Trustee's decision to join EH-REIT to the other, already pending, chapter 11 cases, the only condition the Singapore High Court placed on the REIT Trustee was that it file reports every six months "updating the court on material developments in the preceding six months including without limitation: (a)  developments in the Chapter 11 proceedings in relation to the restructuring of the EH-REIT and its business."[46]

### h.  The Bankruptcy

On January 18, 2021, certain of the Debtors (including EH S-1, and EH S-2) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Court held a first-day hearing and appointed Mr. Tantleff to act as foreign representative,[47] which would allow the Debtors to seek recognition of their chapter 11 proceedings as foreign

---

[44] Singapore Application ¶ 32.

[45] Joint Exh. 3, hereinafter the "Singapore High Court Order" at ¶1.b.

[46] Singapore High Court Order at ¶ 2.

[47] *See* D.I. 52 (Order Authoring Chief Restructuring Officer Alan Tantleff to Act as Foreign Representative of Debtors).

main proceedings in Singapore and enforce the automatic stay globally.[48]  The Court also

approved, on an interim basis, the Debtors' motion to obtain up to $125 million in post-

petition financing,[49] which includes a proposed budget that would pay over $11 million

of the REIT Trustee's fees and expenses.

On January 27, 2021, the REIT Trustee filed a voluntary chapter 11 petition on EH-

REIT's behalf.  EH-REIT's chapter 11 petition identifies EH-REIT not as a corporation, nor

as a partnership, but as a "Real Estate Investment Trust under Singapore law."[50]  At the

same time, the REIT Trustee sought approval to appoint Mr. Tantleff to act as EH-REIT's

foreign representative, asserting that it had concerns that creditors or unitholders of EH-

REIT might attempt to take legal action in Singapore and therefore recognition of EH-

REIT's putative chapter 11 case in Singapore is necessary to enforce the automatic stay

globally.

### B.  Legal Analysis

#### 1.  Burden of Proof

The burden of proof in establishing eligibility for bankruptcy relief lies with the

party filing the bankruptcy petition, which in this case is EH-REIT and the Singapore

SPVs.[51]  Once the debtor has established it is an eligible debtor the burden shifts to the

---

[48]  D.I. 7 (Debtors' Motion Pursuant to Bankruptcy Code Section 1505 Authorizing Chief Restructuring Officer Alan Tantleff to Act as Foreign Representative of Debtors) at ¶¶ 20-21.

[49]  D.I. 20 (Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Debtors to Obtain Postpetition Financing, ((ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Modifying Automatic Stay and (iv) Granting Related Relief).

[50]  Case No. 21- 10120 (Eagle Hospitality Real Estate Investment Trust), D.I. 1 (Voluntary Petition for Non-Individuals Filing for Bankruptcy Petition).

[51]  *In re Dille Family Trust*, 598 B.R. 179, 189 (Bankr. W.D. Pa. 2019).

movant to place at issue the good faith of the debtor's bankruptcy filing.[52] If the movant appropriately places the debtor's good faith at issue, the burden shifts once again to the debtor to establish that the petition was filed in good faith.[53]

### 2. Governing Law

Section 109(d) of the Bankruptcy Code provides that only "a person ... may be a debtor" under Chapter 11. The term "person" is defined under section 101(14) as including an "individual, partnership, and corporation..." The term "corporation," in turn, is defined in section 101(9) as being limited to certain business entities, including a "business trust." "Weaving these terms together, courts have concluded that only valid 'business trusts' may be eligible for bankruptcy relief, while ordinary non-business trusts are not."[54] Moreover, while "the term 'entity' in the Bankruptcy Code includes a 'trust' … debtor eligibility is not afforded to all 'entities.' Rather, it is limited to 'persons,' and the only trust within the definition of a 'person' is a 'business trust.'"[55]

Thus, in order for EH-REIT to be an eligible debtor it must be a "business trust."[56] The next question is what law governs whether EH-REIT is a business trust. There is a split of authority as to whether the law of the jurisdiction in which the trust resides or

---

[52] *In re S. Caanan Cellular Invs., Inc.*, No. 09-10474, 2009 WL 2922959 at *6 (Bankr. E.D. Pa. May 19, 2009); *In re Zais Inv. Grade Ltd. VII*, 455 B.R, 839, 848 (Bankr. D.N.J. 2011).

[53] *In re Integrated Telecom Express, Inc.*, 384 F. 3d 157, 162 n. 10 (4th Cir. 2004); *In re Tamecki*, 229 F.3d at 207.

[54] *Id.* at 190 (citing *In re Blanche Zwerdling Revocable Living Tr.*, 531 B.R. 537, 542-546 (Bankr. D. N.J. 2015)).

[55] *Id.* (internal citation omitted).

[56] The parties agree that the Singapore SPE's are corporations. In addition, section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor." The parties agree that each of the relevant debtors owns property in the United States.

federal common law governs.[57]  That said, the weight of authority falls in favor of applying federal common law.[58]  The Court disagrees with this authority.

As always, it is helpful to start with first principles.  As Professors Douglas G. Baird and Anthony J. Casey have written, one of the foundational principles of bankruptcy law is that it changes non-bankruptcy law only when the purposes of bankruptcy require it.

> There are three principal strands to the Court's bankruptcy jurisprudence. The first, embodied in *Butner v United States* and its progeny, centers on the idea that the bankruptcy forum must vindicate nonbankruptcy rights. In contrast to administrative agencies that give shape to federal policies, bankruptcy judges should not unsettle nonbankruptcy rights — rights that are largely creatures of state rather than federal law. In the absence of a clear directive from Congress, those nonbankruptcy rights trump a judge's impulse to advance federal policy.[59]

There is no more fundamental right than the right to exist, whether the "person" is an individual human being or an artificial legal entity.  In the United States (with limited exceptions not relevant here), corporations, partnerships, limited partnerships, limited liability companies and trusts are fictitious entities that exist under state law.  Their internal governance and legal rights and obligations are governed by state law.

---

[57]  *In re Dille Family Trust*, 598 B.R. at 191 (citing *Cutler v. 65 Security Plan*, 831 F. Supp. 1008, 1014-15 (E.D.N.Y. 1993)).

[58]  *In re Catholic School Employees Pension Trust*, 599 B.R. 634, 654 (1st Cir. BAP 2019) ("there is consensus that federal law should govern the determination of eligibility for trusts.").

[59]  Douglas G. Baird & Anthony J. Casey, *Bankruptcy Step Zero*, 2012 Sup. Ct. Rev. 203, 204 (2012).  *See also* Douglas G. Baird, Elements of Bankruptcy 6 (4th ed. 2006) ("*Butner* allows us to draw from a complicated statute a single organizing principle.  Knowing the outcome under nonbankruptcy law can go a long way toward understanding the problem in bankruptcy.  When a litigant seeks an outcome different from the one that would hold outside bankruptcy, the bankruptcy judge will likely ask the litigant to identify the part of the Bankruptcy Code that compels the departure.").

There is no federal law that creates business entities.  Thus, in determining whether an entity such as a trust has the capacity to take a specific legal action one should look in the first instance to the state law under which the entity exists.  This same principle should apply to determining whether a trust such as EH-REIT is a "business trust" that is eligible to be a debtor under the Bankruptcy Code - unless there is a clear directive otherwise.

Courts that hold federal law applies have found this clear directive in Article I, § 8, Cl. 4 of the Constitution, which provides that "Congress shall have the power . . .  to establish . . . uniform laws on the subject of bankruptcies."[60]  The argument is that to hold state law governs whether an entity is a business trust "would result in different results in different states and an entity would be eligible for relief in one state but not another."[61]  However, this is the exact argument that was rejected by the Supreme Court in *Butner v. United States*.[62]

*Butner* concerned a dispute between a bankruptcy trustee and a second lien secured lender over the right to the rents collected during the period between the debtor's bankruptcy and the foreclosure sale of the secured property.  The question before the Supreme Court was whether the right to such rents is to be determined by a federal rule of equity or by the law of the state where the property is located.  If the Supreme Court were to hold that the underlying right to rents was governed by state law, the outcome

---

[60] *Cutler*, 831 F. Supp. at 1015 (quoting *In the Matter of Arehart*, 52 B.R. 308, 310-11 (Bankr. M.D. Fla. 1985)). *See also In re Dille Family Trust*, 598 B.R. at 191 (same).

[61] *Id.*

[62] *Butner v. United States*, 440 U.S. 48 (1979).

would vary between states as, in some states, there is an automatic entitlement to rents, and, in some states, the right to rents is conditioned on actual or constructive possession of the premises.  The Circuits that had adopted a federal rule of equity did so, in part, to create "uniform laws of bankruptcy."   Nonetheless, the Supreme Court rejected that argument and famously held that "[p]roperty interests are created and defined by state law."[63]  In so doing, the Court also stated that "[u]niform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'"[64]  Thus, rather than creating uncertainty, reliance on non-bankruptcy law, promotes certainty.  This would apply to the business trust issue as, at the time of the trust's creation, the persons involved would be looking to the law of the jurisdiction empowering the existence of the trust to define the trust's legal rights – not federal bankruptcy law.

Moreover, the argument that "an entity would be eligible for relief in one state but not another" is incorrect.  It is true that under cases involving identical fact patterns but different trusts a trust may be considered a business trust under one state's law but not another.  But the determination of a specific trust's status as a business trust will be identical in all bankruptcy courts because the decision will uniformly be based on the law of the jurisdiction under which the trust exists.  This promotes certainty because persons

---

[63]  *Id*. at 55.

[64]  *Id*. (quoting *Lewis v. Manufacturers National Ban*k, 364 U.S. 603, 609 (1961)).

will know when they form a trust in Delaware, for example, that Delaware law will uniformly govern whether it is a business trust even if the trust files bankruptcy in California.

Finally, the precept that applying federal common law to determine whether a trust is a business trust will promote uniformity has proved to be false.  There is a striking inconsistency between bankruptcy courts on this issue with at least three different legal tests having been developed.[65]

Thus, the Court finds that federal common law should not determine whether a trust is a "business trust" under the Bankruptcy Code.  Rather, the law of the jurisdiction in which the trust is organized, in this case the Republic of Singapore, shall govern.[66]  As there is no dispute that the Singapore SPVs are eligible debtors, the Court shall now turn to whether EH-REIT is a business trust under Singapore law.

### 3.  Is EH-REIT a Business Trust Under Singapore Law?

The issue is whether EH-REIT is a business trust under Singapore law.  In support of the Debtors' position that EH-REIT is a business trust the Debtors submitted the expert testimony of Professor Hans Tjio.[67]  Professor Tjio opined that:

---

[65] *Catholic School Employee Pension Trust*, 599 B.R. at 654 ("Three different approaches are evident from the case law, subject to various permutations. These approaches can be summarized as 'the primary purpose' test, the multi-factor test, and a six-factor test derived from a Supreme Court tax case.").

[66] *Butner* and the relevant case law involve federal law versus state law.  While those cases involve domestic debtors, there is no reason not to apply the same principles to foreign debtors.  Indeed, the argument as to predictability is perhaps even more persuasive in the case of foreign debtors.

[67] Professor Tjio is a Professor at the Faculty of Law of the National University of Singapore ("NUS"). Since the time he joined NUS in 1990, he has taught courses in equity and trust law, international trusts, company law and securities regulation.  Presently, he is a director of the EW Centre for Law and Business at the Faculty. Aside from articles that he has written, he is the author or co-author of three books: *Corporate Law* (2015, Academy Publishing); *Principles and Practice of Securities Regulation in Singapore* (3rd ed, 2017, 2nd ed,

a) There is no single exhaustive definition of the term "business trust" in any case or statute under Singapore law and, as the term is understood, a business trust is simply a trading trust that is "a business enterprise structured as a trust" and which has unitholders and creditors. It offers an alternative to the corporation form. That said, the Business Trusts Act contains a definition of the term "business trust" which applies for the purposes of the said Act. This definition requires the trust to, among other things, generate a profit for its unitholders without such unitholders having day-to-day control over the management of the trust property.

b) A trust may be a business trust under Singapore law whether or not it is registered under the Business Trusts Act. This is because the Business Trusts Act does not create a comprehensive mandatory registration regime for business trusts in Singapore. One key type of business trust in Singapore, Singapore REIT's ("S REITS") can choose to be authorised as collective investment schemes under the Securities and Futures Act (Cap 289, 2006 Rev Ed) or registered as business trusts under the Business Trusts Act, the latter of which was enacted in 2004, more than 2 years after the first S REIT's were created in Singapore. Most S REIT's operate in Singapore as collective investment schemes ("CIS REITS"), as do almost all unit trusts and mutual funds. It is only if a trust having units that are exclusively or primarily non-redeemable offers units to the public that registration under the Business Trusts Act is required. Many unlisted business trusts are not registered under the Business Trusts Act.

c) EH REIT [is] a business trust under Singapore law, even if it was not registered under the Business Trusts Act. Apart from the fact that EH REIT comes within the definition of "business trust" in the Business Trusts Act, EH REIT operates a business which generates profits for its unitholders who have contributed capital to it, and borrows or guarantees loans from creditors, and therefore is a "business trust" as that term is commonly understood in Singapore.

d) Whether or not it is a business trust registered under the Business Trusts Act, an S REIT has sufficient legal persona to be restructured as a separate entity under Singapore law. This is partly because S REIT unitholders do

---

2011, 1st ed 2004, Lexis-Nexis Butterworths) and *The International Encyclopedia of Laws, Property and Trust Law in Singapore* (2000, Kluwer). He obtained his M.A. degree from the University of Cambridge and his L.L.M. from Harvard University.

From 2000 to 2004, Professor Tjio was engaged as a consultant to the Singapore Authority, during which time he worked closely with the Securities and Futures Department in the MAS to review and to help develop and to draft the Business Trust Act, and to draft the regulations to the Securities and Futures Act. He is clearly an expert on the issues before the Court.

not have "equitable or proprietary interests" in the underlying REIT assets but can only require due administration of the REIT by the REIT managers and REIT trustee. The REIT manager is a fiduciary in relation to the trust even if not itself a trustee. As the beneficial interest must be held by someone (and the REIT unitholders do not own such interest), it is my view that it resides in the REIT as a separate entity or in a separate patrimony controlled by the REIT trustee that is ringfenced from the REIT trustee's own estate, in the sense that the bankruptcy of the REIT trustee will not affect the underlying REIT assets and vice versa. As such, the REIT assets are capable of being restructured on their own. Both legal and regulatory provisions and court pronouncements in Singapore recognise the S REIT as being capable of undergoing restructuring. EH REIT, as an S REIT, is capable of undergoing a restructuring under Singapore law.[68]

It is undisputed that EH-REIT is not registered under the Business Trust Act.  The question then turns to whether EH-REIT has sufficient attributes to be considered a business trust even if it is not registered as such.  Professor Tjio's testified that "[a] trust may be a business trust under Singapore law whether or not it is registered under the Business Trusts Act . . . because the Business Trusts Act does not create a comprehensive mandatory registration regime for business trusts in Singapore."  Rather the Business Trust Act provides a mechanism for business trusts to choose to be registered under the Business Trust Act and, thus, receive the benefits of such registration.  Indeed, the Business Trust Act refers to "registered business trusts" as well as "business trusts" generally, "which logically implies that business trusts may exist with or without being registered as such."[69]

---

[68] Debtors' Hr'g. Exh. 1, Declaration of Professor Hans Tjio As to Whether Eagle Hospitality Real Estate Trust ('EH REIT') Was, At The Time Of Its Chapter 11 Filing On January 27, 2021, A Business Trust Under Singapore Law ("Tjio Declaration") at 3-5.

[69] *Id*. at 10.

"It follows that whether a trust is to be regarded as a 'business trust' is a question not of labels or registration or formalities. *Rather, it turns on whether the trust in question carries on business, which is a question of fact.*"[70]  In short, "a business trust is simply a trust which carries on a business." [71]    Under Singapore law, the "administration and management of property, including that carried out through a 'legal representative, or a trustee, whether by employees or agents or otherwise' comes within the understood meaning" of carrying on business.[72]  The undisputed facts of this case clearly establish that, under Singapore law, EH-REIT is engaged in business, and, thus is a "business trust."[73]

The Agent submitted the expert testimony of Professor Loi Chit Fai Kelry.[74] Professor Loi's opinion framed the issues before the Court differently than Professor Tjio. The Agent presented the following issues to Professor Loi:

> Under Singapore law, does [EH-REIT] exist and function in the same or similar way as a company or other form of corporate entity; that is, does [EH-REIT] have standing to appear in a Singapore court, the power to own

---

[70] *Id*. (emphasis added).

[71] *Id*. at 11.

[72] *Id*. at 10.

[73] In the Tjio Declaration, Professor Tjio reviews in detail the aspects of EH-REIT's activities that constitute its engagement in business.  *See* Tjio Declaration at 11-14.  Those facts are undisputed and are largely set forth in the Findings of Facts, *infra*.

[74] Professor Loi is an Associate Professor (with tenure) at the Faculty of Law of NUS.  He is Co-Director of the Asian Law Institute and Articles Editor and Book Reviews Editor of the Singapore Journal of Legal Studies. He joined NUS as an Assistant Professor in 2010 and was promoted to Associate Professor (with tenure) in 2014. At NUS, he teaches Law of Contract, and Equity and Trusts.  He received his L.L.B. from NUS, and his L.L.M. degree from the University of London.  He is scheduled to graduate with a D.Phil. in Law from the University of Oxford this spring.  He is clearly an expert on the issues before the Court.

property, make contracts, and operate a business, and other attributes of legal personality?[75]

In response to the issues as framed by the Agent, Professor Loi opined that:

> In my opinion, [EH-REIT] is not a legal entity or legal person under Singapore law. [EH-REIT] is a scheme or arrangement which gives rise to a trust over investments in real estate.
>
> [EH-REIT] is not a business trust registered under Singapore's Business Trusts Act. Regardless of whether [EH-REIT] is a business trust or whether [EH-REIT] is given any other label, [EH-REIT] is not recognised as a legal person or legal entity.
>
> Since it is not a legal entity or legal person, [EH-REIT] cannot own property, cannot own or operate a business, cannot make contracts, cannot sue and cannot be sued in its own name. In contrast, a company is treated as a legal person or legal entity under Singapore law, such that a company can own property and can enter into contracts, and a company has standing in the Singapore courts to sue and be sued in its own name.[76]

It is important to note that in neither the Loi Declaration nor at the May 28th hearing did Professor Loi express any views on the relevant question, which is whether EH-REIT is a business trust under Singapore law.[77] Rather, Professor Loi opined that EH-REIT lacks sufficient legal personhood to initiate insolvency proceedings.[78] However, Professor Loi's testimony misses the point. The question is not whether EH-REIT is a legal person or legal entity. Congress has already determined that a corporation is a person and that a business trust is a corporation. Thus, under the Bankruptcy Code, a business trust is a legal person. The question is whether EH-REIT is a business trust.

---

[75] Agent's Hr'g. Exh. 1, Declaration of Loi Chit Fai Kelry ("Loi Declaration") at 3.

[76] *Id.*

[77] D.I. 802, Hr'g. Tr. (May 28, 2021) at 16.

[78] Professor Loi agreed that EH-REIT could be the subject of insolvency proceedings in Singapore, provided those proceedings were initiated by the trustee. *Id*. at 15-16.

Professor Loi's opinion is only relevant to the extent that legal personhood is critical in determining whether something can be considered a business trust under Singapore law. But, as Professor Tjio's testimony makes clear, legal personhood is not a required element for the existence of a business trust.  To the extent legal personhood is relevant, which it is not, Professor Tjio's testimony further refutes much of Professor Loi's testimony and is persuasive that EH-REIT has, at least, some attributes of legal personhood, which are sufficient to support a finding that it is a business trust.[79]

In sum, the Court finds Professor's Tjio's testimony to be highly persuasive and not rebutted by Professor Loi's testimony.  Thus, the Court holds that EH-REIT is a business trust under Singapore law and, thus, an eligible debtor under the Bankruptcy Code.

### 4.  EH-REIT and Singapore SPVs Cases Were Filed in Good Faith

In addition to arguing that EH-REIT is not an eligible debtor, the Agent asserts that the Parent Debtors' cases were not filed in good faith and are subject to dismissal under section 1112(b) of the Bankruptcy Code.

### a.  Standard of Review

"[O]nce a debtor's good faith is appropriately put at issue, it is the burden of the debtor to produce evidence of good faith."[80]  A debtor's good faith is "at issue" if a party (i) "call[s] into question [the] debtor's good faith, and" (ii) "put[s] on evidence sufficient

---

[79] *See* Debtors' Hr'g Exh. 2, Rebuttal Declaration of Professor Hans Tjio to the Declaration of Loi Chit Fai Kelry Dated May 17, 2021 at 3-6; Hr'g. Tr. (May 28, 2021) at 18-89 (cross-examination of Professor Tjio).

[80] *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 208 (3d Cir. 2000). *See also In re SGL Carbon Corp.*, 200 F.3d 154, 162 n. 10 (3d Cir. 1999) (citations omitted).

to impugn that good faith . . . ."[81]  Where there is a disparity of information, and the known facts of the case align with the bad faith allegation, the debtor's good faith is placed at issue.[82]

It is unclear what "evidence to impugn the good faith" of the debtor means.  At least one court rejected the *Tamecki* "at issue" formulation[83] of the burden of proof in favor of a formulation placing upon the movant the "the burden of producing a prima facie case of 'bad faith,' as well as the ultimate risk of non-persuasion on that issue . . . ."[84]

In any event, whether a case has been filed in good faith is a fact intensive inquiry that must be examined against the totality of facts and circumstances.[85]

---

[81] *Tamecki*, 229 F.3d, at 207 n. 2 ("We hold merely that in this case where the trustee has called into question debtor's good faith, and put on evidence sufficient to impugn that good faith, the burden then shifts to the debtor to prove his good faith.").

[82] *Id.* at 208, 211 (Alito, J. concurring) (responding to J. Rendell's dissent) ("But the trustee, who is obviously not a party to the divorce proceeding, is in a comparatively poor position to show the reason for the delay. *The known facts* about the divorce proceeding *are sufficient* to place upon the debtor the burden of explaining the reason for the delay, which has now reached seven years.  It may be that there are entirely legitimate reasons for the delay. If so, it should have been easy for Tamecki to show what they were. But he made no effort to do so.") (emphasis added). *See also Perlin v. Hitachi Cap. Am. Corp.*, 497 F.3d 364, 368–69 (3d Cir. 2007) ("Applying the *Tamecki* framework, the Bankruptcy Court found that Hitachi had presented sufficient information to shift the burden to the [debtors] to prove that their petition was brought in good faith.").

[83] *In re Horan*, 304 B.R. 42, 46 (Bankr. D. Conn. 2004) ("In her Supplemental Memorandum . . . , the UST argues that once a debtor's good faith is put at issue, the debtor has the burden of establishing good faith. As explained below, the court rejects that formulation of the burden of proof on a motion to dismiss a chapter 7 case for "bad faith."  Rather, the court holds that the burden of producing a prima facie case of "bad faith," as well as the ultimate risk of non-persuasion on that issue, is on the movant.").

[84] *Id.* at n.6 (declining to follow *Tamecki* due to uncertainty as to what it means but questioning whether "*evidence sufficient to impugn that good faith* . . . might be read to state the unremarkable proposition that, once the movant has established a *prima facie* case of 'bad faith,' the burden of production shifts to the debtor.") (emphasis in original).

[85] *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999).

### b. Analysis

Dismissal based on lack of good faith "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence."[86] Courts consider thirteen factors in conducting their good faith inquiry:

> a. Single asset case;
>
> b. Few unsecured creditors;
>
> c. No ongoing business or employees;
>
> d. Petition filed on eve of foreclosure;
>
> e. Two party dispute which can be resolved in pending state court action;
>
> f. No cash or income;
>
> g. No pressure from non-moving creditors;
>
> h. Previous bankruptcy petition;
>
> i. Prepetition conduct was improper;
>
> j. No possibility of reorganization;
>
> k. Debtor formed immediately prepetition;
>
> l. Debtor filed solely to create automatic stay; and
>
> m. Subjective intent of the debtor.[87]

---

[86] *Industrial Insurance Services, Inv. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir. 1991).

[87] *In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 557 (D. Del. 2002) (citations omitted).  *See also In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (To determine whether a chapter 11 petition is filed in good faith, a court should focus on two factors: "(1) whether the petition serves a valid bankruptcy purpose, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." (citations omitted)).

"The focus of the inquiry is whether the petitioner sought 'to achieve objectives outside the legitimate scope of the bankruptcy laws' when filing for protection under Chapter 11." *In other words, is there a valid reorganizational purpose?*[88] "Moreover, [i]t is well established that no single factor is determinative of a lack of good faith in filing a petition."[89]

The Agent asserts that: (i) the Parent Debtors' case serve no valid reorganizational purpose; (ii) there is not an ongoing concern to preserve, and, even if there was, the Parent Debtors have not shown that chapter 11 maximizes value that would be lost outside of bankruptcy; (iii) EH-REIT's windup must adhere to Singapore's statutory requirements under section 295 of the SFA and not the U.S. Bankruptcy Code; (iv) should the property sales of the U.S. hotels generate sufficient proceeds to satisfy the creditor claims at the U.S. debtors, those proceeds will flow up to the Singapore SPVs, and then continue to flow to the REIT Trustee, without the need of any reorganization or restructuring to occur; and (v) the sole purpose of the Parent Debtors' bankruptcy cases is to drain millions of dollars in professional costs from the U.S. Debtors' estates.[90]

To begin. Almost all of the thirteen *Primestone* factors are not present (or alleged) here. Specifically, these are not single asset cases; collectively, there are multiple unsecured creditors; the petitions were not filed on the eve of foreclosure; these cases are

---

[88] *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (internal quotations marks omitted; *citing In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994)).

[89] *In re Tiffany Square Assocs., Ltd.*, 104 B.R. 438, 441 (Bankr. M.D. Fla. 1989) (citation omitted); *see also In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 558 (D. Del. 2002) (*citing In re Tiffany Square Assocs., Ltd.*).

[90] Motion at p. 17.

not two-party disputes; there is nothing in the record to establish pressure from creditors; there are no prior bankruptcy petitions; these debtors were not formed immediately prepetition; and these cases were not filed solely to invoke the automatic stay. Furthermore, there is no allegation of improper prepetition conduct. Lastly, there has been no allegation of a nefarious intent of the debtors. The sole focus of the issue of "good faith" is focused on whether there is a legitimate bankruptcy purpose and the possibility of reorganization for the Parent Debtors.

Also, it is important to note that, in the context of large, complex, multi-debtor chapter 11 cases, nonoperational holding companies routinely file for bankruptcy. This is consistent with the principle that when a business enterprise includes multiple debtors, the dismissal analysis is not performed with respect to a debtor in isolation—the court must consider such debtors "holistically."[91] Here, the Debtors have assets, income, business operations, and creditors, and while most of the Debtors do not have employees,[92] this is only because employment of Hotel personnel is handled by hotel management companies, making direct employment arrangements unnecessary. Furthermore, it is not bad faith to file a chapter 11 case just because it may be possible that potential distributions to equity can be made outside of chapter 11, or because the Parent Debtors could have sought insolvency relief in Singapore.

---

[91] *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 301 (Bankr. D. Del. 2011) ("[T]he Court concludes it must consider the Debtors holistically in order to determine if there is a realistic possibility that Mezz II can be rehabilitated.").

[92] Urban Commons Queensway, LLC is an employer under multiple collective bargaining agreements. *See* Docket No. 439 Schedule G.

Here, the Debtors have commenced a sale process aimed at maximizing the value of the Debtors' assets. In that regard, on May 28, 2021, the Court entered four sale orders authorizing the sale of all but one of the Debtors' hotels for approximately $482 million. The restructuring of the Debtors though a 363 sale followed by a plan is a legitimate bankruptcy purposes.[93]   Lastly, the Parent Debtors have obtained financing for the Debtors' operations during the Chapter 11 cases.

---

[93] *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 303 (Bankr. D. Del. 2011) ("The Code expressly contemplates the use of a bankruptcy case to sell the assets of the estate in such a manner. 11 U.S.C. §§ 363 & 1123(a)(5)."). *JER/Jameson* resulted in dismissal based on the specifics facts that there was no evidence that the debtors could conduct a sale process that would realize or preserve value that would not be available outside of the chapter 11 process. *Id.* Specifically, the court found that:

> The Debtors have known since August 2008 of the need to refinance the debt or to sell the enterprise, have made numerous efforts to do so, but have been unable to achieve either . . . It is unlikely that the bankruptcy filing will enhance their chances of finding financing or a buyer. Further, the Debtors have taken no steps in this case to conduct a sale process and, although they initially expressed optimism that they would be able to obtain DIP financing from Gramercy, no such motion has been filed to date (more than two months since the filing).

*Id.* Here, the facts are inapposite as the Debtors obtained a stalking horse bidder and have sold substantially all their assets. The Agent cites to several other cases in its brief and all are distinguishable. *In re Derma Pen, LLC*, Case No. 14-11894 (KJC), 2014 WL 7269762, at *7 (Bankr. D. Del. Dec. 19, 2014) ("Unquestionably, Derma Pen's bankruptcy filing was timed to stop the Utah Litigation with the further purpose of moving the dispute to what the Debtor perceived as a 'friendlier' forum for disposition of the same issues pending before the Utah District Court. There is no dispute that the petition was filed shortly after the Utah District Court found in favor of the Movants and against the Debtor on two motions for partial summary judgment. It was also filed one business day prior to the start of a jury trial. Further, at the time of the filing, the parties also expected that the Utah District Court would soon issue rulings on two additional motions for partial summary judgment that had been filed by 4EY and Marshall."). The dismissal in *In re Derma Pen, LLC* was predicated on the "finding that [the petition was] filed for bankruptcy as a litigation tactic, rather than as a good faith attempt to reorganize or preserve value for creditors." In *Tamecki, supra*, the Third Circuit ruled that the debtor filed his Chapter 7 petition shortly before coming into enough funds to repay his debts and, therefore, acted in bad faith. *Id.* ay 206-07. *In Westland DevCo, LP*, this Court dismissed the chapter 11 case of a single asset real estate debtor after finding that the case was "a two-party dispute between the debtor and the secured creditor and certainly can be dealt with in the longstanding foreclosure or examiner law of the State of New Mexico.", *In re Westland DevCo, LP*, No. 10-11166 (Bankr. D. Del.) (D.I. 106 Hr'g Tr. (May 10, 2010) at 67:22-25). In *SGL Carbon*, the Third Circuit held that while it is not per se bad faith to file a chapter 11 petition to utilize the special powers and provisions of the Bankruptcy Code, some level of financial distress is required. *In re SGL Carbon Corp., supra*.

Turning to the cases, in *Heisley v U.I.P Engineered Prods. Corp. (In re U.I.P. Engineered Prods. Corp.)*,[94] the court considered the propriety of solvent subsidiaries joining in the insolvent parent corporation's bankruptcy.  Creditors sought to dismiss the subsidiaries' cases, asserting that the subsidiaries admitted solvency and, thus, abused the bankruptcy process.[95]  The Fourth Circuit found otherwise, stating that it was irrelevant whether the subsidiaries could independently demonstrate good faith for their filings.[96]  Rather, the question was whether the wholly-owned subsidiaries "should have been included in their parent company's bankruptcy estate, when the parent company had filed in good faith for Chapter 11 reorganization."[97]  The Court found that it was "clearly sound business practice for [the parent] to seek Chapter 11 protection for its wholly-owned subsidiaries when those subsidiaries were crucial to its own reorganization plan."[98]  The Court explained that the nature of a corporate family created an " 'identity of interest' . . . that justifies the protection of the subsidiaries as well as the parent corporation."[99]

In *In re Mirant Corp.*, the court similarly held that if a subsidiary had not been included in the bankruptcy filing, then the court expected that it would have "been pushed by creditors concerned about leaving so large a part of the Debtors' business and

---

[94] *Heisley v U.I.P Engineered Prods. Corp. (In re U.I.P. Engineered Prod. Corp.)*, 831 F.2d 54 (4th Cir. 1987).

[95] *Id.* at 56.

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*

assets beyond court supervision" continuing that "the need for rehabilitation of the corporate family enterprise is obvious, it is clearly a valid use of chapter 11 to address that need."[100]  Furthermore, this Court has held that bankruptcy protection is valid when the subsidiary debtors' *only* means of funding their payment of liabilities was through money sourced from its affiliate debtors.[101]

The Agent's assertion that DIP financing will still be available for the Parent Debtors is conjecture.  The DIP loan was made knowing that the Parent Debtors were part of the integrated corporate structure that filed their chapter 11 petitions as part of a large integrated and complex bankruptcy.  Indeed, the Agent's own DIP financing proposal included the participation of the Parent Debtors.  There is nothing in the record to indicate that these bankruptcies were filed for any other reason than to be part-and-parcel of the integrated and affiliated companies' bankruptcy that is seeking a sale of its assets or reorganization in this Court, and, unlike *JER/Jameson*, there was a stalking horse bidder and a Court approved sale of substantially all of the Debtors' assets.

This case is strikingly similar to *Heisley* and *Mirant*– there is an identity of interests that justifies the protection of the Parent Debtors and they are part of a complex and integrated capital structure.  The identity of interest is dispositive of the Parent Debtors' good faith filing.

---

[100] *In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *6 (Bankr. N.D. Tex. Jan. 26, 2005) (footnote omitted).

[101] *In re Energy Future Holdings Corp.*, 561 B.R. 630, 640 (Bankr. D. Del. 2016).

As a result, the Court finds that the Parent Debtors have met their burden of establishing that their cases were filed in good faith and for a legitimate bankruptcy purpose.

### 5.  Abstention

The Agent asserts that the Court should abstain from hearing these cases and dismiss them pursuant to Section 305 of the Bankruptcy Code.  The Agent claims that "Section 305 is often appropriate where the debtor is an entity formed under the laws of a foreign country."[102]

"Whether to dismiss a case or abstain pursuant to section 305 is committed to the discretion of the bankruptcy court, and is determined based upon the totality of the circumstances[.]  Courts agree that abstention under § 305(a)(1) is a form of 'extraordinary relief.'"[103]  The interests of both the debtors and the creditors must be served by granting the relief.[104]  However, "the party seeking abstention bears the burden of proof and it is substantial."[105]

Both parties discuss *In re Northshore Mainland Services, Inc.*[106]  Therein, movants filed motions to dismiss both the U.S. and foreign debtors' cases.  On the same day that

---

[102] Motion at pp. 18-19.

[103]  *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015) (citations and internal quotations marks omitted).

[104]  *In re AMC Invs., LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (citations omitted).

[105]  *In re Kennedy*, 504 B.R. 815, 828 (Bankr. S.D. Miss. 2014) (citations omitted).  *Crown Vill. Farm, LLC v. Arl, L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 96 (Bankr. D. Del. 2009) (holding that "abstention under section 305(a) is a power that should only be utilized under extraordinary circumstances." (citations omitted)).

[106]  *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 195 (Bankr. D. Del. 2015).

the *Northshore Mainland* debtors filed their petitions in the Delaware bankruptcy court, the debtors filed the "Originating Summons with the Supreme Court of the Commonwealth of The Bahamas" seeking recognition of the chapter 11 cases and a stay of all proceedings.[107] Shortly after the bankruptcy filing, the Bahamian Attorney General presented a petition to the Bahamian Supreme Court seeking order for the winding up of all the Bahamian debtors' business and issued an application for appointment of a provisional liquidators for the Bahamian debtors.  Furthermore, several parties and the Bahamian Attorney General objected to the Debtors' originating summons.[108]  The Bahamian Supreme Court rejected the debtors' Bahamian summons.[109]  In addition, the Bahamian Supreme Court refused to recognize the chapter 11 cases or to enforce the automatic stay in The Bahamas.[110]  Thereafter the Bahamian Court appointed joint provisional liquidators for seven of the debtors.[111]  The *Northshore Mainland* court considered the following in determining whether to abstain under Section 305:

> Courts consider the following non-exclusive factors "to gauge the overall best interests" of the debtor and creditors:
>
> (1) the economy and efficiency of administration;
>
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
>
> (3) whether federal proceedings are necessary to reach a just and equitable solution;

---

[107] *Id.* at 197.

[108] *Id.* at 198.

[109] *Id.*

[110] *Id.* at 204-05.

[111] *Id.* at 199.

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.[112]

The bankruptcy court considered the U.S. debtors separately from the foreign debtors. Although the bankruptcy court recognized the important economic interest of the Bahamian government in the U.S. debtors' assets, the court held that "[h]owever real and important as that interest is, it is no more important than the right of a company incorporated in the United States to have recourse to relief in a United States Bankruptcy Court. The Debtors' preference for restructuring under the protections of the United States Bankruptcy Code is understandable and entitled to some weight. Chapter 11 of the United States Bankruptcy Code, with all stakeholders participating, under these circumstances, would be an ideal vehicle for the restructuring of this family of related companies . . . ."[113] Ultimately, the *Northshore Mainland* court denied the 305(a) motion as to the debtor not subject to a foreign insolvency proceeding, but granted the motion with respect to the debtor subject to pending Bahamian proceedings.[114] This is a far-cry from the facts before the Court here. At bottom, the *Northshore Services* court was

---

[112] *Id.* at 203-04 (citations omitted).

[113] *Id.* at 206.

[114] *Id.* at 207.

determining whether to abstain from the U.S. debtors cases and there were pending

proceedings (that refused to recognize the chapter 11 cases and the automatic stay) in the

foreign jurisdiction.

The facts here are more akin to *In re AMC Investors, LLC*, where this Court denied

abstention because there was not a pending foreign proceeding.[115]

Here, there are no bankruptcy, insolvency, restructuring, receivership, workout or

similar formal or informal proceedings either ongoing, pending, or imminent in

Singapore involving the debtors.  To the contrary, the Singapore Court Order specifically

clarified that the REIT Trustee had authority to file a chapter 11 petition on behalf of EH-

REIT, joining EH-REIT to the already-pending chapter 11 cases of the other Debtors

(including the Parent Debtors).

As a result, the Agent has not met its substantial burden or shown extraordinary

circumstances for the Court to abstain under Section 305(a), and the motion to abstain

under Section 305 will be denied.

### 6.  Conclusion

For the foregoing reasons, the Court will deny the Motion.  As set forth above, the

Court holds that the EH-REIT is a business trust and, thus, is an eligible debtor under the

Bankruptcy Code.  In addition, the Court holds that the cases of EH-REIT and its two

Singapore affiliates were filed in good faith.  Lastly, the Court holds that the Agent has

---

[115] *In re AMC Invs., LLC*, 406 B.R. 478, 489 (Bankr. D. Del. 2009) ("While receivership is certainly an option in this case, no such action has been instituted.").

not met its substantial burden or shown extraordinary circumstances for this Court to abstain.  The Court will enter an order.