# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EHT US1, Inc., *et al.*, | ) | Case No. 21-10036 (CSS) |
| | ) | |
| Debtors. | ) | |
| ———————————————— | ) | |

## <u>OPINION</u>

COLE SCHOTZ P.C.
Seth Van Aalten
G. David Dean
Justin R. Alberto
500 Delaware Avenue
Wilmington, DE 19801
　-and-
PAUL HASTINGS LLP
Luc A. Despins
G. Alexander Bongartz
200 Park Avenue
New York, NY 10166

Attorneys for Debtors and
Debtors in Possession

COZEN O'CONNOR
Thomas M. Horan
1201 N. Market Street
Suite 1001
Wilmington, DE 19801
　-and-
BROWNSTEIN HYATT FABER
SCHRECK, LLP
Steven E. Abelman
Philip A. Gosch
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Counsel to the Evolution Hospitality,
LLC and Interstate Management
Company, LLC

Dated: March 15, 2022

Sontchi, J. _____

## INTRODUCTION

Before the Court is the (i) Debtors' Objection to Proofs of Claim Filed by Evolution Hospitality, LLC;[1] and (ii) Debtors' Objection to Proof of Claim Filed by Interstate Management Company, LLC.[2]  The Debtors assert that the Evolution Claims and the Interstate Claim (together the "Disputed Claims") are rightfully asserted against the Master Lessees, the counterparties to the Evolution and Interstate contracts, rather than being a liability of the Debtors.  In response, Evolution and Interstate assert that their claims are not based on breach of contract, rather, such Disputed Claims are claims in equity, resulting from claims of alter ego and unjust enrichment.

As set forth below, the Court holds that the Objections will be sustained on the Debtors' assertions that there is no contract between Evolution and the Debtors.  The Objections will be overruled, without prejudice, on the equitable grounds raised by Evolutions, including alter ego and unjust enrichment.  The equitable relief sought by Evolution contains questions of fact, requires an adversary proceeding, and discovery for the Court to reach a determination of those issues.

## JURISDICTION

The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended

---

[1] D.I. 1324 (the "Evolution Objection" filed by the debtors and debtors in possession, the "Debtors" objecting to the "Evolution Claims," as identified by the Debtors as Claim Nos. 658, 659, 660, 661, 662 and 663).

[2] D.I. 1325 (the "Interstate Objection" filed by the Debtors objecting to the "Interstate Claim," as identified by the Debtors as Claim No. 657; and the Interstate Objection together with the Evolution Objection, the "Objections."  Furthermore, Evolution Hospitality, LLC ("Evolution Hospitality") and Interstate Management Company, LLC ("Interstate"), shall be referred to collectively as "Evolution," unless otherwise noted herein.).

Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a) and 502 of the Bankruptcy Code, Bankruptcy Rules 3007 and 9014, and United States Bankruptcy Court for the District of Delaware Local Rule 3007-1.

## BACKGROUND

### A.  Procedural Background

On January 18, 2021 (the "Petition Date"), EHT US1, Inc. ("EHT") and each of the other Debtors, other than Eagle Hospitality Real Estate Investment Trust ("EH-REIT"), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing these chapter 11 cases (the "Chapter 11 Cases").  On January 27, 2021, EH-REIT filed a petition for voluntary relief under chapter 11 of the Bankruptcy Code.

On February 4, 2021, the Office of the United States Trustee for Region 3 (the "U.S. Trustee") appointed an official committee of unsecured creditors, pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee"). No trustee has been appointed in these chapter 11 cases.

On April 9, 2021, the Court entered an order establishing July 15, 2021, as the General Bar Date.[3]  Notice of the General Bar Date, along with the other bar dates, was provided by mail and publication in accordance with the procedures outlined in the Bar

---

[3] D.I. 560 (the "Bar Date Order").

Date Order.[4]  On September 1, 2021, the Court entered an amended order establishing a

bar date of October 6, 2021, for administrative expense claims.[5]

Evolution and Interstate filed the following claims:

| Claim No. | Debtor Lessors | Claimant | Amount |
|---|---|---|---|
| 657 | Sky Harbor Denver Tech Center, LLC | Interstate | $683,397.21 |
| 658 | Urban Commons Bayshore A, LLC | Evolution Hospitality | $652,619.41 |
| 659 | UCCONT1, LLC | Evolution Hospitality | $5,953,008.67 |
| 660 | Urban Commons Anaheim HI, LLC | Evolution Hospitality | $1,292,998.99 |
| 661 | Urban Commons Cordova A, LLC | Evolution Hospitality | $3,162,571.47 |
| 662 | UCF 1, LLC | Evolution Hospitality | $1,316,745.98 |
| 663 | Urban Commons Riverside Blvd., A, LLC | Evolution Hospitality | $508,869.92 |
| 664 | Urban Commons Queensway, LLC | Evolution Hospitality | $7,712,809.81 |

On October 7, 2021, the Debtors filed the Evolution Objection and the Interstate

Objection; both Objections are fully briefed.  This is the Court's decision thereon.

**B.  Factual Background**

> **i.  Pre-IPO Ownership of Hotels and Agreements with Evolution and Interstate**

EH-REIT and its direct and indirect subsidiaries (including Debtor and non-debtor

entities) together comprise the Eagle Hospitality Group, which was formed in May 2019

with the principal strategy of investing on a long-term basis in a diversified portfolio of

income-producing real estate properties in the United States—exclusively hotels.

As of the Petition Date, the Eagle Hospitality Group, through direct and indirect

wholly-owned subsidiaries of EH-REIT, owned eighteen full-service hotels (the

---

[4] D.I. 592 and 601.

[5] D.I. 1125.

"Hotels"). Each Hotel was owned by a separate LLC entity (collectively, the "Propcos"), of which fifteen are Debtors in the Chapter 11 Cases.

The Hotels were owned by the Propcos prior to the May 2019 formation of the Eagle Hospitality Group—the Propcos themselves, however, were under different ownership. Specifically, prior to May 2019, the Propcos, in their capacity as the Pre-IPO Propcos, were each a subsidiary of Urban Commons LLC ("Urban Commons"). In connection with their ownership and operation of the Hotels, four of the Pre-IPO Propcos (before they were owned by the Eagle Hospitality Group) each entered into (a) an Evolution[6] hotel management agreement ("HMA") regarding each of their respective Hotels, which are: (i) Embassy Suites Anaheim North; (ii) Holiday Inn Resort Orlando Suites – Waterpark; (iii) Sheraton Pasadena Hotel; and (iv) The Queen Mary Long Beach; and (b) an Interstate HMA regarding the Sheraton Denver Tech Center (the "Sheraton Denver").

The Evolution HMAs and the Interstate HMA in place prior to the May 2019 Transaction were each between Evolution/Interstate and the applicable Pre-IPO Propco and, when originally executed, did not involve, name, or refer to any Eagle Hospitality Group entity (nor could they, as the Eagle Hospitality Group did not exist at the time these agreements were executed).

---

[6] Evolution is a hotel and resort operator with experience managing the day-to-day operations of hotels. Evolution is part of the corporate family of Aimbridge Hospitality, which bills itself on its website as "the world's largest third party-operator" and "the global leader in hotel management." Aimbridge Hospitality also owns Interstate.

On or around May 24, 2019, and concurrently with the May 2019 Transaction, the Master Lessees replaced the Pre-IPO Propcos as parties to the then-existing Evolution HMAs pursuant to the Assignment Agreements.

        **ii.    May 2019 Transaction and Transfer of Ownership of Propcos and Hotels**

On or around May 24, 2019, Urban Commons sold the membership interests in, among others, the Pre-IPO Propcos that owned the Hotels, to EH-REIT (such transaction, together with all related documents, agreements, and transactions, the "May 2019 Transaction"). The purchase was funded by the issuance of ownership units in EH-REIT, which were offered to the public pursuant to a prospectus dated May 16, 2019, and through an initial public offering (the "May 2019 IPO") on the Mainboard of the Singapore Exchange Securities Trading Limited.

Pursuant to a securities purchase agreement dated as of April 25, 2019, EH-REIT used the funds raised from the May 2019 IPO to purchase the ownership interests in, among others, the Pre-IPO Propcos that owned the Hotels.

Concurrently with the Eagle Hospitality Group's purchase of the Pre-IPO Propcos and the corresponding transfer of ownership of the Hotels to the Eagle Hospitality Group, each of the "newly formed" Propcos (together, the "Master Lessors"), in their new capacity as entities within the Eagle Hospitality Group, leased the Hotel it owned to one of eighteen lessees under eighteen substantially similar master lease agreements (collectively, the "Master Leases"). Each of the eighteen lessees (together, the "Master

Lessees") is wholly-owned by EHT Asset Management, LLC, which, in turn, is a direct and wholly-owned subsidiary of Urban Commons.

The Master Leases governed the rights and obligations of the Propcos and the Master Lessees, including provisions that the Master Lessees would be entirely responsible for operating the Hotels (including the Hotels for which Evolution served as manager under the Evolution HMAs), through third-party contracts entered into by the applicable Master Lessee with hotel management companies (including Evolution), franchisors/licensors, and other vendors and servicers.

The Master Lessees were entitled to keep all profits generated from the operation of the Hotels to the extent remaining after the Master Lessees paid rent to the Propcos along with the funding or payment of operating expenses, reserve requirements, and overhead, including any fees required under the HMAs, all as set forth in the Master Leases.

Concurrently with the May 2019 Transaction, the Master Lessees entered series of assignment, transfer, and assumption agreements to assign and transfer various contracts relating to the Hotels from the Pre-IPO Propcos to the Master Lessees, including the Assignment Agreements for the Evolution HMAs and the Interstate HMA. The purpose and effect of each Assignment Agreement was to transfer and assign in full all the applicable Pre-IPO Propco's rights and obligations under the relevant Evolution and Interstate HMA to the applicable Master Lessee.  Following the assignments, these Propcos ceased to be parties to the Evolution and Interstate HMAs.

### i. Omnibus Assignment Agreements

With respect to two of the Evolution-Managed Hotels, namely the Sheraton Pasadena Hotel and the Embassy Suites Anaheim North, the applicable Propcos (as assignors) and the applicable Master Lessees (as assignees) each entered into an Omnibus Assignment and Assumption of Contracts and Other Obligations and Assets (together, the "Omnibus Assignment Agreements"), each with an effective date of May 24, 2019 (i.e., concurrent with the May 2019 Transaction and the entrance into the Master Leases). The Omnibus Assignment Agreements evidence the assignment, transfer, assumption of, and indemnification from, all rights and obligations under the contracts contemplated therein (including by extension the Evolution HMAs) in connection with the Master Lessees' entrance into the Master Leases. In particular, the Omnibus Assignment Agreements provide that:[7]

> Other than with respect to Excluded Assets and Obligations, Assignor hereby unconditionally assigns and transfers to Assignee all of Assignor's rights and obligations under (i) all contracts and other written agreements with any vendors, service providers, consultants, engineers, design professionals, governmental authorities and any other persons concerning the Property or any portion thereof (the "Contracts").[8]

The Omnibus Assignment Agreements further provide that:

> Assignee hereby assumes Assignor's rights and obligations under the Contracts and Other Obligations and Assets.[9]

---

[7] Bongartz Decl., Ex. 7, Omnibus Assignment and Assumption of Contracts and Other Obligations and Assets, dated as of May 24, 2019, by Urban Commons Cordova A, LLC, and EHT SPH, LLC (the "Sheraton Pasadena Omnibus Assignment Agreement").

[8] *Id.* at § 1.

[9] *Id.* at § 2.

The Omnibus Assignment Agreements also provide that:

> The Assignee will be responsible for payment of all moneys due under each such Contracts and Other Obligations and Assets on and after the Effective Date and will indemnify the Assignor and its nominee in respect of all Claims under or in respect of the Contracts and Other Obligations and Assets in respect of any act, matter or thing occurring on and after the Effective Date. For purposes herein, "Claim" means any claim, action, demand, proceeding or judgment however arising, whether at Law or in equity, and including: (i) under statute; (ii) in tort for negligence or otherwise, including negligent misrepresentation; or (iii) in restitution for unjust enrichment.[10]

### ii. *The Holiday Inn Resort Orlando Suites – Waterpark Assignment Agreement*

The Evolution HMA for the Holiday Inn Resort Orlando Suites – Waterpark was assigned by the applicable Pre-IPO Propco (i.e., UCCONT1, LLC) to the applicable Master Lessee (i.e., EHT HIOR, LLC) under a standalone agreement specific to the assignment of the Evolution HMA (the "Holiday Inn Orlando HMA Assignment and Assumption Agreement" and together with the Omnibus Assignment Agreements, the "Assignment Agreements").[11]  Similar to the Omnibus Assignment Agreements, the Holiday Inn Orlando HMA Assignment and Assumption Agreement explicitly provides for the transfer, conveyance, and delivery of all rights, interests, and obligations under the applicable Evolution HMA from the Pre-IPO Propco (as assignor) to the Master

---

[10] *Id.* at § 3.

[11] Bongartz Decl., Ex. 3, Assignment and Assumption Agreement dated May 24, 2019 by and between UCCONT1, LLC and EHT HIOR, LLC.

Lessee (as assignee), as well as for the retention by the (post-IPO) Propco of only those obligations that arose prior to the date of assignment:

> Effective as of the date hereof, Assignor hereby assigns, sells, transfers, conveys and delivers to Assignee, forever, all of Assignor's right, title and interest in, to and under the HMA (the "Assignment"), and Assignee hereby accepts the Assignment and assumes and agrees to pay, perform and discharge when due the obligations of "Owner" [i.e., the Pre-IPO Propco] under the HMA arising from and after the date hereof. For the avoidance of doubt, any obligations of the Assignor arising under the HMA prior to the date hereof shall continue to remain the obligations of Assignor.[12]

With respect to the Omnibus Assignment Agreements and the Holiday Inn Orlando HMA Assignment and Assumption Agreement, Evolution's express acknowledgement under the Evolution Caretaker Agreement that "no Lessor is a party to any Management Agreement" reflects the fact that, to the extent even required, Evolution had consented to the full and complete assignment of the applicable Evolution HMAs to the Master Lessees pursuant to the May 2019 Transaction.

### iii.    Interstate Assignment Agreement

The Interstate HMA for the Sheraton Denver was assigned by the Denver Propco to the Master Lessee (i.e., EHT SDTC, LLC) under the Assignment Agreement.[13] The Assignment Agreement explicitly provides for the transfer, conveyance, and delivery of all rights, interests, and obligations under the Interstate HMA from the Denver Propco

---

[12] *Id.* at § 1.

[13] Declaration of G. Alexander Bongartz in Support of Relief Requested in Debtors' Objection to Proofs of Claim Filed by Interstate Management Company, LLC (the "Bongartz Interstate Decl."), Exh. 3.

(as assignor) to the Master Lessee (as assignee), as well as for the retention by the (post-IPO) Denver Propco of only those obligations that arose prior to the date of assignment:

> Effective as of the date hereof, Assignor hereby assigns, sells, transfers, conveys and delivers to Assignee, forever, all of Assignor's right, title and interest in, to and under, the HMA (the "Assignment"), and Assignee hereby accepts the Assignment and assumes and agrees to pay, perform and discharge when due the obligations of "Owner" under the HMA arising from and after the date hereof. For the avoidance of doubt, any obligations of Assignor arising under the HMA prior to the date hereof shall continue to remain the obligation of Assignor.[14]

Additionally, Interstate's express acknowledgement under the Interstate Caretaker Agreement that "Lessor is not a party to the Management Agreement" reflects the fact that, to the extent even required, Interstate had consented to the full and complete assignment of the Interstate HMA to the Master Lessee pursuant to the May 2019 Transaction.[15]

### iii.   Operation of Hotels After May 2019 Transaction, Defaults on Master Leases and Closure of Hotels, and Entrance into Caretaker Agreements

After the consummation of the May 2019 Transaction, and as contemplated by the Master Leases, the Master Lessees, pursuant to the Evolution HMAs, operated the Hotels with Evolution serving as Hotel manager.

Beginning with the January 2020 rent, the Master Lessees failed to pay the rent due to the Eagle Hospitality Group under the Master Leases.  In addition, prior to their rent defaults, the Master Lessees had already begun to default on their payment obligations

---

[14] *Id.* at § 1.

[15] *Id.* at Exh. 4 at 1.

under various hotel management agreements, including the Evolution HMAs. These defaults eventually resulted in Evolution closing every one of the Evolution-Managed Hotels on or around May 7, 2020, and the closure of the Denver Sheraton (the Interstate-Managed Hotel) on May 26, 2020. None of the applicable Master Lessees nor their ultimate parent, Urban Commons LLC, cured these defaults, and, on May 12, 2020 (i.e., following the closure of the Evolution Managed Hotels) and May 26, 2020 (i.e., following the closure of the Sheraton Denver), Evolution and Interstate and the applicable Debtors, now under the management of Mr. Tantleff (as CRO) and FTI, entered into the Evolution Caretaker Agreement for the Evolution Managed Hotels and the Interstate Caretaker Agreement for the Sheraton Denver on an emergency basis to prevent waste and deterioration of these Managed Hotels while they were closed to the public (together, the "Caretaker Agreements").[16]  As noted, Evolution acknowledged in the Evolution Caretaker Agreement that "no Lessor [defined as the eight Propcos for the Evolution-Managed Hotels] is a party to any Management Agreement."[17]  Interstate made a similar acknowledgment in the Interstate Caretaker Agreement.[18]

In addition, the Caretaker Agreements expressly state that nothing in that agreement causes any of the Master Lessors to assume any of the Master Lessees'

---

[16]  *See* Bongartz Decl., Exh. 4 ("Evolution Caretaker Agreement") and Bongartz Interstate Decl., Exh. 4 ("Interstate Caretaker Agreement").

[17]  Bongartz Decl., Exh. 4 at 1.

[18]  Bongartz Interstate Decl., Exh. 4 at 1.

obligations or liabilities under the Evolution HMAs and the Interstate HMA. In particular, the Caretaker Agreements provide that:

> No Lessor shall be or become liable for any Lessee's obligations or liabilities under any Management Agreement solely by virtue of the execution and delivery or performance of this Agreement. The Parties acknowledge and agree that neither the execution of this Agreement nor the performance of any of the terms and/or conditions hereof (including, without limitation, the funding of Caretaker Costs or Outstanding AP by any Lessor) shall constitute an assumption by, or otherwise make, any Lessor obligated under or liable for any of Lessee's interest, obligations or liabilities under any Management Agreement or any other agreement between the applicable Lessee and Operator (and/or its affiliates), and Operator hereby waives and forever releases any claims that the execution of this Agreement or the performance of any of the terms and/or conditions hereof (including, without limitation, the funding of Caretaker Costs or Outstanding AP by any Lessor) constitutes an assumption by, or otherwise makes, any Lessor obligated under or liable for any of Lessee's interest, obligations or liabilities under any Management Agreement or any other agreement between the applicable Lessee and Operator (and/or its affiliates).[19]

Moreover, the Caretaker Agreements provide that they supersede any existing non-disturbance agreements, owner agreements, consents, or other agreements entered between Evolution and the Master Lessors that could potentially obligate the Master Lessors to assume the Evolution HMAs and the Interstate HMA upon the termination of either the Evolution HMAs or the Interstate HMA, respectively, or the Master Leases. To that end, the Caretaker Agreements provide that:

---

[19] Evolution Caretaker Agreement at § 5; Interstate Caretaker Agreement at § 5.

> [N]otwithstanding the existence of any non-disturbance agreements, owner agreements, consents to assignments or any other agreements, if any, between Operator (or any of its affiliates) and any Lessor (or any of its affiliates) and notwithstanding anything to the contrary contained therein, Operator acknowledges and agrees that in no event shall any Lessor, upon any termination of a Master Lease, a Management Agreement or this Agreement, as applicable, be obligated to either assume any Management Agreement with respect to a Hotel or otherwise enter into a new hotel management agreement with Operator (or its affiliates) with respect to any Hotel.[20]

The two provisions detailed above (which ensure that no aspect of the Caretaker Agreements would cause any Debtor to assume any of the Evolution HMAs or Interstate HMA, as applicable) are only logical and appropriate to the extent that the Master Lessors are not already parties to the Evolution HMAs or the Interstate HMA.

The Caretaker Agreements state that each Master Lessee is in default under its respective HMA and further provides that Evolution and/or Interstate reserve their rights to exercise remedies against each such Master Lessee for such defaults under the terms of the Evolution HMAs or the Interstate HMA, as the case may be.  To that end, the Caretaker Agreements provide that:

> [A]s of the Effective Date, each Lessee is in default beyond applicable cure periods under each Management Agreement, and Operator reserves the right to exercise any and all remedies against each Lessee under each such Management Agreement.[21]

---

[20] *Id.*

[21] *Id.*

### iv.    Removal of Woods and Wu and Retention of CRO

As early as September 2019, and continuing until April 2020, the Master Lessees breached most of their obligations under the Master Leases, including (among other things) by failing to pay rent and/or by defaulting under the third-party hotel management agreements (including the Evolution HMAs and the Interstate HMA) under which the Hotels were operated.

Because of the Master Lessees' failure to cure the rent and non-rent defaults that had arisen since the May 2019 Transaction, a special committee of directors of Eagle Hospitality REIT Management Pte. Ltd. (the "Former REIT Manager") was appointed pursuant to a resolution dated March 26, 2020.[22]

On April 13, 2020, the special committee retained FTI, including the appointment of Alan Tantleff as CRO to the Eagle Hospitality Group. As CRO, Mr. Tantleff (with the assistance of Paul Hastings LLP as legal counsel and FTI as restructuring advisors) began to explore the options available to the Eagle Hospitality Group, including an investigation into the activities of the Master Lessees and Urban Commons, termination of the Master Leases, and the initiation of legal actions to obtain legal control over the Hotels.

On April 24, 2020, Woods and Wu were removed as authorized signatories and officers of the Propcos. On May 20, 2020, Woods and Wu resigned as directors of the Former REIT Manager and, on December 30, 2020, the Former REIT Manager was removed as Manager of EH-REIT.

_____

[22] The Former REIT Manager is an entity owned by Woods and Wu and is not a subsidiary of EH-REIT.

### C.  Termination of the Master Leases

The Propcos (now managed by the CRO), sent the Master Lessees notices of defaults on (i) March 17, 2020, (ii) June 9, 2020, (iii) June 18, 2020, (iv) July 9, 2020, and (v) August 5, 2020. The Master Lessees failed to cure their defaults, and, on September 21, 2020, the Propcos served 10-day notices of termination with respect to each of the Master Leases.

Following the notices of termination, the Propcos initiated "unlawful detainer" actions in state courts across the nation to regain possession of the Hotels and obtain damages resulting from the Master Lessees' numerous and ongoing defaults.  After the Petition Date, the Debtors also commenced adversary proceedings seeking to regain possession of the properties for which they had not yet done so through the state court proceedings.

### D.  Disputed Claims

On July 12, 2021, Evolution Hospitality filed the six Disputed Claims covering the Evolution Managed Hotels,[23] attaching as Exhibit A to each a substantially identical "Summary of Claim and Reservation of Rights" setting out the basis for its claims and appending, as applicable, various agreements, consents, and related materials in support of the claims.[24]

---

[23] Proof of Claim No. 658 relates to both the Holiday Inn & Suites San Mateo – San Francisco SFO and the San Mateo SFO Airport Hotel.

[24] These supplements are referred to herein as the "Evolution POC Attachments," and citations to specific pages thereto shall be noted as "Evolution POC Att. at ___."

On July 12, 2021, Interstate filed its Disputed Claim with respect to the Sheraton Denver, attaching as Exhibit A its "Summary of Claim and Reservation of Rights" setting out the basis for its claim and appending various agreements, consents, and related materials in support of the claim.[25]

The Debtors object to these claims on the basis that even though none of the Propcos are parties to the Evolution HMAs or the Interstate HMA (including as a result of the assignment of these agreements to the applicable Master Lessee), and even though the respective Caretaker Agreements expressly releases the Master Lessors from any obligation to assume the Evolution HMAs or the Interstate HMA, as applicable, upon termination of any Master Lease, any Evolution HMA or Interstate HMA, or the Caretaker Agreements, Evolution and Interstate assert, without any legal or factual support, in each of its Disputed Claims that the applicable Debtor is liable for amounts allegedly due and owing by the applicable Master Lessee under the relevant HMA.

Although not mentioned in the claims themselves, Evolution responds that the Disputed Claims are **not** for breach of contract but are based on the theories of alter ego and unjust enrichment.[26] Evolution claims that the Debtors and non-debtor entities operated as a single economic enterprise, and it would be inequitable to uphold the fiction of separate legal entities.

---

[25] This supplement is referred to herein as the "Interstate POC Attachments," and citations to specific pages thereto shall be noted as "Interstate POC Att. at ___."

[26] The response was filed jointly by Evolution Hospitality and Interstate (D.I. 1449) (the "Response").

## ANALYSIS

### A.  Legal Standard

When asserting a proof of claim against an estate, a claimant must allege facts to support the claim.[27]  Where the claimant alleges sufficient facts to support its claims, the claim is afforded prima facie validity.[28]  An objecting party may overcome the prima facie validity by "refut[ing] at least one of the allegations that is essential to the claim's legal sufficiency."[29]  Once the objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of his claim by a preponderance of the evidence.[30]  "The burden of persuasion is always on the claimant."[31]

### B.  The Debtor is not Party to the Evolution or Interstate HMAs

Although these facts do not appear to be in dispute, as it is the basis of the Evolution Objection and Interstate Objection in the first instance, the Court will discuss these issues.

There is no standing to sue for breach of contract if there is not privity between the parties.[32]  Each Evolution HMA is between Evolution and the relevant Master Lessee.

---

[27] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

[28] *Id.*

[29] *Id.* at 173–74.

[30] *Id.* at 174.

[31] *Id.*

[32] The Evolution HMAs are governed by, as applicable, California, Colorado, and Florida law; and the Interstate HMS is governed by Colorado law.  The Evolution HMAs do not provide for a choice of law; however, the remaining agreements do. *See*, e.g., Evolution Caretaker Agreement at § 8; Assumption and Assignment Agreement at § 4 and Interstate HMA at § 23.6 (This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the state of Colorado without reference to its conflict of laws provisions.").  Evolution does not seem to dispute the choice of law named by the Debtors.  In any event, for breach of contract, each state's law is similar.  Under California

The same is true for Interstate, the Interstate HMA is between Interstate and the Master Lessee. No Eagle Hospitality Group entity is a party to either the Evolution HMAs or the Interstate HMA, nor did any Eagle Hospitality Group entity guarantee or subsequently assume the liabilities of the Master Lessee under any HMA or other agreement.

Furthermore, under the Evolution Caretaker Agreement, Evolution expressly waived its rights to assert any claims that the Debtors assumed, or would be obligated to assume, the Evolution HMAs. The same is true for Interstate. Under the Interstate Caretaker Agreement, Interstate expressly waived the right to assert any claims that the Denver Propco assumed, or would be obligated to assume, the Interstate HMA.

There is no contractual privity between the Debtors and Evolution with respect to the Evolution HMAs, the Disputed Claims against the Debtors with respect to the

---

law, "[i]t is elementary that a party generally has no standing to sue another for breach of contract when the parties are not in privity." *Roy v. Steinberg*, No. B232053, 2013 WL 1808676, at *3 (Cal. Ct. App. Apr. 30, 2013) (citations omitted); *see also Windham at Carmel Mountain Ranch Ass'n v. Super. Ct.*, 109 Cal. App. 4th 1162, 1173 (2003) (citations and quotation marks omitted) ("[s]omeone who is not a party to [a] contract has no standing to enforce the contract.") (internal references omitted). Likewise, in Colorado, "[g]enerally, only parties to a contract may seek to enforce its terms," meaning that "a party must have privity of contract to sue for breach of that contract." *Bewley v. Semler*, 432 P.3d 582, 586-87 (Colo. 2018); *see also Forest City Stapleton Inc. v. Rogers*, 393 P.3d 487, 490 (Colo. 2017) ("Stated simply, privity of contract requires that one must be a party to the contract to enforce a term in the contract . . . ."); *The Preserve at Brighton Homeowners Ass'n, Inc. v. Freund investments, LLC*, No. 2018 CV 31229, 2019 WL 13067019, at *5 (Colo. Dist. Ct. Nov. 01, 2019) (citations omitted) ("Privity of contract has long been a touchstone of contract causes of action and requires that 'one must be a party to the contract to enforce a term in the contract or an implied warranty arising out of the contract.'"). Similarly, under Florida law, "[u]nless a person is a party to a contract, that person may not sue—or, for that matter, be sued—for breach of that contract where the non-party has received only an incidental or consequential benefit of the contract." *Morgan Stanley DW, Inc. v. Halliday*, 873 So. 2d 400, 403 (Fla. Dist. Ct. App. 2004) (citations omitted) ("Unless a person is a party to a contract, that person may not sue—or, for that matter, be sued—for breach of that contract where the non-party has received only an incidental or consequential benefit of the contract."); *see also Leesburg Cmty. Cancer Ctr. v. Leesburg Reg'l Med. Ctr., Inc.*, 972 So.2d 203, 206 (Fla. Dist. Ct. App. 2007) (citations omitted) ("As a general rule, there is 'no privity of contract or estate between [an] original lessor and [a] sublessee,' because there is no contractual relationship between the parties."); *Greenacre Props. v. Rao*, 933 So.2d 19, 23 (Fla. Dist. Ct. App. 2006) ("As a general rule, a person who is not a party to a contract cannot sue for a breach of the contract even if the person receives some incidental benefit from the contract.").

Holiday Inn & Suites – Anaheim, the Holiday Inn & Suites San Mateo.  Likewise, Debtors are not parties to any of the Assigned HMAs. Each of the Assignment Agreements provide that all rights and obligations under the relevant Evolution HMAs arising from and after the May 2019 Transaction are assigned and transferred from the applicable Pre-IPO Propco to the applicable Master Lessee from the date of the assignment and with the assignee (here, the Master Lessee) expressly assuming such rights and obligations while simultaneously indemnifying the assignor against any claims in connection with the relevant Evolution HMA after the effective date of the assignment.  Thus, again, there is not contractual privity between the Debtors and Evolution with respect to the Evolution HMAs assigned to the Master Lessees, because upon those assignments, the Propcos cased to be parties to the Assigned HMAs.

Similarly, there is no contractual privity between any of the Debtors and Interstate with respect to the Interstate HMA because upon assignment, the Denver Propco ceased to be a party to the Interstate HMA.

### C. Caretaker Agreements Evidence Evolution's and Interstate's Acknowledgment that the Propcos are not Bound by the HMAs

Pursuant to the Evolution Caretaker Agreement and the Interstate Caretaker Agreement, "no Lessor is a party to any Management Agreement."  This evidences that Evolution and Interstate acknowledged that there is no contractual privity between the Master Lessors and Evolution under the Evolution HMAs as well as its consent to the full and complete assignment of the Evolution HMAs to the Master Lessees as part of the May 2019 Transaction.  The same is true for Interstate.

Only parties to a contract can seek to enforce its terms, thus Evolution and Interstate cannot validly assert any claims against and of the Debtors with respect to any defaults or other breaches under the HMAs.

**D. The Disputed Claims Assert Liability for Defaults Committed by the Master Lessee under the Evolution HMAs and the Intestate HMA**

Both the Evolution Disputed Claims and the Interstate Disputed Claims, state in the Summary of claims, attached as Exhibit A to each Disputed Claim, several defaults by the applicable Master Lessee (not the Debtors) under various provisions of the relevant HMA. The Disputed Claims attributes the alleged defaults under the applicable HMA to the Master Lessee:

During and prior to this period [commencing as of September 1, 2019],

> Lessee prevented Evolution from having sufficient funds to pay or reimburse itself for Operating Expenses of the Hotels owned by Debtor by consistently failing and refusing to provide Evolution with access to Hotel bank accounts and use of Hotel revenues for the payment of such Operating Expenses and otherwise failing and refusing to provide Operating Funds to the Hotels owned by Debtor for the payment of such Operating Expenses, all in violation of the express terms of the Hotel Management Agreements.[33]

Evolution Hospitality and Interstate also allege that:

> [T]he Hotel Management Agreement pursuant to which Manager provided services for the Hotel owned by Debtor make clear that all amounts claimed by Interstate were to be paid from Hotel revenues that were controlled and misapplied by Lessee in violation of the Hotel Management Agreement.[34]

---

[33] Evolution POC, at Exh. A; Interstate POC at Exh. A.

[34] *Id.*

Evolution Hospitality and Interstate also identifies certain provisions of the relevant HMAs that were breached, identifying the Master Lessee as the party owning such obligations and liabilities to Evolution and Interstate.[35]

However, as stated above, there is no contractual privity between Evolution Hospitality or Interstate and the Debtors.  Therefore, these assertions by Evolution for direct breach of contract cannot stand.

### E.  Conclusion

Based on the above, there is no contractual privity between Interstate and the Debtors or Evolution Hospitality and the Debtors, and thus, there can be no claim for breach of contract by either Interstate or Evolution Hospitality.  As such, the Objection is sustained, in part, as to this issue.

### F.  Evolution's Equitable Claims Against the EH-REIT Enterprise

Evolution asserts that the EH-REIT Enterprise operated as a single economic entity under which the Debtor Lessors constituted the alter ego of the Non-Debtor Lessees and would be inequitable for this Court to uphold a legal distinction between these entities. Evolution continues that the Debtors would be unjustly enriched if these claims were not allowed against the Debtors.

Evolution's equitable claims are questions of fact and there has been no discovery to flush out the facts needed to decide the question.  In other words, the Debtors have rebutted the valid claim presumption regarding the Disputed Claims as a matter of law,

---

[35] *Id.* (seeking the payment or reimbursement of employee expenses and benefits, insurance, management fees, operating expenses, interest, legal fees, and indemnities from the Master Lessee).

but the Court is unable to rule on this record because the equitable claims are question of fact and discovery is required.  As a result, the Court will overrule, in part, the Objections without prejudice and allow Evolution to seek relief of its equitable claims, if any, through an adversary action.

## CONCLUSION

For the reasons set forth above, the Court finds that as a matter of contract law, Evolution Hospitality and Interstate have no breach of contract claims against the Debtors.  However, the Court finds that Evolution's equitable claims against the Debtors are not ripe for adjudication without evidentiary findings of fact, which are not properly before the Court.  An order will be issued.